UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEHIGH VALLEY 1 LLC SUCCESSOR BY ASSIGNMENT TO WINDSTREAM CAPITAL LLC, SUCCESSOR BY ASSIGNMENT TO THE UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT SUCCESSOR BY ASSIGNMENT TO M&T REALTY CAPITAL CORPORATION, | ) ) ) ) ) ) ) ) | No. 5:24-cv-02627-CH<br><br>No. 5:24-cv-02709-CH |
| Plaintiff, | ) ) ) | Honorable Catherine Henry, J. |
| v. | ) ) ) | |
| WHITEHALL FIDUCIARY LLC, AS TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007, | ) ) ) | |
| Defendant. | ) ) ) | |
| LEHIGH VALLEY 1 LLC SUCCESSOR BY ASSIGNMENT TO WINDSTREAM CAPITAL LLC, SUCCESSOR BY ASSIGNMENT TO THE UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT SUCCESSOR BY ASSIGNMENT TO M&T REALTY CAPITAL CORPORATION, | ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| SAUCON TRUST U/T/A DATED OCTOBER 1, 2007, | ) ) ) | |
| Defendant. | ) ) | |
| WHITEHALL FIDUCIARY LLC, AS, TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007 | ) ) ) ) | |
| Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) | |
| -and- | ) ) ) | |
| MATTHEW E. AMMON, in his Official Capacity as Acting Secretary of the UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

## AMENDED THIRD PARTY COMPLAINT

Defendant/Third-Party Plaintiff, Whitehall Fiduciary LLC, as Trustee of Whitehall Trust U/T/A dated August 1, 2007 ("Whitehall Trust"), and Saucon Trust, U/T/A dated October 1, 2007 ("Saucon Trust") (collectively known as "Third-Party Plaintiffs") by and through their undersigned counsel, as and for their Third-Party Complaint against the Third-Party Defendants UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and ERIC SCOTT TURNER , in his Official Capacity as Secretary of the UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (collectively referred to as "HUD" or the "Department" or "Third-Party Defendants"), respectfully alleges, upon information and belief, as follows:

## INTRODUCTION

1.      This is a third-party complaint filed pursuant to Federal Rule of Civil Procedure 14 by Third-Party Plaintiffs against Third-Party Defendants who are or may be liable to Third-Party Plaintiffs for all or part of Lehigh Valley 1 LLC's ("Lehigh Valley 1") claims against Third-Party Plaintiffs as described in Lehigh Valley 1's Amended Complaints in both the Whitehall Trust and Saucon Trust actions . See Dkt. 7 (5:24-cv-02627-CH); Dkt. 9 (5:24-cv-02709-CH)

2.      This is also a petition for judicial review, seeking review of HUD's final agency action, pursuant to the Administrative Procedures Act, 5 U.S.C. Section 701, et seq. (the "APA"), as well as an action for declaratory relief, pursuant to 5 U.S.C. Section 702, and 28 U.S.C. Sections 2201 and 2202. An immediate, actual controversy exists which requires resolution by this Court.

## PARTIES

3.      Whitehall Trust is a Pennsylvania trust with its principal place of business at 1177 Sixth Street, Whitehall, Pennsylvania 18052.

4.    Saucon Trust is a Pennsylvania trust with its principal place of business at 1050 Main Street, Hellertown, Pennsylvania 18055.

5.    Third-Party Defendant, the United States Department of Housing and Urban Development, is a United States government agency, located at 451 7th Street S.W., Washington, DC 20410, and having a field office at The Strawbridge Building, 801 Market Street, 12th Floor Philadelphia, Pennsylvania 19107.

6.    Third-Party Defendant, Eric Scott Turner, is the Secretary of the United States Department of Housing and Urban Development, with an office located at 451 7th Street S.W., Washington, D.C. 20410.

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction based on 28 U.S.C. §§ 1331 and 1343(a)(3), because: (i) this case seeks judicial review of federal agency action, pursuant to the APA, 5 U.S.C. §§ 702 and 706, and (ii) this case raises violations of Third-Party Plaintiffs' federal constitutional rights under the Fifth Amendment and is brought pursuant to 28 U.S.C. §§ 2201 (for declaratory relief). This matter raises numerous federal questions.

8.    Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b).

## STATEMENT OF FACTS

i.    *History of the Properties*

a. Whitehall Property

9.    Whitehall Trust is the owner of real property located at 1177 6th Street, Whitehall, Pennsylvania 18052 (the "Whitehall Property").

10.    Whitehall Trust's relationship with HUD originated in the early 2000s. At that time, Whitehall Trust began the process of applying for a HUD-backed mortgage loan for the Property in or around January 2012. HUD agreed to insure the loan for the project, pursuant to Section

221(d)(4) of the National Housing Act, 12 U.S.C. § 1701, et seq. On January 26, 2012, Whitehall

Trust executed a Regulatory Agreement with HUD. A true and correct copy of the Regulatory

Agreement, dated January 26, 2012, is attached hereto as Exhibit A (the "Whitehall Regulatory

Agreement").

11.    The Whitehall Regulatory Agreement reflected the agency's agreement to insure

the loan that was, at that time, owned by M&T Realty Capital Corporation ("M & T"), pursuant to

the documents encumbering the Property (the "Whitehall Mortgage Loan"). See Mortgage Loan,

January 19, 2012, a true and correct copy of which is attached hereto as Exhibit B, and Deed of

Trust Note, dated January 26, 2012 (the "Whitehall Note") a true and correct copy of which is

attached hereto as Exhibit C (collectively known as the "Whitehall Loan Documents").

12.    Thereafter, Whitehall Trust set to work rehabilitating the Whitehall Property.

13.    Since then, Whitehall Trust has maintained to the building in compliance with State

and Federal regulations for nursing home programs and also to ensure that its operator/tenant (the

"Whitehall Operator Tenant") is able to maintain the excellent standard of care provided to the

most vulnerable members of its community.

14.    The Whitehall Regulatory Agreement was to remain in effect so long as the contract

of mortgage insurance continues in effect, pursuant to Section 232 of the National Housing Act.

See Whitehall Regulatory Agreement.

15.    Pursuant to the Whitehall Regulatory Agreement, in the event Whitehall Trust was

unable to make a regular payment due under the Whitehall Note, HUD could grant the

mortgagee/lender authority to withdraw sufficient funds from an existing reserve account to make

said payment. Ex. A ("In the event that the owner is unable to make a mortgage note payment on

the due date and that payment cannot be made prior to the due day of the next such installment or

when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary

based on a monetary default, or to withdraw an election already made, the Secretary is authorized

to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied

to the mortgage payment in order to prevent or cure the default.")

16.     The Whitehall Property is occupied solely by the Whitehall Operator Tenant, for

the limited purpose of the aforesaid personal care facility.

17.     Commencing in 2020, and solely due to the nationwide impact of the COVID-19

pandemic, the Whitehall Operator Tenant suffered a cash flow deficiency as a result of both the

need for it to purchase substantial personal protective equipment to protect its employees during

the health crisis and its patients being unable to pay for their stay in the facility. Additionally, the

Whitehall Operator Tenant was bound by certain governmental regulations that prohibited from

evicting patients who were unable to pay. As a result, the Whitehall Operator Tenant ceased to pay

rent to Whitehall Trust and, in turn, Whitehall Trust was unable to service its debt to M&T.

18.     During that time period, Whitehall Trust made numerous inquiries to determine its

options under the Whitehall Loan Documents, the National Housing Act, and the Whitehall

Regulatory Agreement to ensure that it met both its obligations to its patients and to HUD.

19.     Also, during this time, the President of the United States issued various Emergency

Declarations in acknowledgement of the financial crisis caused by the COVID-19 Pandemic and

designed to provide emergency support to government borrowers like Whitehall Trust, whose cash

flow deficiencies were exacerbated, in part, by regulations that were in place to protect patients.

20.     In accordance with the Emergency Declarations declaring a national emergency

due to the COVID-19 pandemic, the government passed the Coronavirus Relief, and Economic

Security Act (the "CARES Act"), which provides a mortgage payment forbearance option for all

borrowers who suffer a financial hardship due to the COVID-19 national emergency. The relief under Section 4022 of the CARES Act is available to anyone who has a federally backed mortgage **regardless of delinquency status**. See Section 9056(a)(b) of Title 15 of the United States Code.

21.    Whitehall Trust sought all options available to it under the Emergency Declarations (which, as stated, also prohibited the Whitehall Operator Tenant from evicting tenants in default of their payment obligations to Whitehall Trust), the National Housing Act and the Whitehall Regulatory Agreement. See Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55293 (Sept. 4, 2020).

22.    At the same time, HUD regulations, as well as the Whitehall Regulatory Agreement authorized HUD to take regularly monthly mortgage payments from a Whitehall Reserve Account that had been consistently maintained by Whitehall Trust, which, at times relevant hereto, held nearly a very substantial sum of funds deposited by  Whitehall Trust (the "Whitehall Reserve Account").

23.    Consistent with HUD regulations and the Whitehall Regulatory Agreement, at various times during the COVID 19 crisis, HUD did make payment toward the Whitehall Note from the Whitehall Reserve Account to avoid a default on the loan and ensure that the operations could continue on the Whitehall Property.

24.    Indeed, HUD drew three (3) payments from the Whitehall Reserve Account per the request of Whitehall Trust and consistent with its own regulations, the National Housing Act, its agreement with the Whitehall Trust. Such conduct was also consistent with various Presidential decrees intended to alleviate the financial burden of businesses like the Whitehall Trust's caused by the COVID-19 pandemic.

25.     For reasons unknown to Whitehall Trust, without any notice to Whitehall Trust, and albeit the fact that the Whitehall Mortgage was still insured by Section 232 of the National Housing Act, HUD refused to draw the regular monthly debt service due under the Whitehall Note from the Whitehall Reserve Account. Such conduct was a deviation from HUD's prior course of conduct and inconsistent with HUD's rights under the Whitehall Regulatory Agreement.

26.     After causing Whitehall Trust's default on the loan by refusing to draw funds from the Whitehall Reserve Account, despite both regulatory and contractual authority to do so, HUD acted contrary to the initiatives and actions of the United States, to the extreme prejudice and harm of Whitehall Trust, and did further act without good faith or fair dealing in response to the national crisis, by refusing to discuss, work with and otherwise achieve a resolution of the loan with Whitehall Trust, especially where the United States would have received greater benefit financially and for the benefit of housing a special needs group of Americans as is a purpose of the program for such lending. Between August 2021 and July 2023, HUD made no attempt to negotiate a workout agreement with Whitehall Trust to enable Whitehall Trust cure any default under the Whitehall Note despite the fact that Section 5.5(A)(2) of Part III of the Section 232 Handbook required HUD to negotiate a possible workout of default in good faith.

27.     Instead, inexplicably, in July 2023, HUD notified Whitehall Trust of its intention to sell the loan at an auction.

28.     Upon inquiry to M&T Realty Credit Corp to determine the status of the Whitehall Reserve Account, Whitehall Trust received an informal notice that HUD , despite its refusal to utilize the Whitehall Reserve Account to draw the monthly debt service due under the Whitehall Note, which would have prevented the payment default, had, instead, depleted the Whitehall

Reserve Account at the time of loan assignment to reduce the balance due — without allowance or application as cure or other beneficial purpose.

29.     In its notice of intent to sell the note at auction, HUD also advised Whitehall Trust that Whitehall Trust was prohibited from acquiring the loan despite Whitehall Trust's willingness to offer fair value of the loan and its willingness to offer more than the sum received by HUD in the restricted auction.

30.     There are no regulations or authority that prohibited Whitehall Trust from acquiring and/or curing the loan.

31.     Thereafter, on September 23, 2023, HUD purportedly assigned the Whitehall Loan Documents — other than the Whitehall Regulatory Agreement - to Windstream.

32.     Such actions of, by and for HUD explicitly and wrongfully excluding the Whitehall Regulatory Agreement as the Project was still insured under Section 232.

33.     To date, HUD has not provided Whitehall Trust with an Estoppel Letter, a Certificate of Balance Due, nor an accounting of the amount due on the Whitehall Note as of the date of the assignment.

34.     The loan was assigned to HUD in on or about November 16, 2022. See Assignment of Mortgage to HUD, dated November 16, 2022, a true and correct copy of which is attached hereto as Exhibit D.

35.     Prior to the time of the assignment, from M & T to HUD, Whitehall Trust's representative frequently proposed various resolutions, including a re-finance of the Whitehall Mortgage Loan, or other prepayment of same. Due to Whitehall Trust's purported default in the Whitehall Regulatory Agreement, however, HUD has refused to allow Whitehall Trust to satisfy the Whitehall Mortgage Loan and clear its ownership of the Whitehall Property.

36.     Since the time of the Assignment, and during related proceedings, HUD has suggested that it intended to foreclose the outstanding Whitehall Mortgage Loan.

37.     HUD has refused to utilize the workout process required by Section 232 of the National Housing Act, which is intended to avoid foreclosure of residential care facilities

b. Saucon Property

38.     Saucon Trust is the owner of real property located at 1050 Main Street, Hellertown, Pennsylvania 18055 (the "Saucon Property").

39.     Saucon Trust's relationship with HUD originated in the early 2000s. At that time, Whitehall Trust began the process of applying for a HUD-backed mortgage loan for the Saucon Property in or around January 2012. HUD agreed to insure the loan for the project, pursuant to Section 221(d)(4) of the National Housing Act, 12 U.S.C. § 1701, et seq. On January 26, 2012, Saucon Trust executed a Regulatory Agreement with HUD (the "Saucon Regulatory Agreement"). A true and correct copy of the Saucon Regulatory Agreement, dated December 1, 2012, is attached hereto as Exhibit I.

40.     The Saucon Regulatory Agreement reflected the agency's agreement to insure the loan that was, at that time, owned by M&T, pursuant to the documents encumbering the Saucon Property (the "Saucon Mortgage Loan"). See Saucon Mortgage Loan, December 1, 2012, a true and correct copy of which is attached hereto as Exhibit J, and Deed of Trust Note, dated December 1, 2012 (the "Saucon Note") a true and correct copy of which is attached hereto as Exhibit K (collectively known as the "Saucon Loan Documents").

41.     Thereafter, Saucon Trust set to work rehabilitating the Saucon Property.

42.     Since then, Saucon Trust has maintained to the building in compliance with State and Federal regulations for nursing home programs and also to ensure that its operator/tenant (the

"Saucon Operator Tenant") is able to maintain the excellent standard of care provided to the most vulnerable members of its community.

43.    The Saucon Regulatory Agreement was to remain in effect so long as the contract of mortgage insurance continues in effect, pursuant to Section 232 of the National Housing Act. See Saucon Regulatory Agreement.

44.    Pursuant to the Saucon Regulatory Agreement, in the event Saucon Trust was unable to make a regular payment due under the Saucon Note, HUD could grant the mortgagee/lender authority to withdraw sufficient funds from an existing reserve account to make said payment. Ex. I ("In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default.")

45.    The Saucon Property is occupied solely by the Saucon Operator Tenant, for the limited purpose of the aforesaid personal care facility.

46.    Commencing in 2020, and solely due to the nationwide impact of the COVID-19 pandemic, the Saucon Operator Tenant suffered a cash flow deficiency as a result of both the need for it to purchase substantial personal protective equipment to protect its employees during the health crisis and its patients being unable to pay for their stay in the facility. Additionally, the Saucon Operator Tenant was bound by certain governmental regulations that prohibited from evicting patients who were unable to pay. As a result, the Saucon Operator Tenant ceased to pay rent to Saucon Trust and, in turn, Saucon Trust was unable to service its debt to M&T.

47.     During that time period, Saucon Trust made numerous inquiries to determine its options under the Saucon Loan Documents, the National Housing Act, and the Saucon Regulatory Agreement to ensure that it met both its obligations to its patients and to HUD.

48.     Also, during this time, the President of the United States issued various Emergency Declarations in acknowledgement of the financial crisis caused by the COVID-19 Pandemic and designed to provide emergency support to government borrowers like Saucon Trust, whose cash flow deficiencies were exacerbated, in part, by regulations that were in place to protect patients.

49.     In accordance with the Emergency Declarations declaring a national emergency due to the COVID-19 pandemic, the government passed the CARES Act, which provides a mortgage payment forbearance option for all borrowers who suffer a financial hardship due to the COVID-19 national emergency. The relief under Section 4022 of the CARES Act is available to anyone who has a federally backed mortgage **regardless of delinquency status**. See Section 9056(a)(b) of Title 15 of the United States Code.

50.     Saucon Trust sought all options available to it under the Emergency Declarations (which, as stated, also prohibited the Saucon Operator Tenant from evicting tenants in default of their payment obligations to Saucon Trust), the National Housing Act and the Regulatory Agreement. See Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55293 (Sept. 4, 2020).

51.     At the same time, HUD regulations, as well as the Saucon Regulatory Agreement authorized HUD to take regularly monthly mortgage payments from a Reserve Account that had been consistently maintained by Saucon Trust, which, at times relevant hereto, held nearly a very substantial sum of funds deposited by Saucon Trust (the "Saucon Reserve Account").

11

52.     Consistent with HUD regulations and the Saucon Regulatory Agreement, at various times during the COVID 19 crisis, HUD did make payment toward the Saucon Note from the Saucon Reserve Account to avoid a default on the loan and ensure that the operations could continue on the Saucon Property.

53.     Indeed, HUD drew three (3) payments from the Saucon Reserve Account per the request of Saucon Trust and consistent with its own regulations, the National Housing Act, its agreement with Saucon Trust. Such conduct was also consistent with various Presidential decrees intended to alleviate the financial burden of businesses like Saucon Trust's caused by the COVID-19 pandemic.

54.     For reasons unknown to Saucon Trust, without any notice to Saucon Trust, and albeit the fact that the Saucon Mortgage was still insured by Section 232 of the National Housing Act, HUD refused to draw the regular monthly debt service due under the Saucon Note from the Saucon Reserve Account. Such conduct was a deviation from HUD's prior course of conduct and inconsistent with HUD's rights under the Saucon Regulatory Agreement.

55.     After causing Saucon Trust's default on the loan by refusing to draw funds from the Saucon Reserve Account, despite both regulatory and contractual authority to do so, HUD acted contrary to the initiatives and actions of the United States, to the extreme prejudice and harm of Saucon Trust, and did further act without good faith or fair dealing in response to the national crisis, by refusing to discuss, work with and otherwise achieve a resolution of the loan with Saucon Trust, especially where the United States would have received greater benefit financially and for the benefit of housing a special needs group of Americans as is a purpose of the program for such lending. Between August 2021 and July 2023, HUD made no attempt to negotiate a workout agreement with Saucon Trust to enable Saucon Trust cure any default under the Saucon Note

despite the fact that Section 5.5(A)(2) of Part III of the Section 232 Handbook required HUD to negotiate a possible workout of default in good faith.

56.    Instead, inexplicably, in July 2023, HUD notified Saucon Trust of its intention to sell the loan at an auction.

57.    Upon inquiry to M&T Realty Credit Corp to determine the status of the Saucon Reserve Account, Saucon Trust received an informal notice that HUD , despite its refusal to utilize the Saucon Reserve Account to draw the monthly debt service due under the Saucon Note, which would have prevented the payment default, had, instead, depleted the Saucon Reserve Account at the time of loan assignment to reduce the balance due — without allowance or application as cure or other beneficial purpose.

58.    In its notice of intent to sell the note at auction, HUD also advised Saucon Trust that Saucon Trust was prohibited from acquiring the loan despite Saucon Trust's willingness to offer fair value of the loan and its willingness to offer more than the sum received by HUD in the restricted auction.

59.    There are no regulations or authority that prohibited Saucon Trust from acquiring and/or curing the loan.

60.    Thereafter, on September 23, 2023, HUD purportedly assigned the Saucon Loan Documents — other than the Saucon Regulatory Agreement - to Windstream.

61.    Such actions of, by and for HUD explicitly and wrongfully excluding the Saucon Regulatory Agreement as the Saucon Property was still insured under Section 232.

62.    To date, HUD has not provided Saucon Trust with an Estoppel Letter, a Certificate of Balance Due, nor an accounting of the amount due on the Saucon Note as of the date of the assignment.

63.     The loan was assigned to HUD in on or about November 16, 2022. See Assignment of Mortgage to HUD, dated November 16, 2022, a true and correct copy of which is attached hereto as Exhibit L.

64.     Prior to the time of the assignment, from M & T to HUD, Saucon Trust's representative frequently proposed various resolutions, including a re-finance of the Saucon Mortgage Loan, or other prepayment of same. Due to Saucon Trust's purported default in the Saucon Regulatory Agreement, however, HUD has refused to allow Saucon Trust to satisfy the Saucon Mortgage Loan and clear its ownership of the Saucon Property.

65.     Since the time of the Assignment, and during related proceedings, HUD has suggested that it intended to foreclose the outstanding Saucon Mortgage Loan.

66.     HUD has refused to utilize the workout process required by Section 232 of the National Housing Act, which is intended to avoid foreclosure of residential care facilities

    *ii.*     *HUD's Improper Sale and Subsequent Closing of the Mortgage Loans*

67.     At this time, however, HUD has purported to sell the Whitehall Mortgage Loan and the Saucon Mortgage Loan (collectively known as the "Mortgage Loans") to a third-party purchaser, Windstream, instead of pursuing foreclosure proceedings itself.

68.     Specifically, on or about June 20, 2023 HUD issued separate correspondence to Third-Party Plaintiffs, as the respective owners of the Saucon Property and the Whitehall Property (collectively known as the "Properties"), indicating that the Mortgage Loans would be sold, along with several others, in an "upcoming loan sale," i. e. , an auction of multifamily mortgage loans, but did not specify the date upon which the sale or closing was to take place (collectively known as the "Loan Sale Letters"). A true and correct copy of the Loan Sale Letters are attached as Exhibit E.

69.    The Loan Sale Letters also stated that "[t]he details of the sale will be published in the Sale Announcement after a loan sale date is determined You will be able to view the Sale Announcement on the HUD website at Asset Loan Sales Information." See Exhibit E. Although a Sale Announcement was published in the Federal Register, it does not appear that any information on the loan sale was subsequently published on HUD's website. See https://www.hud.gov/program_offices/housing/comp/asset/mfam/mprev (last accessed Jan. 29, 2024).

70.    Although dated June 20, 2023, no individual or entity acting on behalf of Third-Party Plaintiffs had notice of the matters set forth in the Loan Sale Letters, until after the actual loan sale.

71.    As set forth in the Loan Sale Letters, Third-Party Plaintiffs, as well as any of its affiliates, were expressly prohibited from participating in the bidding process, and sale of the loan extinguished Third-Party Plaintiffs' interests in the Saucon Regulatory Agreement and the Whitehall Regulatory Agreement (collectively known as the "Regulatory Agreements"). See Ex. E (stating that, "[n]either you, nor any of your principals, affiliates, and assigns can purchase the loan or qualify to bid in the loan sale . . . . Unless your loan is subordinate to another FHA-insured mortgage loan, the Regulatory Agreement between you and HUD will no longer apply after the loan sale is closed, and you will no longer be obligated to meet its requirements.").

72.    Again, there are no regulations or authority that prohibited Third-Party Plaintiffs from acquiring and/or curing the loan.

73.    The Loan Sale Letters requested no comment on the part of Third-Party Plaintiffs, and further, provided no opportunity to participate in the process of formulating either the Saucon Loan Sale or the Whitehall Loan sale; it only requested that Third-Party Plaintiffs provide certain

documents that HUD claimed were necessary to conduct its due diligence with respect to the Properties, and indicated that the mortgagor may need to provide access to the Properties in order to conduct an appraisal.

74.    Subsequently, on July 28, 2023, HUD published notice of its intended loan sale in the Federal Register, Vol. 88, No. 144, a true and correct copy of which is attached hereto as Exhibit F. This notice contains a great deal of additional information that had not been set forth in the Loan Sale Letters, including the date of the sale, which was announced to be August 30, 2023. See Exhibit F.

75.    As indicated in the Federal Register notice, the loan sale at issue was denominated MHLS 2023-2, and described the noticed action as a sale of "one unsubsidized multifamily and nine unsubsidized healthcare mortgage loans, without Federal Housing Administration ("FHA") insurance, in a competitive, sealed bid sale on or about August 30, 2023. See Exhibit F, at p. 48905.

76.    Were it not for HUD's explicit exclusion of Third-Party Plaintiffs and any of its affiliates from the bidding process, and for its lack of notice of the matters published on the Federal Register, Third-Party Plaintiffs would have proceeded to timely submit a bid to participate in the sale of the Mortgage Loan, as the Federal Register notice indicates was required. See id.

77.    Pursuant to that exclusion, however, the requisite terms of "Bidder Eligibility" for participation in the loan sale contained various criteria which explicitly prohibited any such individuals or entities from bidding. See id.

78.    Third-Party Plaintiffs did not receive timely notice of the matters contained in the Federal Register notice.

79.    As set forth in the Federal Register notice, subsequent to the "competitive, sealed bid process" scheduled for August 30, 2023, "HUD anticipates that an award or awards will be

made on or before September 6, 2023." <u>See</u> <u>id</u>. Moreover, "[c]losing is expected to take place on September 20, 2023." See id. (emphasis added). To Third-Party Plaintiffs' knowledge, however, no subsequent notice was given before the sale and transfer of the Mortgage Loans were closed.

80.     Instead, on October 5, 2023, Windstream Capital, LLC ("<u>Windstream</u>") sent to Whitehall Trust, via certified mail and regular mail, a notice indicating that the mortgage loan has been sold, transferred and assigned by HUD to Windstream, and that all future payments should be made to Windstream. <u>See</u> correspondence dated October 5, 2023, a true and correct copy of which is attached hereto as Exhibit G.

81.     Third-Party Plaintiffs has received from Lehigh Valley 1's counsel a document believed to reflect the assignment of the Mortgage Loans, Whitehall Note, and Saucon Note from HUD to Lehigh Valley 1, LLC, dated May 15, 2024 a true and correct copy of each which are attached hereto as Exhibit H.

82.     Any and all defaults alleged by Lehigh Valley 1 were caused in whole or in part by the actions of HUD.

83.     Any and all damages suffered by Lehigh Valley 1 resulted from the failure of HUD to comply with various regulations and agreements with the Third-Party Plaintiffs.

84.     Any default alleged by Lehigh Valley 1 resulted from HUD's unreasonable behavior toward the Third-Party Plaintiffs.

85.     At all times relevant hereto, Third-Party Defendants have acted in bad faith with regard to the Loan Documents.

86.     Third-Party Plaintiffs have incurred attorneys' fees and costs in connection with the filing and prosecution of this lawsuit, and hereby requests to be made whole for same, pursuant to 42 U.S.C. § 1988, and pursuant to any other applicable source of law.

## CLAIMS FOR RELIEF

### COUNT I
**Judicial Review for HUD's Violation of 5 U.S.C. § 553,
Pursuant to 5 U.S.C. §§ 702 and 706**

87.    Third-Party Plaintiffs hereby re-alleges and incorporates by reference all paragraphs set forth above, as if fully alleged herein.

88.    HUD has violated the notice-and-comment procedures set forth in the APA, because it has not provided Third-Party Plaintiffs with adequate notice of its announced loan sale and subsequent closing of the loan sale, nor permitted the Third-Party Plaintiffs to comment or otherwise participate in the administrative rule-making process.

89.    HUD's sale of the Mortgage Loans and its subsequent closing on the loan sale are each a "substantive rule," within the meaning of the APA. See 5 U.S.C. § 551(4).

90.    In pertinent part, the APA states that:

> (b)    General notice of proposed rulemaking shall be published in the Federal Register, unless persons subject thereto are named and either personally served or have actual notice thereof in accordance with law. <u>The notice shall include — (1) A statement of the time, place and nature of public rulemaking proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved...(c)</u> After notice required by this section, the agency shall give interested persons with or without opportunity for oral presentation...

<u>See</u> 5 U.S.C. § 553 (emphasis added).

91.    Section 553 goes on to provide that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except — (1) a substantive rule which grants or recognizes an exemption or relieves a restriction; (2) interpretive rules and statements of policy; or (3) as otherwise provided by the agency for good cause <u>found and published with the rule</u>." 5 U.S.C. § 553(d) (emphasis added).

92.     HUD did not publish notice of the date or time of its intended loan sale in the Loan Sale Letters dated June 20, 2023. <u>See</u> Exhibit E. Moreover, although HUD subsequently published notice in the Federal Register, that notice did not specify the time or place that subsequent rulemaking in the form of closing on the loan sale would take place, even though its Federal Register notice indicated that "[c]losings are expected to take place on a specified date between November 29 and December 7, 2022. <u>See</u> Exhibit F.

93.     Nonetheless, HUD proceeded with an auction of the Mortgage Loans at issue here, on August 30, 2023, and apparently, an award of same "on or before September 6, 2023." See Ex. F. Subsequently, HUD's final agency action was reflected in an award of a contract to the successful third-party bidder, in HUD's discretion, and closing of the loan sale in favor of Windstream, on or about October 5, 2023. <u>See</u> Exhibit G.

94.     There was no good cause for HUD's consummating the sale of the Mortgage Loans without adequate notice to a highly interested party, *i.e.*, Third-Party Plaintiffs.

95.     Moreover, the notice published in the Federal Register (see Exhibit F) made clear that, as the former mortgagor, Third-Party Plaintiffs, and any of its affiliated entities were to be excluded from the bidding and from the sale, generally. Third-Party Plaintiffs would not have been able to bid in the sale on November 16 even if it had timely received actual notice of the sale.

96.     As such, HUD's Federal Register notice violated 5 U.S.C. § 553(d), for providing insufficient notice of the rulemaking embodied in MHLS 2023-2, and for failing to provide Third-Party Plaintiffs with the ". . .opportunity to participate in the rulemaking through submission of written data, views, or arguments." <u>See</u> 5 U.S.C. § 553(c).

97.     Under the APA, the Court may "hold unlawful and set aside [this] agency action," as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or as

"without observance of procedure required by law." See 5 U.S.C. § 706(2)(A), (2)(D). Third-Party

Plaintiff also seeks review under 5 U.S.C. § 702.

## COUNT II
### Judicial Review for HUD's Violation of 12 U.S.C. § 1701z-11
### and 12 U.S.C. § 1715z-11a, Pursuant to 5 U.S.C. §§ 702 and 706

98.     Third-Party Plaintiffs hereby re-allege and incorporate by reference all paragraphs

set forth above, as if fully alleged herein.

99.     The National Housing Act, 12 U.S.C. § 1701, et seq. (the "NHA"), states, in

relevant part that "[t]he Secretary of [HUD] shall manage or dispose of multifamily housing

projects that are owned by the Secretary or that are subject to a mortgage held by the Secretary in

a manner that. . . (1) is consistent with the National Housing Act and this section; (2) will protect

the financial interests of the Federal Government; and (3) will, in the least costly fashion among

reasonable available alternatives, address [certain goals articulated by Congress as important to

NHA policy] ." See 12 U.S.C. § 1701z-11(a) (emphasis added).

100.    The NHA further states that "[d]uring fiscal year 1997 and fiscal years thereafter,

the Secretary may manage and dispose of multi-family properties owned by the Secretary...and

multifamily mortgages held by the Secretary on such terms and conditions as the Secretary may

determine, notwithstanding any other provision of law."). See 12 U.S.C. § 1715z-11a(a).

101.    Notwithstanding these broad discretionary statements, HUD's decisions under the

NHA are reviewable in this Court, as the NHA provides standards by which to assess them. See

e.g., 12 U.S.C. § 1701z-11(a).

102.    In this case, however, HUD's announced MHLS 2023-2 ran afoul of these

standards, because the sale, and Third-Party Plaintiffs' exclusion from the bidding process, mean

that HUD disposed of the Mortgage Loans without duly considering the "financial interests of the

Federal Government," and may have effectuated a choice that is not the "least costly" among its several alternatives. See id.

103.    Due to Third-Party Plaintiffs' longstanding operation of the Properties, and its massive investment of funds into same, Third-Party Plaintiffs believe they had a more direct incentive in bidding the full amount of the outstanding loan, or as close thereto as need be, than any other third-party purchaser, who would seek to obtain the Mortgage Loans for the lowest price possible — including the purchaser Windstream who obtained an interest in the Mortgage Loans.

104.    As such, if Third-Party Plaintiffs are correct, HUD's exclusion of Third-Party Plaintiffs from the bidding process resulted in HUD receiving a lower amount in exchange for the Mortgage Loans, than it otherwise would have if Third-Party Plaintiffs were permitted to participate. Even if Third-Party Plaintiffs had not been the successful bidder, its involvement in the bidding process would undoubtedly have driven the bids of third-party participants higher, resulting in more financial recovery.

105.    By excluding Third-Party Plaintiffs and their affiliates from the bidding process, however, HUD has disregarded these considerations and virtually guaranteed that foreclosure of the Mortgage Loans will be necessary by the third-party purchaser, Windstream, the assignee, Lehigh Valley 1, and/or any subsequent assignee, resulting in a loss to the public that otherwise could have been avoided.

106.    Under the APA, the Court may "hold unlawful and set aside [this] agency action," as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or as "without observance of procedure required by law." See 5 U.S.C. § 706(2)(A), (2)(D). Third-Party Plaintiffs also seek review under 5 U.S.C. § 702.

**COUNT III**
**Judicial Review for HUD's Violation of 24 C.F.R. Part 290,**
**Pursuant to 5 U.S.C. §§ 702 and 706**

107.    Third-Party Plaintiffs hereby re-allege and incorporate by reference all paragraphs set forth above, as if fully alleged herein.

108.    Pursuant to the authority reflected in 12 U.S.C. § 1702, HUD has undertaken to promulgate additional regulations, which act to constrain its discretion in the disposition of non-performing mortgage loans.

109.    As to "unsubsidized projects," the regulations provide that "[d]elinquent mortgages may be sold without FHA mortgage insurance. However, delinquent mortgages will not be sold if: (1) HUD believes that foreclosure is unavoidable; and (2) The project securing the mortgage is occupied by very low-income tenants who are not receiving housing assistance and would be likely to pay rent in excess of 30 percent of their adjusted monthly income if HUD sold the mortgage." See 24 C.F.R. § 290.35 (emphasis added).

110.    Specialized definitions of what constitute "subsidized projects" and "unsubsidized projects" are set forth at 12 U.S.C. § 1701z-11(b)(2)-(b)(4).

111.    HUD's Federal Register notice (see Exhibit F), makes clear that the Mortgage Loans at issue pertain to an "unsubsidized" project.

112.    As the Properties encumbered by the Mortgage Loans are to be considered an "unsubsidized project," within the meaning of the NHA, HUD violated 24 C.F.R. § 290.35, for conveying the Mortgage Loans even though foreclosure of the Mortgage Loans are utterly "unavoidable," for reasons that HUD itself has brought about (causing Third-Party Plaintiffs' default in the Regulatory Agreements, resulting in the assignment to HUD, and then arbitrarily excluding it from the bidding on their respective Mortgage Loans).

113.    Under the APA, the Court may "hold unlawful and set aside [this] agency action," as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or as "without observance of procedure required by law." See 5 U.S.C. § 706(2)(A), (2)(D). Third-Party Plaintiffs also seek review under 5 U.S.C. § 702.

## COUNT IV
**Violation of Fifth Amendment Right to Procedural Due Process,**
**<u>Pursuant to 28 U.S.C. §§ 2201 and 5 U.S.C. §§ 702, 706</u>**

114.    Third-Party Plaintiffs hereby re-allege and incorporate by reference all paragraphs set forth above, as if fully set alleged herein.

115.    Third-Party Plaintiffs enjoyed a legitimate claim of entitlement to their interests in the Mortgage Loans (see Exs. B & C, J & K), as well as the Regulatory Agreements (see Exhibits A, I).

116.    Third-Party Plaintiffs also enjoy a legitimate claim of entitlement to the Properties encumbered by the Mortgage Loans, which will inevitably be extinguished in a foreclosure action by the third-party purchaser of the Mortgage Loans, Windstream, the assignee, Lehigh Valley 1, and/or any subsequent assignee, if the loan sale reflected in MHLS 2023-2 is not set aside by this Court.

117.    HUD has sold the Mortgage Loans to a third-party purchaser, without Third-Party Plaintiff's involvement in the bidding process, and without any substantive input from Third-Party Plaintiffs, or other participation in the rulemaking process. For instance, HUD held no hearing to determine that Third-Party Plaintiffs and their affiliates should be excluded from the bidding process and did not even provide adequate notice of its actions to satisfy the APA.

118.    The procedure contemplated by HUD, as set forth in its Federal Register notice (see Exhibit F), did not provide Third-Party Plaintiffs with "due process of law," within the meaning of

the Fifth Amendment to the United States Constitution, because it offered Third-Party Plaintiffs no means of ensuring its rights were protected in connection with MHLS 2023-2.

119.    Under the APA, the Court may "hold unlawful and set aside [this] agency action: as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or as "contrary to constitutional right, power, privilege, or immunity." See 5 U.S.C. § 706(2)(A), (2)(B). Third-Party Plaintiffs also seek review under 5 U.S.C. § 702, and the Court may order declaratory relief pursuant to the APA, as well as pursuant to 28 U.S.C. § 2201, for HUD's constitutional violations.

## COUNT V
### Violation of Fifth Amendment Right to Substantive Due Process, Pursuant to 28 U.S.C. §§ 2201 and 5 U.S.C. §§ 702, 706

120.    Third-Party Plaintiffs hereby re-allege and incorporate by reference all paragraphs set forth above, as if fully alleged herein.

121.    Third-Party Plaintiffs enjoyed a legitimate claim of entitlement to their interests in the Loan Documents (see Exs. B & C, J & K), as well as the Regulatory Agreements (see Exhibits A, I).

122.    Third-Party Plaintiffs also enjoy a legitimate claim of entitlement to the Properties encumbered by the Mortgage Loans, which will inevitably be extinguished in a foreclosure action by the third-party purchaser of the Mortgage Loans, Windstream, the assignee, Lehigh Valley 1, LLC, and/or any subsequent assignee, if the loan sale reflected in MHLS 2023-2 is not set aside by this Court.

123.    Through its own arbitrary conduct, HUD has directly precipitated the Third-Party Plaintiffs' default of the Mortgage Loans and of the Regulatory Agreements (Exhibit A, I), which resulted in an assignment of the Mortgage Loans to HUD. See Exhibits D, L.

124.    Now, in excluding Third-Party Plaintiffs and any of their affiliates from the bidding process, without offering any explanation for this exclusion, HUD has arbitrarily determined that Third-Party Plaintiffs be deprived of their property interest in the Mortgage Loans, and in effect, that HUD will arbitrarily be deprived of its interest in the Properties, upon a foreclosure action by the third-party purchaser, Windstream, the assignee, Lehigh Valley 1, and/or any subsequent assignee.

125.    There is no rational justification for HUD's exclusion of Third-Party Plaintiffs from the bidding process.

126.    Because the exclusion resulted in HUD violating its statutory duties and recovering less funds for the public than if Third-Party Plaintiffs had participated in the sale, inter alia, HUD's MHLS 2023-2 violated Third-Party Plaintiffs' right to substantive due process under the Fifth Amendment to the U.S. Constitution.

127.    Under the APA, the Court may "hold unlawful and set aside [this] agency action," as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or as "contrary to constitutional right, power, privilege, or immunity." See 5 U.S.C. § 706(2)(A), (2)(B). Third-Party Plaintiffs also seek review under 5 U.S.C. § 702, and the Court may order declaratory relief pursuant to the APA, as well as pursuant to 28 U.S.C. § 2201, for HUD's constitutional violations.

### COUNT VI
### Violation of Fifth Amendment Right to Equal Protection,
### Pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 702, 706

128.    Third-Party Plaintiffs hereby re-allege and incorporate by reference all paragraphs set forth above, as if fully alleged herein.

129.    Third-Party Plaintiffs enjoyed a legitimate claim of entitlement to their interest in the Mortgage Loans (see Exs. B & C, J & K), as well as the Regulatory Agreements (see Exhibits A, I).

130.    Third-Party Plaintiffs also enjoy a legitimate claim of entitlement to the Properties encumbered by the Mortgage Loans, which will inevitably be extinguished in a foreclosure action by the third-party purchaser of the Mortgage Loans, Windstream, the assignee, Lehigh Valley 1, and/or any subsequent assignee, if the loan sale reflected in MHLS 2023-2 is not set aside by this Court.

131.    Through its own arbitrary conduct, HUD has directly precipitated the Third-Party Plaintiffs' default of the Mortgage Loans and of the Regulatory Agreements (Exhibit A, I), which resulted in an assignment of the Mortgage Loans to HUD. See Exhibits D, L.

132.    Now, in excluding Third-Party Plaintiffs and any of their affiliates from the bidding process, without offering any explanation for this exclusion, HUD has arbitrarily determined that Third-Party Plaintiffs will be deprived of their property interest in the Mortgage Loans, and in effect, that HUD will arbitrarily be deprived of their interest in the Properties, upon a foreclosure action by the third-party purchaser, Windstream, the assignee, Lehigh Valley 1, and/or any subsequent assignee.

133.    There is no rational justification for HUD's intentional treatment of Third-Party Plaintiffs and their affiliates, differently from similarly situated individuals or entities, including any other entity that may have wished to submit a bid on the Mortgage Loans.

134.    Because that differential treatment in intentionally excluding Third-Party Plaintiffs has resulted in HUD violating its statutory duties and recovering less funds for the public than if Third-Party Plaintiffs participated in the sale, HUD's MHLS 2023-2 violated the Third-Party

Plaintiffs' right to equal protection of the laws, under the Fifth Amendment to the U.S. Constitution.

135.    Under the APA, the Court may "hold unlawful and set aside [this] agency action," as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or as "contrary to constitutional right, power, privilege, or immunity." See 5 U.S.C. § 706(2)(A), (2)(B). Third-Party Plaintiffs also seek review under 5 U.S.C. § 702, and the Court may order declaratory and/or injunctive relief pursuant to the APA, as well as pursuant to 28 U.S.C. §§ 2201 and 2202, for HUD's constitutional violations.

### COUNT VII
### Declaratory Relief Pursuant to
### U.S.C. § 2201 and 5 U.S.C. §§ 702 & 706

136.    Third-Party Plaintiffs hereby re-allege and incorporate by reference all paragraphs set forth above, as if fully alleged herein.

137.    Based upon the foregoing allegations, there is presently existing between the parties hereto an actual, substantial, ongoing controversy that requires the Court's intervention. This request for a declaratory judgment is not seeking an advisory opinion from the Court.

138.    28 U.S.C. § 2201 provides, in relevant part, that In a case of actual controversy within its jurisdiction...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

139.    All the parties necessary to resolve the present controversies are presently before the Court, and subject to its jurisdiction.

140.    A declaratory judgment as requested below would resolve all controversies between the parties hereto.

141.    Among the various matters comprising the parties' dispute are:

(a)     Whether HUD's sale of the Mortgage Loans violated 5 U.S.C. § 553, for providing insufficient notice and/or otherwise violating HUD's notice-and-comment obligations under the APA;

(b)     Whether HUD's sale of the Mortgage Loans violated 12 U.S.C. § 1701z-11 and/or § 1715z-11 a, for not serving the goals of the National Housing Act, or otherwise;

(c)     Whether HUD's sale of the Mortgage Loans violated 24 C.F.R. Part 290, for not satisfying the procedural and/or other regulatory requirements for the sale of Multifamily Mortgage Loans, under that Part;

(d)     Whether HUD's sale of the Mortgage Loans violated Third-Party Plaintiffs' Fifth Amendment right to procedural due process, for arbitrarily excluding it from the bidding process and thereby preventing it from avoiding injury to its interests in real property, and/or for not providing Third-Party Plaintiffs with adequate notice of the announced sale, or otherwise;

(e)     Whether HUD's sale of the Mortgage Loans violated Third-Party Plaintiffs' Fifth Amendment right to substantive due process, for handling Third-Party Plaintiffs' interests in real property in an arbitrary fashion, and otherwise depriving the Third-Party Plaintiffs of rights guaranteed by the U.S. Constitution;

(f)     Whether HUD's sale of the Mortgage Loans violated the Third Party Plaintiffs' Fifth Amendment right to equal protection, for arbitrarily excluding it from the bidding process and thereby preventing it from avoiding injury to its interests in real property, and/or for not providing Third-Party Plaintiffs with adequate notice of the announced sale, or otherwise;

(g)     Whether the remedies requested here against HUD, in the form of setting aside the sale of the Mortgage Loans and any assignments relating thereto, are also properly applied as against the third-party purchaser, Windstream, pursuant to the APA or otherwise; and

(h)     Whether the remedies requested here against HUD, in the form of setting aside the sale of the Mortgage Loans and any assignments relating thereto, are also properly applied as against the assignee currently holding the Mortgage Loans, Windstream, pursuant to the APA or otherwise.

## COUNT VIII
### Contribution

142.    Third-Party Plaintiffs hereby re-allege and incorporate by reference all paragraphs set forth above, as if fully alleged herein.

143.    In the event, Third-Party Plaintiffs are found liable to Lehigh Valley 1, which liability is denied, Third-Party Defendants are jointly and severally liable with Third-Party Plaintiffs, and/or are liable over Third-Party Plaintiffs for contribution or such equitable apportionment as the Court shall deem appropriate.

## COUNT IX
## Common Law Indemnification

144.    Third-Party Plaintiffs hereby re-allege and incorporate by reference all paragraphs set forth above, as if fully alleged herein.

145.    In the event, Third-Party Plaintiffs are found liable to Lehigh Valley 1, which liability is denied, any liability is based upon non-active, passive, and non-contributory conduct, and the wrongdoing by HUD was the primary, active, and contributory caused of Lehigh Valley 1's injuries.

146.    116.    As a result of the above, Third-Party Plaintiffs are entitled to common law indemnification.

## RELIEF REQUESTED

**WHEREFORE**, having set forth the claims for relief above, Third-Party Plaintiffs respectfully prays for relief as follows:

A.    That the Court declare that HUD's sale of the Mortgage Loans violated 5 U.S.C. § 553, for providing insufficient notice and/or otherwise violating HUD's notice-and-comment obligations under the APA;

B.    That the Court declare that HUD's sale of the Mortgage Loans violated 12 U.S.C. § 1701z-11 and/or § 1715z-11a, for not serving the goals of the National Housing Act, or otherwise;

C.   That the Court declare that HUD's sale of the Mortgage Loans violated 24 C.F.R. Part 290, for not satisfying the procedural and/or other regulatory requirements for the sale of Multifamily Mortgage Loans, under that Part;

D.   That the Court declare that HUD's sale of the Mortgage Loans violated the Third Party Plaintiffs' Fifth Amendment right to procedural due process, for arbitrarily excluding it from the bidding process and thereby preventing it from avoiding injury to its interests in real property, and/or for not providing Third-Party Plaintiffs with adequate notice of the announced sale, or otherwise;

E.   That the Court declare that HUD's sale of the Mortgage Loans violated Third-Party Plaintiffs' Fifth Amendment right to substantive due process, for handling Third-Party Plaintiffs' interests in real property in an arbitrary fashion, and otherwise depriving Third-Party Plaintiffs of rights guaranteed by the U.S. Constitution;

F.   That the Court declare that HUD's sale of the Mortgage Loans violated Third-Party Plaintiffs' Fifth Amendment right to equal protection, for arbitrarily excluding it from the bidding process and thereby preventing it from avoiding injury to its interests in real property, and/or for not providing Third-Party Plaintiffs with adequate notice of the announced sale, or otherwise;

G.   That the Court order declaratory relief: (i) vacating HUD's sale of the Mortgage Loans in MHLS 2023-2 on or around September 3, 2023, and/or setting aside the closing of the Mortgage Loans effective on December 6, 2022, as well as any subsequent assignments of the Mortgage Loans; (ii) declaring that HUD may not sell the Mortgage Loans in the future, as a violation of the National Housing Act and/or the regulatory requirements of 24 C.F.R. Part 290, or in the alternative; (iv) that HUD may not sell

the Mortgage Loans without satisfying the notice-and-comment procedures of the APA, and allowing Third-Party Plaintiffs to participate in the bidding process;

H.  Judgment in Third-Party Plaintiffs' favor and against HUD for contribution for all sums of money that may be found due together with counsel fees and costs of suit;

I.  Judgment in the Third-Party Plaintiffs' favor and against HUD for common law indemnification for all sums of money that may be found due together with counsel fees and costs of suit; and

J.  That the Court order such other relief as is deemed equitable and just.

Respectfully Submitted:

LAHOUD LAW GROUP, P.C.

BY:*/s/ Raymound G. Lahoud, Esquire*

Raymound G. Lahoud, Esquire
Atty. ID #335380
Tower 6
600 Hamilton St., Suite 300
Allentown, PA  18101
484-544-0022

**NORRIS McLAUGHLIN P.A.**

*/s/ Rebecca J. Price*
Rebecca J. Price, Esquire
515 West Hamilton Street, Suite 502
Allentown, PA 18101
P: (484) 544-0022
F: (610) 628-2481
E: rprice@norris-law.com

**NORRIS McLAUGHLIN P.A.**

/s/ Benjamin Sheppard
Benjamin P. Sheppard, Esquire
515 West Hamilton Street, Suite 502
Allentown, PA 18101
P: (484) 765-2214
F:      (610) 391-1805
E: bsheppard@norris-law.com

*Attorneys for Third-Party Plaintiffs*

Dated: 03/19/25

# Exhibit A

## Regulatory Agreement

2

**Return to:**
Andrea K. Durham, Esq.
Attorney Advisor
U.S. Department of Housing and Urban Development
The Wanamaker Building
100 Penn Square East
Philadelphia, PA 19107-3380

RECORDED
01/26/2012 8:52:22 AM
RECORDER OF DEEDS
LEHIGH COUNTY
PENNSYLVANIA
Inst Num:      201200276C

**PIN: 5498 9378 8632-1**

## Regulatory Agreement for Multifamily Housing Projects

**U.S. Department of Housing And Urban Development**
Office of Housing
Federal Housing Commissioner

| Under Sections 207, 220, 221(d)(4), 231 and 232, Except Nonprofits | | | |
|---|---|---|---|
| Project Number | | Mortgagee | |
| **034-22084** | | **M&T Realty Capital Corporation** | |
| Amount of Mortgage Note | | Date | |
| **$15,788,700.00** | | as of January _26_, 2012 | |
| Mortgage Recorded State **Pennsylvania** | County **Lehigh** | Date | Originally endorsed for insurance under Section |
| Book | Page | Contemporaneously herewith | **232**, pursuant to Sections 223(f) and 223(a)(7) |

This Agreement, together with the LEAN Rider to Regulatory Agreement for Multifamily Housing Projects attached hereto and made a part hereof (the "Rider"), entered into ~~this~~ as of the _19th_ day of **January**, 2012, to be effective as of **January** _26_ 2012, between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITHALL TRUST** u/t/a dated **August 1, 2007, a Pennsylvania trust whose address is 1177 Sixth Street, Whitehall, Pennsylvania 18052**

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors (hereinafter referred to as Secretary).

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the

mortgage insured or held by the Secretary of an amount equal to **$8,075.00** per month, unless a different date or amount is approved in writing by the Secretary. See **Rider Paragraph A.**

Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default. In addition, in the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or

13

LEAN Rider
to Regulatory Agreement for
Multifamily Housing Projects

This Rider is attached to and made a part of that certain Regulatory Agreement for Multifamily Housing Projects dated **as of January** /9 , 2012, **to be effective as of January** 2/6 , 2012 (the "Agreement") by and between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITHALL TRUST u/t/a dated August 1, 2007** ("Owners") and the Secretary of Housing and Urban Development (the "Secretary") with respect to **Whitehall Manor Senior Living**, FHA Project No. **034-22084**. In the event of any conflict between any provision of this Rider and any other provision of the Agreement, the provision of this Rider shall be controlling. The Agreement is hereby amended and supplemented as follows:

A.     Reserve Fund for Replacements. The following is hereby added to the end of the first subparagraph of paragraph 2(a) of the Agreement:

The amount of the monthly deposits to the reserve fund for replacements shall be subject to change in accordance with the requirements of the Secretary, but such change can be accomplished by a letter from HUD to the Owner and will not necessitate an amendment to the Agreement. In connection therewith, every ten (10) years, the mortgagee shall obtain a physical and capital needs assessment report for the Secretary to evaluate, **the first such report to be obtained on or before October 1, 2018.** The cost of such report may be paid from the reserve fund for replacements.

In addition to the required monthly deposits to the said reserve fund, the balance in the replacement reserve fund existing with respect to the project under FHA Project No. **034-22020** shall be transferred to the replacement reserve fund to be established pursuant to this Agreement under FHA Project No. **034-22084.**

B.     Certain Matters Requiring Approval of the Secretary.

(1)     Paragraph 6(c) of the Agreement is hereby amended to read as follows:

(c) Convey, assign, or transfer any right to manage or receive the rents and profits from the mortgaged property.

(2)     The following is hereby added to the end of paragraph 6 of the Agreement:

(i)     Permit any conveyance, assignment, or transfer of any direct or indirect legal or beneficial interest in the Owners that requires approval of the Secretary under (i) the Secretary's transfer of physical assets requirements and procedures or (ii) the Secretary's previous participation approval requirements and procedures.

(j)     Enter into, or agree to the assignment of, any operating or commercial lease for all or part of the mortgaged property. As a condition of the Secretary's approval of any operating lease or any assignment thereof, the lessee or assignee, as applicable, shall execute a regulatory agreement in form and substance satisfactory to the Secretary.

(k)     Enter into any amendment of any operating or commercial lease of all or any part of the mortgaged property that (i) reduces the rent or other payments due thereunder, (ii) increases the obligations of the Owners or the rights of the lessee, (iii) decreases the rights of the Owners or the obligations of the lessee, or (iv)

R-1

alters any provision of such lease required by the Secretary to be included therein.

    (l)    Use the mortgaged property for any purpose other than the Approved Use.

C.    Management Contracts. Paragraph 9(a) of the Agreement is hereby deleted in its entirety and the following is substituted in lieu thereof:

    (a)    Any management contract involving the project entered into by any of the Owners or any lessee shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate such management contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project. In addition to the foregoing, in the event that a management agent is (or will be) the holder of the project's license or is (or will be) the payee under one or more third-party payor agreements with respect to the project, the provisions of paragraphs 6(j) and 6(k) of this Agreement shall be applicable to such management agreement as and to the same extent as if such management agreement were an operating lease.

D.    Financial Statements. Paragraph 9(e) of the Agreement is hereby amended to replace "sixty (60) days" with "ninety (90) days."

E.    Confidentiality of Resident/Patient Medical Records and Information. Paragraph 9(c) of the Agreement is hereby amended to add the following at its end:

    (c)    . . . The obligations of Owners under this paragraph shall be limited to the extent necessary in order for Owners to comply with applicable laws regarding the confidentiality of resident/patient medical records and information.

F.    Permits and Approvals. Paragraph 9(h) of the Agreement is hereby deleted in its entirety and the following is substituted in lieu therefor:

    (h)(1)    The Owners shall at all times maintain in full force and effect, or cause the lessee or management agent (as applicable) to maintain in full force and effect, all certificates of need, bed authority, provider agreements, licenses, permits and approvals required to operate the project for the Approved Use (collectively, the "Permits and Approvals"). Without the prior written consent of the Secretary, none of the Permits or Approvals shall be conveyed, assigned, encumbered, transferred or alienated from the project. The Owners shall ensure that the project is at all times operated in accordance with the requirements of the Permits and Approvals.

    (2)    The security agreement and UCC financing statements referred to in paragraph 9(i) below shall constitute, to the extent permitted by law, a first lien upon all of the Owners' rights, titles and interest, if any, in the Permits and Approvals. However, in the event of either a monetary or other default under this agreement, the note, or the mortgage, the Owners shall cooperate in any legal and lawful manner necessary or required to permit the continued operation of the project for the Approved Use. For the intents and purposes herein, Owners hereby irrevocably nominate and appoint the Secretary, his/her successors and assigns, as their attorney-in-fact coupled with an interest to do all things necessary to continue to operate the project for the Approved Use including but not limited to the power and authority to provide any and all information and data, pay such fees as may be

required, and execute and sign in the name of the Owners, their successors or assigns, any and all documents, to the extent that such information, data, fees and documents may be required by any governmental entity exercising jurisdiction over the project.

(3)     The Owners shall not alter, or suffer or permit the alteration of, any Permit or Approval, without the prior written approval of the Secretary. In the event that any such alteration is proposed, upon learning of such proposed alteration, the Owners will advise the Secretary and mortgagee promptly. The Owners will insert the foregoing requirements into any operating lease for the project.

(4)     The Owners shall deliver to the Secretary and the mortgagee, within ten (10) days after receipt thereof, copies of any and all notices, reports, surveys and other correspondence (regardless of form) received by the Owners from any governmental authority that includes any statement, finding or assertion that (i) the Owners, any lessee, any management agent or the project is or may be in violation of (or default under) any of the Permits or Approvals or any governmental requirements applicable thereto, (ii) any of the Permits or Approvals are to be terminated or not renewed or (iii) the Owners are, or any lessee, any management agent or the project is, subject to any governmental investigation or inquiry involving fraud. The Owners shall deliver to the Secretary and the mortgagee, simultaneously with delivery thereof to any governmental authority, any and all responses given by or on behalf of the Owners to such governmental authority and shall provide to the Secretary and the mortgagee, promptly upon request, such information regarding any of the foregoing as the Secretary or the mortgagee may request. The receipt by the Secretary or the mortgagee of notices, reports, surveys, correspondence and other information shall not in any way impose any obligation or liability on the Secretary, the mortgagee or their respective agents, representatives or designees to take (or refrain from taking) any action, and the Secretary, the mortgagee and their respective agents, representatives and designees shall have no liability for any action or failure to act thereon or as a result thereof.

G.     <u>Personal Property; Security Interests</u>.  The following is hereby added to the Agreement as paragraph 9(i):

(i)     The Owners shall suitably equip, or cause to be equipped, the project for its use and operation for the Approved Use. Except as otherwise approved in writing by the Secretary, the Owners shall grant to the mortgagee and the Secretary a first lien security interest in all personal property of the Owners as additional security for the obligations of the Owners under the note, mortgage and this agreement. Such security interest shall be evidenced by such security agreements as the mortgagee and/or the Secretary may require and, in connection therewith, the Owners shall execute and deliver such deposit account control agreements as may be required by the mortgagee and/or the Secretary. Owners hereby authorize each of the mortgagee and the Secretary to file such UCC financing statements and continuation statements as either of them may deem to be necessary or appropriate in connection with the foregoing security interest. The Owners shall not be permitted to grant any other liens on any of such personal property without the prior written approval of the mortgagee and the Secretary. If the project includes a skilled nursing home and is not subject to an operating lease, the Owners shall be permitted to pledge their accounts receivable to an accounts receivable lender in a manner approved by the mortgagee and the Secretary. In the event that the mortgagee and the Secretary grant such approval, (i) the holder(s) of such lien shall enter into an intercreditor agreement and a rider thereto with the mortgagee or the Secretary, or both, on such terms and conditions as may be required by the mortgagee and the Secretary and (ii) the

Owners shall comply with any requirements imposed on them by the mortgagee or the Secretary (or either of them) in connection therewith.

H.      Professional Liability Insurance.  The following is hereby added to the Agreement as paragraph 9(j):

     (j)     The Owners shall maintain, or cause the lessee or management agent (as applicable) to maintain, professional liability insurance that complies with the applicable requirements of the Secretary.  Annually, the Owners shall provide, or cause the lessee or management agent (as applicable) to provide, to the Secretary and mortgagee, a certification of compliance with the Secretary's professional liability insurance requirements as evidenced by an Accord or certified copy of the insurance policy.

I.      Notices.  Notices sent pursuant to Paragraph 11 of the Agreement may be sent by registered or certified mail, hand delivery or by a nationally recognized overnight delivery service.

J.      Defined Terms.  The following definitions are hereby added to paragraph 13 of the Agreement:

     (l)     "rent," "profits" and "income" shall include: all healthcare insurance receivables, rents, lease payments, revenues, charges, fees and assistance payments arising from the operation of the project, including but not limited to workers' compensation, social security and other third-party reimbursement payments, Accounts Receivable (as defined in the Collateral Description for the Security Agreement and UCC-1 Financing Statement for the Mortgagor) and all payments and income arising from the operation of the project and/or the provision of services to residents or tenants thereof.

     (m)     "Approved Use" means the use of the project as a **215-bed assisted living facility** and such other uses as may be approved in writing from time to time by the Secretary based upon a request made by the Owners, lessee or management agent, but excluding any uses that are discontinued with the written approval of the Secretary.

**[To be executed and notarized by the Owners in the same manner as the Regulatory Agreement]**

[SIGNATURE PAGE TO LEAN RIDER TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]

IN WITNESS WHEREOF, the undersigned has executed this Rider as of the date first set forth above.

<div align="right">

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
    Abraham R. Atiyeh, Manager

</div>

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF LEHIGH

On this the 11th day of January, 2012, before me, the undersigned officer, personally appeared Abraham R. Atiyeh, who acknowledged himself to be a manager of the said Whitehall Fiduciary, LLC, the sole Trustee of Whitehall Trust, and that he as such manager, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the limited liability company by himself as such manager.

_____
Notary Public

**Commonwealth of Pennsylvania**
NOTARIAL SEAL
MARIANNE L. RICE, Notary Public
City of Allentown, Lehigh County
My Commission Expires Aug. 20, 2015

R-5

authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary.

.3. Real property covered by the mortgage and this agreement is described in ~~Schedule~~ Exhibit A attached hereto.

(This paragraph 4 is not applicable to cases insured under Section 232.)

4. (a) Owners shall make dwelling accommodation and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary, for any project subject to regulation of rent by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

(b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owners or others to such tenant upon his request, in addition to the facilities and services included in the approved rental schedule. Approval of charges for facilities and services is not required for any project not subject to regulation of rent by the Secretary.

(c) For any project subject to regulation of rent by the Secretary, the Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which Owners have no effective control or;

(ii) Deny the increase stating the reasons therefor.

5. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Sections 231 or 232 and is not designed primarily for occupancy by elderly persons, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any remaining unrented units may be rented to non-preferred applicants;

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over nonpreferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Through such further provisions agreed to in writing by the parties.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

6. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer ,or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) ~~Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property~~
See Rider Paragraph B.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

## Exhibit A

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO.  5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

12/20/2011 12696899

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except. for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

**See Rider Paragraph B.**

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of

sale, and fail to have such adverse actions set aside within forty-five (45) days.

9. (a) ~~Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project~~ **See Rider Paragraph C.**

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents. **See Rider Paragraph E.**

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary. **See Rider Paragraph D.**

(f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a financial institution, whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall

immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) ~~If the mortgage is insured under Section 232:~~

    ~~(1) The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.~~

    ~~(2) The Owners shall suitably equip the project for nursing home operations.~~

    ~~(3) The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.~~

    (i) ~~If the mortgage is insured under Section 231, Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.~~

**See Rider Paragraphs F, G and H.**

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts 100, 107 and 110, and Subparts I and M of Part 200).

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement

effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

    (ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage.

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

**See Rider Paragraph I.**

12. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

(d) "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project; and

(ii) All tenant security deposits held.

(g) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(h) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(i) "Section" refers to a Section of the National Housing Act, as amended.

(j) "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

(k) "Elderly person" means any person, married or single, who is sixty-two years of age or over.

**See Rider Paragraph J.**

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provisions of this Agreement shall not affect the validity or of the remaining portions thereof.

17. The following Owners: **Whitehall Trust, its trustees and beneficiaries, present and future**

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

**(To be executed with formalities for recording a deed to real estate.)**

[COUNTERPART SIGNATURE PAGE TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first set forth above.

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
    Abraham R. Atiyeh, Manager

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF LEHIGH

On this the 19th day of January, 2012, before me, the undersigned officer, personally appeared Abraham R. Atiyeh, who acknowledged himself to be a manager of the said Whitehall Fiduciary, LLC, the sole Trustee of Whitehall Trust, and that he as such manager, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the limited liability company by himself as such manager.

_____
Notary Public

Commonwealth of Pennsylvania

NOTARIAL SEAL
MARIANNE L. RICE, Notary Public
City of Allentown, Lehigh County
My Commission Expires Aug. 20, 2015

[COUNTERPART SIGNATURE PAGE TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first set forth above.

**Secretary of Housing and Urban Development**, acting by and
through the **Federal Housing Commissioner**

By: _____

Roger A. Lewis
Authorized Agent
Office of Residential Care Facilities

### ACKNOWLEDGEMENT

STATE OF WASHINGTON    )
                       ) ss:
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that <u>Roger A. Lewis</u> is the person who appeared before me, on
this ___23___ day of <u>January, 2012</u> and said person acknowledged that he signed this instrument, on oath
stated that he was authorized to execute the instrument and acknowledged it as the Authorized Agent of the
Secretary of U.S. Department of Housing and Urban Development, acting by and through the Federal Housing
Commissioner, and the Acting Director of the Production Division in the Office of Residential Care Facilities,
U.S. Department of Housing and Urban Development, and that he, being authorized to do so by virtue of such
office, executed the foregoing instrument on behalf of the Federal Housing Commissioner, acting for the
Secretary of the U.S. Department of Housing and Urban Development, to be the free and voluntary act of such
party for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal.

[SEAL]

_____
Notary Public

(Print Name) _____

Residing at _____

_____
Title (and rank)

My commission expires: ___04-19-15___

### ANDREA E. NAUGLE
### LEHIGH COUNTY CLERK OF JUDICIAL RECORDS



**Recorder of Deeds Division**
**Deborah A. Casciotti, Chief Deputy**
**Lehigh County Courthouse**
**455 W. Hamilton Street - Room 122**
**Allentown, PA  18101-1614**
**(610) 782-3162**

\*RETURN DOCUMENT TO:
WIENER AND WIENER
512 HAMILTON STREET
ALLENTOWN, PA 18101

**Instrument Number - 2012002760**
Recorded On 1/26/2012 At 8:52:22 AM
\* Instrument Type - AGREEMENT
Invoice Number - 114086        User ID: LSA        \***Total Pages** - 14
\* Grantor -  WHITEHALL FIDUCIARY LLC
\* Grantee - SECRETARY OF HOUSING & URBAN DEVELOPMENT
\* Customer - WIENER AND WIENER

\* FEES
```
STATE WRIT TAX              $0.50
RECORDING FEES            $31.00
COUNTY ARCHIVES FEE       $2.00
ROD ARCHIVES FEE          $3.00
UPI CERTIFICATION FEES   $10.00
TOTAL PAID               $46.50
```

I hereby CERTIFY that this document is
Recorded in the Recorder of Deeds Office
of Lehigh County, Pennsylvania



*andrea E Naugle*

Andrea E. Naugle
Clerk of Judicial Records
Recorder of Deeds Division

**LCGIS Registry UPI Certification**
**On January 26, 2012 By SB**

## THIS IS A CERTIFICATION PAGE

# Do Not Detach

## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

INSTRUMENT NUMBER -  **2012002760**


002XU8

# Exhibit B

# Mortgage

Return to:
Kelly Kremer
Vorys, Sater, Seymour and Pease LLP
Atrium Two, Suite 2000
221 East Fourth Street
Cincinnati, Ohio 45202

RECORDED
01/26/2012 8:52:21 AM
RECORDER OF DEEDS
LEHIGH COUNTY
PENNSYLVANIA
Inst Num:     2012002755

PIN: 5498 9378 8632-1

FHA Form No. 4171-b
   (CORPORATE)
Rev. March 1971

---

### PA OPEN-END MORTGAGE

This mortgage is an "Open-End" Mortgage that secures future advances.

42 Pa.C.S.Ann. § 8143

---

# OPEN-END MORTGAGE

THIS MORTGAGE made as of the _19th_ day of **January**, 19 **2012**, to be effective as of January _26_, 2012, between **WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007, a Pennsylvania trust**, the Mortgagor, having its principal place of business at 1177 Sixth Street, Whitehall, Pennsylvania 18052 and **M&T REALTY CAPITAL CORPORATION**, a corporation organized and existing under the laws of **Maryland** and having its principal place of business at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201, the Mortgagee.

In order to secure the payment of an indebtedness in the principal sum of **Fifteen Million Seven Hundred Eighty-Eight Thousand Seven Hundred and No/100** Dollars (**$15,788,700.00**) lawful money of the United States, which sum or so much thereof as may be advanced with interest thereon at **three and thirty-eight hundredths** percent (**3.38**%) per annum, is payable in accordance with the terms of a certain note bearing even date herewith as follows:

Interest only payable on the first day of February, 2012. Commencing on the first day of March, 2012, monthly installments of interest and principal shall be paid in the sum of Sixty-Nine Thousand Eight Hundred Forty-Four and 95/100 Dollars ($69,844.95) each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full. In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest, shall be due and payable on February 1, 2042. The installments of interest and principal shall be applied first to interest at the rate of three and thirty-eight hundredths per centum (3.38%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.

which note provides: (1) that privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days prior written notice to the holder; (2) that if the debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment thereof hereby agree to

1

be jointly and severally bound to pay to the holder hereof any adjusted premium charge required by the applicable Regulations; ~~(3) that notwithstanding any provision for a prepayment charge or premium, prepayments of principal made as aforesaid, which do not exceed an aggregate of fifteen per centum (15%) of the original principal sum of the note in any one calendar year, may be made without any prepayment charge or premium; and (4) that no default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal made pursuant to the privilege of prepayment equals or exceeds the amount of such required installment of principal;~~ and (2) that in the event any installment or part of any installment due under the Note becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder of the Note, in addition to other sums due, a late charge in an amount equal to two percent (2%) of the amount of principal and/or interest so delinquent, as further provided in the Note.

And also to secure payment by the Mortgagor to the Mortgagee of all sums expended or advanced by the Mortgagee pursuant to any term or provision of this mortgage;

And also to secure performance of each covenant, term, condition and agreement of the Mortgagor herein contained and in a certain ~~Building Loan Agreement and~~ Regulatory Agreement hereinafter referred to;

The Mortgagor for valuable consideration, the receipt of which is hereby acknowledged, hath granted, bargained, sold, aliened, enfeoffed, released and confirmed, and by these presents doth grant, bargain, sell, alien, enfeoff, release and confirm unto the said Mortgagee, all the following-described real estate situate in the **Township** of **Whitehall**, County of **Lehigh**, and Commonwealth of Pennsylvania; to wit:

**See Exhibit A, attached hereto and incorporated herein by reference.**

TOGETHER with all and singular the buildings and improvements on said premises, as well as all alterations, additions, or improvements now or hereafter made to said premises, and any and all appliances, machinery, furniture, and equipment (whether fixtures or not) of any nature whatsoever now or hereafter installed in or upon said premises, streets, alleys, passages, ways, waters, water courses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereunto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues and profits thereof; and

TOGETHER with all building materials and equipment now or hereafter delivered to said premises and intended to be installed therein; and

TOGETHER with all fixtures and articles of personal property now or hereafter attached to or in and about the building or buildings now erected or hereafter to be erected on the lands herein described which are necessary to the complete and comfortable use and occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods, chattels, and personal property as are ever used or furnished in operating a building, or the activities conducted therein, similar to the one herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner.

And the said Mortgagor, for itself, its successors and assigns does hereby covenant, promise, and agree with said Mortgagee, its successors and assigns, that all furnaces, heaters, ranges, mantels, cabinets, gas and electric light fixtures, elevators, laundry equipment, refrigerator, air-conditioning equipment, including all operating equipment, Murphy beds and all apparatus, appliances, and fixtures for the creation and distribution of light, heat, power, and water, including all pipes, wires, faucets, bathroom and

kitchen fixtures of whatever kind and nature at present contained or hereafter placed in the building or hereafter standing upon the mortgaged premises and all structures, gas and oil tanks, screens, shades, awnings and Venetian blinds, storm doors and windows and equipment erected or placed in or upon the mortgaged premises are to be considered as annexed to and forming part of the freehold.

TO HAVE AND TO HOLD the said lot or piece of ground described, with the buildings and improvements thereon erected, the hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances unto the said Mortgagee, its successors or assigns, to and for the only proper use and behoof of the said Mortgagee, its successors or assign forever;

Provided however that if said Mortgagor does and shall well and truly pay or cause to be paid unto the said Mortgagee, the aforesaid debt or principal sum secured by this mortgage, on the day and time and in the manner hereinbefore mentioned and appointed for payment of the same, together with interest and all sums advanced for payment of any ground rents, taxes, water rents, charges, claims or insurance premiums and any other advance hereunder as aforesaid, without any fraud or further delay and without any deduction, defalcation or abatement to be made of anything, for or in respect of any ground rents, taxes or water rents or charges or claims or advances whatsoever, then this mortgage and the estate hereby granted, shall cease and become void.

The Mortgagor covenants with the Mortgagee as follows:

1.     That the Mortgagor will deposit with the Mortgagee concurrently with payments of interest or of interest and principal, on the first day of each month after the date hereof until the said note is fully paid, the following sums:

(a)     An amount sufficient to provide the holder hereof with funds to pay the next mortgage insurance premium if this mortgage and the note secured hereby are insured, or a monthly service charge, if they are held by the Secretary of Housing and Urban Development, as follows:

(i)     if and so long as said note of even date and this mortgage are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the holder one month prior to its due date the annual mortgage insurance premium, in order to provide such holder with funds to pay such premium to the Secretary of Housing and Urban Development pursuant to the National Housing Act, as amended, and applicable Regulations thereunder, or

(ii)     Beginning with the first day of the month following an assignment of this mortgage and the note secured hereby to the Secretary of Housing and Urban Development, a monthly service charge which shall be an amount equal to one-twelfth of one-half per centum of the average outstanding principal balance due on the note computed for each successive year, beginning with the first of the month following such assignment, without taking into account delinquencies or prepayments.

(b)     A sum equal to the ground rents, if any, next due, plus the premium that will next become due and payable on policies of fire and other ~~hazard~~ insurance covering the mortgaged property, plus water rents, taxes and assessments next due on the mortgaged property (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rents, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, water rents, taxes, and special assessments.

(c)     All monthly installments of interest or of principal and interest and all payments mentioned in paragraphs (a) and (b) above shall be added together, and the aggregate amount thereof shall

3

be paid by the Mortgagor each month in a single payment to be applied by the Mortgagee to the following items in the order set forth:

(i)     Premium charges under the contract of insurance with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner or service charge;

(ii)    Ground rents, taxes, water rents, assessments, fire and other ~~hazard~~ insurance premiums;

(iii)   Interest on the debt secured hereby; and

(iv)    Amortization of the principal of the debt secured hereby.

Provided that any excess funds accumulated under paragraph (b) above remaining after payment of the items therein mentioned shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefor, the Mortgagor shall without demand forthwith make good the deficiency. Failure to do so before the due date of such item shall be a default hereunder. In case of termination of the contract of mortgage insurance by prepayment of the mortgage in full, or otherwise (except as hereinafter provided), accumulations under paragraph (a) above not required to meet payments due under the contract of mortgage insurance, shall be credited to the Mortgagor. If the property is sold under foreclosure or is otherwise acquired by the Mortgagee after default, any remaining balance of the accumulations under paragraph (b) above shall be credited to the principal of the debt as of the date of commencement of foreclosure proceedings or as of the date the property is otherwise acquired; and accumulations under paragraph (a) above shall be similarly applied unless required to pay sums due to the Secretary of Housing and Urban Development, acting by and through the Commissioner under the contract of mortgage insurance.

2.     That the Mortgagor will keep the improvements now existing or hereafter erected on the mortgaged property insured against loss by fire and such other hazards, casualties, and contingencies, as may be stipulated by the Secretary of Housing and Urban Development, acting by and through the Commissioner upon the insurance of the mortgage and other hazards **and liabilities** as may be required from time to time by the Mortgagee, and all such insurance shall be carried in such companies and be for such periods as may be required by the Mortgagee, and be in an amount which will comply with the coinsurance clause applicable to the location and character of the property but not less than eighty per centum (80%) of the actual cash value of the insurable improvements and equipment of the property and will pay when due any insurance premiums not provided for by monthly payments hereunder and in default thereof the Mortgagee may effect such insurance. Such policies shall be in standard form and endorsed with standard mortgagee clause with loss payable to the Mortgagee ~~and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner as interest may appear,~~ and shall be deposited with the Mortgagee; **the insurance carrier shall be selected by the Mortgagor, subject to approval by the Mortgagee, which shall not be unreasonably withheld**. If the premises covered hereby, or any part thereof, shall be destroyed or damaged by fire or other hazard against which insurance is held as hereinabove provided, the amounts paid by any insurance company or companies by reason of such damage, in pursuance of the contract or contracts of such fire or other hazard insurance, to the extent of the indebtedness secured hereby remaining unpaid, shall be paid to the Mortgagee, and, at its option, may be applied to the debt or released for the repairing or rebuilding of the premises.

3.     That the Mortgagor will keep said premises in as good order and condition as they now are, and will not commit or permit any waste of said premises, reasonable wear and tear excepted. If the Mortgagor shall refuse or neglect to make or cause to be made all necessary repairs to the mortgaged property, then at the option of the Mortgagee, such repairs may be made at the expense of the Mortgagee,

and the cost thereof, with interest at the rate provided in the note secured hereby shall be added to and made a part of the principal debt secured hereby and shall be payable on demand.

4.    The Mortgagee shall have the right to advance and pay any ground rents, taxes, assessments, water rents, and all other charges and claims which are provided to be made by the Mortgagor in paragraphs 1(a) and (b) above, and to advance and pay any sums of money that in its or their judgment may be necessary to perfect or preserve the title of the premises covered hereby. Any amount or amounts so paid by the Mortgagee shall be added to the principal debt secured hereby, shall bear interest at the rate provided in the note secured hereby from the date of payment, and shall be payable on demand. The Mortgagee, at its option, shall be entitled to be subrogated to any lien, claim or demand paid by it, or discharged with money advanced by it and secured by this mortgage.

5.    That so long as this mortgage and the said note secured hereby are insured under the provisions of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the mortgaged property on the basis of race, color or creed.

6.    That so long as this mortgage and the note secured hereby are insured under the provisions of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not rent dwelling accommodations in the mortgaged premises at rental rates in excess of the rates permitted by the Secretary of Housing and Urban Development, acting by, and through the Federal Housing Commissioner or for periods of less than one (1) month or in excess of three (3) years, nor rent the premises as an entirety.

7.    ~~That the indebtedness secured by this mortgage represents funds to be used in the construction of certain improvements on the lands herein described, in accordance with a building loan agreement between the Mortgagor and the Mortgagee dated_____19_, a copy of which is attached hereto and made a part hereof (provided, however, that if and to the extent that said building loan agreement is inconsistent herewith, this mortgage shall govern). If the construction of the improvements to be made pursuant to said building loan agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any reason other than strikes or lock-outs, the Mortgagee, after due notice to the Mortgagor, or any subsequent owner, is hereby vested with full and complete authority to enter upon the said premises to employ watchmen to protect such improvements from depredation or injury and to preserve and protect the personal property therein, to continue any and all outstanding contracts for the erection and completion of said building or buildings, to make and enter into any contracts and obligations wherever necessary, either in its own name or in the name of the Mortgagor, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and all shall be secured by this mortgage and shall be due and payable on demand with interest at the rate provided in the note secured hereby, but no such advances shall be insured unless same are specifically approved by the Federal Housing Commissioner prior to the making thereof. The principal sum and the other charges provided for herein shall, at the option of the Mortgagee or holder of this mortgage and the note secured hereby, become due and payable on the failure of the Mortgagor, or other owner, to keep and perform any of the covenants, conditions and agreements of said building loan agreement. This covenant shall be terminated upon the completion of the improvement to the satisfaction of the Mortgagee and the making of the final advance as provided in said building loan agreement.~~

8.    That the Mortgagor will not voluntarily create or permit to be created against the property subject to this mortgage any lien or liens inferior or superior to the lien of this mortgage; and further, that it will keep and maintain said property free from the claim of all persons supplying labor or materials

5

which will enter into the construction of any and all buildings now being erected or to be erected on said property.

9.    That the improvements ~~about to be made~~ upon the premises above described and all plans and specifications comply with all municipal ordinances and regulations made or promulgated by lawful authority, and that the same ~~will upon completion~~ comply with all such municipal ordinances and regulations and with the rules of the Board of Fire Underwriters having jurisdiction.

10.    That the Mortgagor will not permit or suffer the use of any of the property for any purpose other than that for which the same is now agreed upon to be used; nor will it permit or suffer any alteration of or addition to the buildings or improvements ~~hereafter constructed~~ in or upon said property without the consent of the Mortgagee.

11.    That the Regulatory Agreement, if any, executed by the Mortgagor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Mortgage. Upon default under the Regulatory Agreement and upon the request of the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, the Mortgagee, at its option, may declare the whole of the indebtedness secured hereby to be due and payable.

It is agreed that if at any time, a Writ of Fieri Facias or other execution is properly issued upon a judgment obtained upon the note secured hereby, or if an Action of Mortgage Foreclosure is brought or a Writ of Scire Facias is issued or other foreclosure proceedings instituted upon this mortgage, an attorney's fee ~~commission~~ for collection, viz: **five** per centum (5.0%) of said principal debt or sum shall be payable, and shall be recovered in addition to all principal and interest and all other recoverable sums then due, besides costs of suit. The Mortgagor does hereby expressly waive and relinquish all benefit that may accrue to him by virtue of any and every law, civil or military, made or to be made hereafter exempting the mortgaged premises from attachment, levy and sale under execution.

It is further agreed that the holder of this mortgage, in any action to foreclose, shall be entitled to the appointment of a Receiver of the rents and profits of the mortgaged premises as a matter of right and without notice, with power to collect the rents, issues, and profits of said mortgaged premises, due and becoming due during the pendency of such foreclosure suit, such rents and profits being hereby expressly assigned and pledged as additional security for the payment of the indebtedness secured by this mortgage, without regard to the value of the mortgaged premises or the solvency of any person or persons liable for the payment of the mortgage indebtedness. The Mortgagor for itself and any subsequent owner hereby waives any and all defenses to the application for a Receiver and hereby specifically consents to such appointment without notice, but nothing herein contained is to be construed to deprive the holder of the mortgage of any other right, remedy, or privilege it may now have under the law to have a Receiver appointed. The provision for the appointment of a Receiver of the rents and profits, and the assignment of such rents and profits, is made an express condition upon which the loan hereby secured is made. The rights and remedies herein provided for shall be deemed to be cumulative and in addition to, and not in limitation of, those provided by law.

It is also agreed that, for the purpose of procuring possession of said mortgaged premises to the Mortgagee, its successors and assigns, in the event of any default as defined below, the Mortgagor, for the Mortgagor and for the successors and assigns of the Mortgagor, does hereby authorize and empower any attorney of any court as attorney for the Mortgagor, and for the successors or assigns of the Mortgagor, to sign an agreement for entering in any competent court an amicable action or judgment in ejectment, without any stay of execution, against the Mortgagor, or the successors or assigns of the Mortgagor and against all persons claiming under the Mortgagor, or the successors or assigns of the Mortgagor and for

6

the recovery by the Mortgagee, its successors or assigns, of possession of the mortgaged premises. In any such action, this mortgage or a copy thereof, verified by affidavit, shall be a sufficient warrant of attorney. Thereupon a Writ of Habere Facias Possessionem may issue forthwith without any prior writ or proceeding whatsoever. It is hereby expressly agreed that if for any reason after such action has been commenced the same shall be discontinued, marked satisfied of record or be determined, or possession of the mortgaged premises shall remain in or be restored to the Mortgagor, or the successors or assigns of the Mortgagor, the Mortgagee, its successors and assigns, shall have the right for the same default or in the event of any subsequent defaults, to bring on or more further amicable actions in the manner hereinbefore set forth to recover possession of the mortgaged premises. The Mortgagee, its successors and assigns, shall have the right to bring such amicable action in ejectment after an Action of Mortgage Foreclosure is brought or after the issuance of a Scire Facias sur Mortgage or other foreclosure proceedings are instituted upon this mortgage and after judgment thereon or therein, and after a sale of the mortgaged premises by the sheriff.

It is also expressly agreed that if the Mortgagor should fail to pay any installment of principal and interest or payment due pursuant to covenant one above within thirty (30) days after the due date of such installment or payment, or if the Mortgagor should fail to perform any of the terms, conditions or covenants of the mortgage, the note, ~~the building loan agreement~~, or the regulatory agreement, such failure shall constitute a default and in every such case, the whole principal debt shall, at the option of the Mortgagee, become due and payable immediately, and it shall and may be lawful for said Mortgagee forthwith to bring an Action of Mortgage Foreclosure, to sue out of a Writ of Scire Facias, or to institute other foreclosure proceedings upon this mortgage, and to proceed to judgment and execution for recovery of said principal debt, all interest thereon, all sums advanced for payment of any ground rent, taxes, water rents, charges, claims or insurance premiums as aforesaid, and all other recoverable sums, together with an attorney's commission for collection, without further stay of execution or other process, any law, usage or custom to the contrary notwithstanding. The Mortgagor hereby waives and relinquishes unto and in favor of the Mortgagee, all benefit under the laws now in effect or hereafter passed to relieve the Mortgagor ·in any manner, or to reduce the amount of the note to any greater extent than the amount actually paid for the premises hereby mortgaged at the sale thereof in any judicial proceedings upon the said note or upon this mortgage.

This mortgage and every covenant and agreement herein contained shall be binding upon and inure to the benefit of the Mortgagor and the Mortgagee and their respective successors and assigns and to the extent permitted by law shall bind every subsequent owner of the mortgaged premises.

**Notwithstanding any other provision contained herein or in the Note, it is agreed that the Execution of the Note shall impose no personal liability upon the Mortgagor for payment of the indebtedness evidenced thereby and in the event of a default, the holder of the Note shall look solely to the "Collateral" (defined below) in satisfaction of the indebtedness evidenced by the Note and will not seek or obtain any deficiency or personal judgment against the Mortgagor except such judgment or decree as may be necessary to foreclose and/or bar its interest in the Collateral, provided, that nothing in this condition and no action so taken shall operate to impair any obligation of the Mortgagor under the Regulatory Agreement herein referred to and made a part hereof. As used herein, "Collateral" shall mean and include (i) the property subject to this Mortgage, including, but not limited to, the land, improvements, equipment, personal property, and appurtenances thereto and to the rents, issues and profits thereof, as set forth in this Mortgage and (ii) the collateral described in the Security Agreement of even date herewith given to further secure the Note between the Mortgagor and Mortgagee.**

**See Assignment of Leases Rider to Mortgage attached hereto.**

IN WITNESS WHEREOF, **the Mortgagor has caused this instrument to be duly executed in its behalf by its duly authorized representative.**

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
    Abraham R. Atiyeh, Manager

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF LEHIGH

       On this the 19th day of January, 2012, before me, the undersigned officer, personally appeared Abraham R. Atiyeh who acknowledged himself to be a manager and duly authorized representative of the said Whitehall Fiduciary, LLC, a Pennsylvania limited liability company, sole Trustee of Whitehall Trust, a Pennsylvania trust, and that he as such manager, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the limited liability company by himself as such manager.

_____
Notary Public

Commonwealth of Pennsylvania
NOTARIAL SEAL
MARIANNE L. RICE, Notary Public
City of Allentown, Lehigh County
My Commission Expires Aug. 20, 2015

(To be executed, witnessed and acknowledged as required by the laws of the State of Pennsylvania)

CERTIFICATE OF RESIDENCE

      I, Brianne Schwanitz, Esq., do hereby certify that the correct address of the within-named Mortgagee is 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201 witness my hand this 19th day of January, 2012.

_____
(On behalf of the Mortgagee)

COMMONWEALTH OF PENNSYLVANIA

Loan No. 034-22084

Mortgage

WHITEHALL FIDUCIARY, LLC
AS TRUSTEE OF WHITEHALL
TRUST
TO
M&T REALTY CAPITAL
CORPORATION

COMMONWEALTH OF PENNSYLVANIA,
COUNTY OF LEHIGH

RECORDED on this ____ day of January, A.D. 19 2012, in the Recorder's Office of said County, in Mortgage Book, ____, Vol. ____ Page ____

Given under my hand and seal of the said office, the day and year aforesaid.

Recorder.

8

## Exhibit A

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO.  5498 9378 8632-1

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

9

Whitehall Manor Senior Living
FHA Project No. 034-22084

## ASSIGNMENT OF LEASES RIDER
## TO MORTGAGE

This Assignment of Leases Rider to Mortgage is dated as of January 19, 2012 and is incorporated by reference into that certain Open-End Mortgage dated of even date herewith by and between WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007, a Pennsylvania trust, ("Mortgagor"), and M&T REALTY CAPITAL CORPORATION, a Maryland corporation ("Mortgagee"), as if fully set forth therein.

    1.    Mortgagor hereby assigns, grants and transfers over to Mortgagee, its successors and assigns, all interest of the Mortgagor in and under that certain Lease Agreement by and between Mortgagor, as "Landlord", and Whitehall Manor, Inc., a Pennsylvania corporation, as "Tenant", together with any subsequent leases affecting the property described in the Mortgage (the "Leases"), together with all rents, income, revenues and profits now due, or which may become due under the Leases or arising otherwise out of the property covered by this Mortgage (the "Property"), or any interest therein, together with all rights which Mortgagor may have against all tenants or others under said Leases or otherwise in connection with the Property (collectively, the "Rents"), and including without limitation the rights and interests of Mortgagor as secured party under those provisions of the Leases whereby Tenant grants to Mortgagor a security interest in certain assets of Tenant; including Tenant's accounts receivable, licenses, provider agreements and certificates of need. This assignment is subject to a license hereby reserved to Mortgagor, but limited as hereinafter provided, to collect said Rents. For purposes of the security interests and rights of Mortgagor, as secured party, under each of the Leases which are assigned to Mortgagee under this Section 1, Mortgagor and Mortgagee agree that the term "Mortgagee" shall mean and include both the Mortgagee first named above and U.S. Department of Housing and Urban Development.

    2.    Mortgagor agrees to timely perform and discharge all obligations of Mortgagor as Landlord under the Lease.

    3.    Mortgagor further agrees not to receive or collect any Rents in advance, nor pledge, or assign future Rents, nor release or discharge any Tenant thereof from any obligation under the Lease; nor to cancel, modify, extend or renew any Lease or dispossess any Tenant without the prior written approval of Mortgagee.

    4.    So long as Mortgagor shall not be in default hereunder, Mortgagor shall have the license reserved hereby to collect all Rents.

    5.    Upon default by Mortgagor under this Mortgage, Mortgagee may, at its option, terminate the license of Mortgagor to collect the Rents and bring an action to appoint a receiver to enter upon, take possession of, manage and operate the Property and collect the Rents, make, enforce, and modify the Leases now or hereafter in effect, and otherwise perform all acts with respect to the Property, Leases and Rents as fully as Mortgagor could do if personally present, and Mortgagee shall, after payment of all expenses, credit the net amount of income which it may receive to the indebtedness secured hereby, in the manner, order and amounts as Mortgagee shall determine.

6.      In the event Tenant defaults under its Lease with Mortgagor entitling Mortgagor, as Landlord, under the Lease to cause a receiver to be appointed to operate the Property, and after ten (10) days written notice from Mortgagee to Mortgagor directing Mortgagor to take such actions as are required to have a receiver appointed to so operate the Property, Mortgagor fails to commence such actions and diligently pursue them to completion, such failure shall be a default by Mortgagor under this Mortgage entitling Mortgagee to exercise its rights and remedies under this Mortgage and applicable law. In addition, upon such default or other default by Mortgagor under this Mortgage or the Note secured by this Mortgage that is not cured within any applicable cure period, Mortgagee may initiate such actions as may be necessary, whether in Mortgagee's name or in the name of, and/or in the place, of Mortgagor, to have a receiver appointed to operate the Property.

7.      Notwithstanding anything herein to the contrary, acceptance by Mortgagee of this assignment shall not constitute Mortgagee a mortgagee in possession, or obligate Mortgagee to appear in or defend any action or proceeding relating to the Rents, Leases or the Property, or to take any action hereunder, or incur any expenses; nor shall Mortgagee be liable for any injury or damage to person or property sustained by any persons, in or about the Property. This assignment is an assignment of rights only, and not a delegation of duties.

8.      Mortgagor hereby irrevocably appoints Mortgagee its true and lawful attorney, coupled with an interest, in the name of Mortgagor, to subordinate any Lease to the lien of this Mortgage and to collect all Rents payable under the Leases upon termination of the license herein granted. This assignment shall constitute a direction to and full authority to Tenant and any other tenant under the Leases to pay all Rents to Mortgagee. The foregoing powers are irrevocable, continuing, and exclusive in Mortgagee, its successors and assigns.

9.      Upon payment in full of the indebtedness secured by this Mortgage, this assignment shall be of no further force and effect and Mortgagee shall execute such documents, in recordable form, as may be required or needed to reconvey and/or rescind this assignment.

R-2

### *ANDREA E. NAUGLE*
### *LEHIGH COUNTY CLERK OF JUDICIAL RECORDS*



**Recorder of Deeds Division**
**Deborah A. Casciotti, Chief Deputy**
**Lehigh County Courthouse**
**455 W. Hamilton Street - Room 122**
**Allentown, PA  18101-1614**
**(610) 782-3162**

\*RETURN DOCUMENT TO:
WIENER AND WIENER
512 HAMILTON STREET
ALLENTOWN, PA 18101

**Instrument Number - 2012002759**
Recorded On 1/26/2012 At 8:52:21 AM
\* Instrument Type - MORTGAGE
Invoice Number - 114086      User ID: LSA
\* Mortgagor -  WHITEHALL FIDUCIARY LLC
\* Mortgagee - M&T REALTY CAPITAL CORP
\* Customer - WIENER AND WIENER

\*Total Pages - 12

\* FEES
```
STATE WRIT TAX              $0.50
STATE JCS                  $23.50
RECORDING FEES             $27.00
AFFORDABLE HOUSING         $11.50
COUNTY ARCHIVES FEE         $2.00
ROD ARCHIVES FEE            $3.00
UPI CERTIFICATION FEES     $10.00
TOTAL PAID                 $77.50
```

I hereby CERTIFY that this document is
Recorded in the Recorder of Deeds Office
of Lehigh County, Pennsylvania



*Andrea E. Naugle*
Andrea E. Naugle
Clerk of Judicial Records
Recorder of Deeds Division

**LCGIS Registry UPI Certification**
**On January 26, 2012 By SB**

## THIS IS A CERTIFICATION PAGE

# Do Not Detach

## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT
\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

INSTRUMENT NUMBER - **2012002759**


002XU7

**Exhibit C**

**Mortgage Note**

# MORTGAGE NOTE

$15,788,700.00

Whitehall, Pennsylvania
as of January 26, 2012

FOR VALUE RECEIVED, the undersigned, WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007, a Pennsylvania trust, having an address at 1177 Sixth Street, Whitehall, Pennsylvania 18052, hereinafter called the Maker, promises to pay to M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of Maryland, having an address at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201, or order, hereinafter designated as the Payee, the principal sum of Fifteen Million Seven Hundred Eighty-Eight Thousand Seven Hundred and No/100 Dollars ($15,788,700.00) with interest from date at the rate of three and thirty-eight hundredths per centum (3.38%) per annum on the unpaid balance until paid. The said principal and interest shall be payable in monthly installments as follows:

Interest only payable on the first day of February, 2012. Commencing on the first day of March, 2012, monthly installments of interest and principal shall be paid in the sum of Sixty-Nine Thousand Eight Hundred Forty-Four and 95/100 Dollars ($69,844.95) each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full. In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest, shall be due and payable on February 1, 2042. The installments of interest and principal shall be applied first to interest at the rate of three and thirty-eight hundredths per centum (3.38%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.

See Rider to Mortgage Note attached hereto and incorporated by reference herein.

Both principal and interest under this Note, as well as the additional payments set forth in the mortgage, shall be payable at the office of M&T Realty Capital Corporation, in at P.O. Box 64269, Baltimore, Maryland 21264-4269 or such other place as the holder may designate in writing.

Privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days' prior written notice to the holder. If this debt is paid in full while insured under the provisions of the National Housing Act, as amended, all parties liable for payment thereof agree to be jointly and severally bound to pay to the holder hereof such adjusted mortgage insurance premium as may be required by the applicable Regulations.

~~Notwithstanding any provision herein for a prepayment charge, such charge shall be applicable only to the amount of prepayment in any one calendar year which is in excess of fifteen per centum (15%) of the original principal sum of this Note.~~

Simultaneously with the execution of this Note the Maker has executed and delivered to the Payee a Mortgage secured upon certain premises situated in the county of **Lehigh**, Commonwealth of Pennsylvania, more particularly described in the Mortgage. All of the terms, covenants, provisions, conditions, stipulations and agreements contained in said Mortgage to be kept and performed provisions, conditions, stipulations and agreements contained in said Mortgage to be kept and performed by the Maker are hereby made a part of this Note to the same extent and with the same force and effect as if they were fully set forth herein, and the Maker covenants and agrees to perform the same, or cause the same to be kept and performed, strictly in accordance with the terms and provisions thereof.

If default be made in the payment of any installment under this Note, and if such default is not made good prior to the due date of the next such installment, the entire principal sum and accrued interest shall at once become due and payable without notice, at the option of the holder of this Note. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

~~No default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal already made pursuant to the privilege of prepayment set forth in this Note equals or exceeds the amount of such required installment of principal.~~

All parties to this Note, whether principal, surety, guarantor or endorser, hereby waive presentment for payment, demand, protest, notice of protest and notice of dishonor.

The Maker does hereby empower any attorney of any court of record within the United States or elsewhere to appear for it, with or without a declaration filed, and confess judgment or judgments against it in favor of the Payee or any subsequent holder hereof, as of any term, for the entire unpaid principal of this Note, and all arrearages of interest thereon, together with costs of suit, attorney's fee ~~commission~~ of five percent (5)% for collection, and a release of all errors, on which judgment execution or executions may issue forthwith. The Maker hereby waives the right of inquisition on all property levied upon to collect the indebtedness evidenced hereby and does voluntarily condemn the same and authorizes the Prothonotary to enter such condemnation, and waives and releases all laws, now in force or hereafter enacted, relating to exemption, appraisement or stay of execution.

**[signature appears on next page]**

IN WITNESS WHEREOF, the Maker has caused these presents to be executed
~~under seal~~ the day and year first above written.

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By: _____
Abraham R. Atiyeh, Manager

[SEAL]          Attest:

COMMONWEALTH STATE OF PENNSYLVANIA
LOAN NO. 034-22084

Mortgage Note

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
TO
M&T REALTY CAPITAL CORPORATION

No. 034-22084

Insured under Section 232, pursuant to Sections 223(f) and 223(a)(7)
of the National Housing Act and Regulations published
thereunder

In effect on November 22, 2011

For purposes of compliance with Section 223(a)(7)(A)(iv) of the National
Housing Act, the contract of mortgage insurance regarding FHA Project No.
034-22020 is transferred to FHA Project No. 034-22084 and said contract of
mortgage insurance is hereby amended to reflect the terms, condition and
provisions of the FHA Firm Commitment for Project No. 034-22084 dated
November 22, 2011 and the National Housing Act as evidenced by the
Federal Housing Commissioner's endorsement for insurance of the Note
dated January 26, 2012 executed by Whitehall Fiduciary, LLC, as Trustee
of Whitehall Trust and payable to M&T Realty Capital Corporation in the
amount of $ 15,788,700.00 .

~~To the extent of advances approved by the Secretary~~
~~of Housing and Urban Development acting by and through~~
~~the Federal Housing Commissioner~~

By: _____
(Authorized Agent)

Date _____

A total sum of $ 15,788,700.00 has been approved
for insurance hereunder by the Secretary of Housing and
Urban Development acting by and through the Federal
Housing Commissioner

By: _____
(Authorized Agent)
Roger A. Lewis

Date January 26, 2012

Reference is made to the Act and to the Regulations
thereunder covering assignments of the insurance
protection on this Bond

HUD- Wash., D.C.

17473-8, Rev.3/71

Attest: _____
Carol A. O'Quinn
Assistant Vice President

M&T Realty Capital Corporation
Pay to the order of
_____ without recourse
By: _____
Paula M. Quigley, Administrative Vice President

-3-

## RIDER TO MORTGAGE NOTE

This Rider to Mortgage Note (this "Rider") is attached to and made a part of the Mortgage Note (the "Note") from WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST u/t/a dated August 1, 2007, a Pennsylvania Trust (the "Maker"), to M&T REALTY CAPITAL CORPORATION, a Maryland corporation, dated as of January 26, 2012.

    1.    Prepayment.  (a)    Except as hereinafter set forth, Maker shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to February 28, 2013 (the "Lockout Termination Date"). Maker shall have the right, on or after the Lockout Termination Date, to prepay the indebtedness evidenced hereby in whole or in part on the last business day of any calendar month after such date during the term hereof upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid. In the event of any prepayment of principal at any time on or after the Lockout Termination Date, the Maker shall concurrently pay to the holder of this Note (i) interest on the amount prepaid through and including the last day of the month in which the prepayment is made and (ii) a prepayment premium equal to the following designated percentages of the amount of the principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from February 28, 2013 through February 27, 2014 | 9.0% |
| from February 28, 2014 through February 27, 2015 | 8.0% |
| from February 28, 2015 through February 28, 2016 | 7.0% |
| from February 29, 2016 through February 27, 2017 | 6.0% |
| from February 28, 2017 through February 27, 2018 | 5.0% |
| from February 28, 2018 through February 27, 2019 | 4.0% |
| from February 28, 2019 through February 28, 2020 | 3.0% |
| from February 29, 2020 through February 27, 2021 | 2.0% |
| from February 28, 2021 through February 27, 2022 | 1.0% |
| from February 28, 2022 and thereafter | 0.0% |

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Maker shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

    (b)    Notwithstanding any prepayment prohibition imposed and/or premium required by this Note with respect to prepayments made prior to February 28, 2021, the indebtedness evidenced by this Note may be prepaid in whole or in part on the last business day of any calendar month without the consent of the holder of this Note and without prepayment premium if the Federal Housing Commissioner (the "Commissioner") determines that prepayment will avoid a mortgage insurance claim and is therefore in the best interests of the Federal Government. The holder of this Note understands that the Commissioner would consider

exercising its right to override the prepayment prohibition and/or prepayment premium contained herein only upon satisfaction of all of the following terms and conditions:

(i)     Maker has defaulted under this Note and the Commissioner has received notice of such default, as required by 24 C.F.R. §207.256;

(ii)     The Commissioner determines that the project financed with the proceeds of this Note has been experiencing a net income deficiency, which has not been caused solely by management inadequacy or lack of interest by Maker, and which is of such magnitude that Maker is currently unable to make required debt service payments, pay all project operating expenses and fund all required HUD reserves;

(iii)     The Commissioner finds there is reasonable likelihood that Maker can arrange to refinance the loan evidenced by this Note at a lower interest rate or otherwise reduce the debt service payments through partial prepayment; and

(iv)     The Commissioner determines that refinancing the loan evidenced by this Note at a lower rate or partial prepayment is necessary to restore the said project to a financially viable condition and to avoid an insurance claim.

(c)     Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be collected by the holder of this Note, with respect to any prepayment which is made by or on behalf of the Maker from insurance proceeds as a result of damage to the mortgaged premises or condemnation awards which, at the option of the holder of this Note, may be applied to reduce the indebtedness of Maker evidenced hereby pursuant to the terms and provisions of the Mortgage (the "Mortgage") of even date given by Maker to the holder of this Note to secure said indebtedness. Any prepayment made pursuant to this Paragraph 1(c) shall be deemed to have been made on the last day of the month in which such payment is received by holder and shall include interest on the amount prepaid through and including the last day of the month in which the prepayment is made.

(d)     Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be collected by the holder of this Note, in the event that the maximum principal amount of this Note is reduced (or a partial prepayment is made) solely as the result of a mortgage reduction (or a partial prepayment) required by the Commissioner based upon any cost certification or other report required to be provided by the Maker to the Commissioner subsequent to the date hereof. Any prepayment made pursuant to this Paragraph 1(d) shall be deemed to have been made on the last day of the month in which such payment is received by holder and shall include interest on the amount prepaid through and including the last day of the month in which the prepayment is made.

2.     Late Charges.  In the event any installment or part of any installment due under this Note becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder of this Note, in addition to other sums due hereunder, a late charge in an amount equal to two percent (2%) of the amount of principal and/or interest so delinquent.  Whenever, under the

law of the jurisdiction where the property is located, the amount of any such late charge is considered to be additional interest, this provision shall not be effective if the rate of interest specified in this Note, together with the amount of the late charge, would aggregate an amount in excess of the maximum rate of interest permitted and would constitute usury.

3.    Method of Payment.  All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, and all late charges and other amounts required to be paid hereunder, other than regularly scheduled installments of interest, shall be made to the holder of this Note in immediately available Federal Funds.  Payments received after 12:00 noon Eastern time will be deemed to have been received on the next following business day.

4.    Non-Recourse.  Notwithstanding any other provision contained in this Note, it is agreed that the execution of this Note shall impose no personal liability on the maker hereof for payment of the indebtedness evidenced hereby, and, in the event of a default, the holder hereof shall look solely to the "Collateral" (defined below) in satisfaction of the indebtedness evidenced hereby and will not seek or obtain any deficiency or personal judgment against the maker hereof except such judgment or decree as may be necessary to foreclose or bar its interest in the Collateral except as set out in the Mortgage of even date given to secure this Note.  As used herein, "Collateral" shall mean and include (i) the property subject to the Mortgage, including, but not limited to, the land, improvements, equipment, personal property, and appurtenances thereto and to the rents, issues and profits thereof, as set forth in said Mortgage and (ii) the collateral described in the Security Agreement of even date herewith given to further secure this Note between maker and holder hereof.

**IN WITNESS WHEREOF**, the undersigned Maker has executed this Rider as of the date first above written.

WHITEHALL FIDUCIARY, LLC,
AS TRUSTEE OF WHITEHALL TRUST
u/t/a dated August 1, 2007

By:_____
    Abraham R. Atiyeh, Manager

-6-

**Exhibit D**

**Assignment of HUD**

Inst. # 2022038363 - Page 1 of 6

Project No.:  *1177 10th St. Whitehall PA 18052*

Project Name: **Whitehall Manor Senior Living**

Location:     **Lehigh County, Pennsylvania**
              *Whitehall Township*

## ASSIGNMENT OF MORTGAGE

**Dated November 8, 2022, Effective as of November /6 , 2022**

KNOW ALL MEN BY THESE PRESENTS:

THAT, M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the State of Maryland, hereinafter referred to as the "Assignor", having offices at One Light Street, 12th Floor, Baltimore, Maryland 21202, for value received, does by these presents, without recourse, representation or warranty, except as hereinafter set forth, grant, bargain, sell, assign, transfer and set over unto the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, his/her successors and assigns, hereinafter referred to as "Assignee", having offices at 451 7th Street, SW, Washington D.C., 20410, all right, title and interest in and to that certain:

Mortgage Note and Open-End Mortgage each dated January 19, 2012, to be effective January 26, 2012 (the "Mortgage"), each executed by WHITEHALL FIDUCIARY, LLC, AS TRUSTEE OF WHITEHALL TRUST U/T/A DATED AUGUST 1, 2007, each being in the original principal amount of Fifteen Million Seven Hundred Eighty-Eight Thousand Seven Hundred and No/100 Dollars ($15,788,700.00), which Mortgage Note was made payable to M&T Realty Capital Corporation and which Mortgage Note is secured by the Mortgage recorded January 26, 2012, as Instrument No. 2012002759 in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania.

SEE ATTACHED EXHIBIT "A" FOR A DESCRIPTION OF THE REAL PROPERTY.

TO HAVE AND TO HOLD the same unto said UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, HIS/HER SUCCESSORS AND ASSIGNS.

THIS Assignment is without recourse or warranty, except that the undersigned hereby warrants that no act or omission of the undersigned has impaired the validity or priority of said Mortgage. The undersigned also warrants that said Mortgage is prior to all mechanics' and materialmen's liens filed of record subsequent to the recording of such Mortgage regardless of whether such liens attached prior to such recording date, and prior to all liens and encumbrances

Inst. # 2022030363 - Page 2 of 6

which may have attached or defects which may have arisen subsequent to the recording of such Mortgage (except such liens or other matters as have been approved by the Assignee hereunder). The undersigned also warrants that, as of the execution of this Assignment, the sum of Twelve Million Four Hundred Eighty-Seven Thousand Six Hundred Sixty-Nine and 04/100 Dollars ($12,487,669.04), together with the interest accruing at the rate of 3.38% per annum, as provided in the said Mortgage Note and Mortgage, is actually due and owing under said Mortgage Note and Mortgage, that there are no offsets or counterclaims thereto, and that the undersigned has a good right to assign the said Mortgage Note and Mortgage.

[THIS SPACE INTENTIONALLY LEFT BLANK]

Inst. # 2022038363 - Page 3 of 6

IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed on its behalf as of the date first above written.

**M&T REALTY CAPITAL CORPORATION**, a Maryland corporation

By: _____
Name: Michael Angles
Title:  Senior Vice President

STATE OF MARYLAND        }
                                  } ss.
CITY OF BALTIMORE         }

Before me, _Melissa L. First_____, a Notary Public, in and for said City and State, on this day personally appeared **Michael Angles**, known to me to be the person whose name is subscribed to the foregoing instrument, and known to me to be the **Senior Vice President** of M&T Realty Capital Corporation, a Maryland corporation, and acknowledged to me that he executed said instrument for the purposes and consideration therein expressed and as the authorized act of said corporation.

Given under my hand and seal of office, this the _8th_ day of _November_, 2022.

_____
Notary Public
My Commission Expires:

MELISSA L FIRST
Notary Public - State of Maryland
Baltimore County
My Commission Expires Apr 6, 2026

This instrument prepared by:      Ariel A. Mullin
                                      Vorys, Sater, Seymour and Pease LLP
                                      301 E. Fourth Street, Suite 3500
                                      Cincinnati, Ohio 45202

Inst. # 2022038363 - Page 4 of 6

## EXHIBIT A
## LEGAL DESCRIPTION

UNIT 1 OF WHITEHALL MANOR CONDOMINIUM, according to the Declaration of Condominium of Whitehall Manor Condominium dated August 13, 2008 recorded in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania as its Document ID # 7494518.

PARCEL ID NO. 5498 9378 8632-2

Together with an undivided interest of 50% of, in and to the Common Elements of the said WHITEHALL MANOR CONDOMINIUM.

Whitehall Township
1177 6th Whitehall, PA
18052

Inst. # 2022038363 - Page 5 of 5

Certificate of Residence

I do hereby certify that the correct address of the within-named Assignee is:

offices at 451 7th St. SW.
Washington, PA 20410

Inst. # 2022038363 - Page 6 of 6

## *ANDREA E. NAUGLE*
## *LEHIGH COUNTY CLERK OF JUDICIAL RECORDS*



**Recorder of Deeds Division**
**Karen S. Collura, Chief Deputy**
**Lehigh County Courthouse**
**455 W. Hamilton Street - Room 122**
**Allentown, PA 18101-1614**
**(610) 782-3162**

*RETURN DOCUMENT TO:
FIDELITY NATIONAL TITLE - WESTERVILLE
(10043)
4111 EXECUTIVE PKWY, SUITE 30
WESTERVILLE, OH 43081

**Instrument Number - 2022038363**
Recorded On 11/16/2022 At 2:43:56 PM
* Instrument Type - ASSIGNMENT OF MORTGAGE
Invoice Number - 506774        User ID: CMF        *Total Pages - 6
* Grantor - M&T REALTY CAPITAL CORP  WHITEHALL TRUST
* Grantee - UNITED STATES SECRETARY OF HOUSING & URBAN DEVELOPMENT
* Customer - FIDELITY NATIONAL TITLE - WESTERVILLE (10043)

* FEES
  STATE WRIT TAX            $0.50
  STATE JCS               $40.25
  RECORDING FEES          $17.00
  COUNTY ARCHIVES FEE      $2.00
  ROD ARCHIVES FEE         $3.00
  UPI CERTIFICATION FEES  $10.00
  TOTAL PAID              $72.75

I hereby CERTIFY that this document is
Recorded in the Recorder of Deeds Office
of Lehigh County, Pennsylvania



*Andrea E Naugle*

Andrea E. Naugle
Clerk of Judicial Records
Recorder of Deeds Division

**LCGIS Registry UPI Certification**
**On November 16, 2022 By CJ**

## THIS IS A CERTIFICATION PAGE

# Do Not Detach

## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

INSTRUMENT NUMBER - **2022038363**


00D66N

Inst. # 2012040239 - Page 1 of 11

# COUNTY OF NORTHAMPTON

### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 559-3077

Andrea F. Suter - Recorder
Dorothy J. Edelman - Deputy



Book - 2012-1   Starting Page - 300709
\*Total Pages -   11

Instrument Number - 2012040239
Recorded On 12/13/2012 At 1:05:05 PM
\* Instrument Type - MORTGAGE
Invoice Number - 727362
\* Mortgagor - SAUCON TRUST
\* Mortgagee - M&T REALTY CAPITAL CORPORATION
User - BLM
\* Customer - SIMPLIFILE LC E-RECORDING

| NCGIS Registry UPI Certification |
| On December 13, 2012 By HG |

**\*FEES**

| | | \***RECORDED BY:** |
|---|---|---|
| STATE WRIT TAX | $0.50 | OMEGA ABSTRACT |
| JCS/ACCESS TO JUSTICE | $23.50 | 512 W HAMILTON STREET |
| RECORDING FEES | $25.00 | ALLENTOWN, PA 18101 |
| AFFORDABLE HOUSING | $14.02 | |
| AFFORDABLE HOUSING – | $2.48 | |
| ADMIN FEE | | |
| COUNTY RECORDS | $2.00 | I hereby CERTIFY that this document is recorded in the |
| IMPROVEMENT FEE | | Recorder's Office Of Northampton County, Pennsylvania |
| DEEDS RECORDS | $3.00 | |
| IMPROVEMENT FEE | | |
| UPI CERTIFICATION FEE | $10.00 | |
| TOTAL PAID | $80.50 | |

Andrea F. Suter
Recorder of Deeds

### THIS IS A CERTIFICATION PAGE
# Do Not Detach
THIS PAGE IS NOW THE FIRST PAGE
OF THIS LEGAL DOCUMENT

**Book: 2012-1    Page: 300709**

\* – Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

Inst. # 2012040239 - Page 2 of 11

Return to:
·Donald R. Lewis
Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street
Suite 3500, Great American Tower
Cincinnati, Ohio 45202

UPI: Q7-5u/ZA-1-3-0785

FHA Form No. 4131-b
(CORPORATE)
Rev. March 1977

# MORTGAGE

THIS MORTGAGE made as of the 1st day of December, 42222, between SAUCON TERRY, DTIA DATED OCTOBER 1, 2007, a trust formed under the laws of Pennsylvania, the Mortgagor and M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the state of Maryland and having its principal place of business at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201, the Mortgagee.

In order to secure the payment of an indebtedness in the principal sum of Nineteen Million Four Hundred Sixty-Two Thousand Eight Hundred and No/100 Dollars ($19,462,840.00), lawful money of the United States, which sum or so much thereof as may be advanced with interest thereon at Two and one half percent (2.50%) per annum, is payable in accordance with the terms of a certain note bearing even date herewith as follows:

Interest only payable on the first day of January, 2013. Commencing on the first day of February, 2013, monthly installments of interest and principal shall be paid in the sum of Sixty-Nine Thousand Five Hundred Seventy-Eight and 58/100 Dollars ($69,578.58) each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full. In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest, shall be due and payable on January 1, 2048. The installments of interest and principal shall be applied first to interest at the rate of two and one half percent (2.50%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.

which note provides: (1) that privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due on the first day of any month prior to maturity upon at least thirty (30) days prior written notice to the holder; (2) that if the debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment thereof hereby agree to be jointly and severally bound to pay to the holder hereof any adjusted premium charge required by the applicable Regulations; (3) that notwithstanding any provision for a prepayment charge or premium, prepayments of principal made as aforesaid, which do not exceed an aggregate of fifteen per centum (15%) of the original principal sum of the note in any one calendar year, may be made without any prepayment charge or premium; and (4) that no default shall result by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal made pursuant to the privilege of prepayment equals or exceeds the amount of such required installment of principals and (5) that in the event any installment or part of any installment due under the Note becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder of the Note, in addition to other sums due, a late charge in an amount equal to two percent (2%) of the amount of principal and/or interest so delinquent, as further provided in the Note.

1

Inst. # 2012040239 - Page 3 of 11

And also to secure payment by the Mortgagor to the Mortgagee of all sums expended or advanced by the Mortgagor pursuant to any term or provision of this mortgage;

And also to secure performance of each covenant, term, condition and agreement of the Mortgagor herein contained and in a certain ~~Building Loan Agreement and~~ Regulatory Agreement hereinafter referred to;

The Mortgagor for valuable consideration, the receipt of which is hereby acknowledged, hath granted, bargained, sold, aliened, enfeoffed, released and confirmed, and by these presents doth grant, bargain, sell, alien, enfeoff, release and confirm unto the said Mortgagee, all the following-described real estate situate in the Borough of Halkertown, County of Northampton, and Commonwealth of Pennsylvania, to wit:

See Exhibit A, attached hereto and incorporated herein by reference.

TOGETHER with all and singular the buildings and improvements on said premises, as well as all alterations, additions, or improvements now or hereafter made in said premises, and any and all appliances, machinery, furniture, and equipment (whether fixtures or not) of any nature whatsoever now or hereafter installed in or upon said premises, streets, alleys, passages, ways, waters, water courses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereunto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues and profits thereof; and

TOGETHER with all building materials and equipment now or hereafter delivered to said premises and intended to be installed therein; and

TOGETHER with all fixtures and articles of personal property now or hereafter attached to or in and about the building or buildings now erected or hereafter to be erected on the lands herein described which are necessary to the complete and comfortable use and occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods, chattels, and personal property as are ever used or furnished in operating a building, or the activities conducted therein, similar to the one herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner.

And the said Mortgagor, for itself, its successors and assigns does hereby covenant, promise, and agree with said Mortgagee, its successors and assigns, that all furnaces, boilers, ranges, mantels, cabinets, gas and electric light fixtures, elevators, laundry equipment, refrigerator, air-conditioning equipment, including all operating equipment, Murphy beds and all apparatus, appliances, and fixtures for the creation and distribution of light, heat, power, and water, including all pipes, wires, faucets, bedroom and kitchen fixtures of whatever kind and nature at present contained or hereafter placed in the building or hereafter standing upon the mortgaged premises and all structures, gas and oil tanks, screens, shades, awnings and Venetian blinds, storm doors and windows and equipment erected or placed in or upon the mortgaged premises are to be considered as annexed to and forming part of the freehold.

TO HAVE AND TO HOLD the said lot or piece of ground described, with the buildings and improvements thereon erected, the hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances unto the said Mortgagee, its successors or assigns, to and for the only proper use and behoof of the said Mortgagee, its successors or assigns forever;

Provided however that if said Mortgagor does and shall well and truly pay or cause to be paid unto the said Mortgagee, the aforesaid debt or principal sum secured by this mortgage, on the day and

2

Inst. # 2012040239 - Page 4 of 11

time and in the manner hereinbefore mentioned and appointed for payment of the same, together with interest and all sums advanced for payment of any ground rents, taxes, water rents, charges, claims or insurance premiums and any other advance hereunder as aforesaid, without any fraud or further delay and without any deduction, defalcation or abatement to be made of anything, for or in respect of any ground rents, taxes or water rents or charges or claims or advances whatsoever, then this mortgage and the estate hereby granted, shall cease and become void.

The Mortgagor covenants with the Mortgagee as follows:

1.      That the Mortgagor will deposit with the Mortgagee contaneally with payments of interest or of interest and principal, on the first day of each month after the date hereof until the said note is fully paid, the following sums:

(a)     An amount sufficient to provide the holder hereof with funds to pay the next mortgage insurance premium if this mortgage and the note secured hereby are insured, or a monthly service charge, if they are held by the Secretary of Housing and Urban Development, as follows:

(i)     If and so long as said note of even date and this mortgage are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the holder one month prior to its due date the annual mortgage insurance premium, in order to provide such holder with funds to pay such premium to the Secretary of Housing and Urban Development pursuant to the National Housing Act, as amended, and applicable Regulations thereunder, or

(ii)    Beginning with the first day of the month following an assignment of this mortgage and the note secured hereby to the Secretary of Housing and Urban Development, a monthly service charge which shall be an amount equal to one-twelfth of one-half per centum of the average outstanding principal balance due on the note computed for each successive year, beginning with the first of the month following such assignment, without taking into account delinquencies or prepayments.

(b)     A sum equal to the ground rents, if any, next due, plus the premium that will next become due and payable on policies of fire and other hazard insurance covering the mortgaged property, plus water rents, taxes and assessments next due on the mortgaged property (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rents, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, water rents, taxes, and special assessments.

(c)     All monthly installments of interest or of principal and all payments mentioned in paragraphs (a) and (b) above shall be added together, and the aggregate amount thereof shall be paid by the Mortgagor each month in a single payment to be applied by the Mortgagee to the following items in the order set forth:

(i)     Premium charges under the contract of insurance with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner or service charge;

(ii)    Ground rents, taxes, water rents, assessments, fire and other hazard insurance premiums;

(iii)   Interest on the debt secured hereby; and

(iv)    Amortization of the principal of the debt secured hereby.

3

Inst. # 2012040239 - Page 5 of 11

Provided that any excess funds accumulated under paragraph (b) above remaining after payment of the items therein mentioned shall be credited to subsequent monthly payments of the same nature required thereunder, but if any such item shall exceed the estimate therefor, the Mortgagor shall without demand forthwith make good the deficiency. Failure to do so before the due date of such item shall be a default hereunder. In case of termination of the contract of mortgage insurance by prepayment of the mortgage in full, or otherwise (except as hereinafter provided), accumulations under paragraph (a) above not required to meet payments due under the contract of mortgage insurance, shall be credited to the Mortgagee. If the property is sold under foreclosure or is otherwise acquired by the Mortgagee after default, any remaining balance of the accumulations under paragraph (b) above shall be credited to the principal of the debt as of the date of commencement of foreclosure proceedings or as of the date the property is otherwise acquired; and accumulations under paragraph (a) above shall be similarly applied unless required to pay sums due to the Secretary of Housing and Urban Development, acting by and through the Commissioner under the contract of mortgage insurance.

2.    That the Mortgagor will keep the improvements now existing or hereafter erected on the mortgaged property insured against loss by fire and such other hazards, casualties, and contingencies, as may be stipulated by the Secretary of Housing and Urban Development, acting by and through the Commissioner upon the insurance of the mortgage and other hazards and liabilities as may be required from time to time by the Mortgagee, and all such insurance shall be carried in such companies and for such periods as may be required by the Mortgagee, and be in an amount which will comply with the coinsurance clause applicable to the location and character of the property but not less than eighty per centum (80%) of the actual cash value of the insurable improvements and equipment of the property and will pay when due any insurance premiums not provided for by monthly payments hereunder and in default thereof the Mortgagee may effect such insurance. Such policies shall be in standard form and endorsed with standard mortgage clause with loss payable to the Mortgagee and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner as interest may appear; and shall be deposited with the Mortgagee; the insurance carrier shall be selected by the Mortgagor, subject to approval by the Mortgagee, which shall not be unreasonably withheld. If the premises covered hereby, or any part thereof, shall be destroyed or damaged by fire or other hazard against which insurance is held as hereinabove provided, the amounts paid by any insurance company or companies by reason of such damage, in pursuance of the contract or contracts of such fire or other hazard insurance, to the extent of its indebtedness secured hereby remaining unpaid, shall be paid to the Mortgagee, and, at its option, may be applied in the debt or released for the repairing or rebuilding of the premises.

3.    That the Mortgagor will keep said premises in as good order and condition as they now are, and will not commit or permit any waste of said premises, reasonable wear and tear excepted. If the Mortgagor shall refuse or neglect to make or cause to be made all necessary repairs to the mortgaged property, then at the option of the Mortgagee, such repairs may be made at the expense of the Mortgagee, and the cost thereof, with interest at the rate provided in the note secured hereby shall be added to and made a part of the principal debt secured hereby and shall be payable on demand.

4.    The Mortgagee shall have the right to advance and pay any ground rents, taxes, assessments, water rents, and all other charges and claims which are provided to be made by the Mortgagor in paragraphs 1(a) and (b) above, and to advance and pay any sums of money that in its or their judgment may be necessary to perfect or preserve the title of the premises covered hereby. Any amount or amounts so paid by the Mortgagee shall be added to the principal debt secured hereby, shall bear interest at the rate provided in the note secured hereby from the date of payment, and shall be payable on demand. The Mortgagee, at its option, shall be entitled to be subrogated to any lien, claim or demand paid by it, or discharged with money advanced by it and secured by this mortgage.

4

Inst. # 2012040239 - Page 6 of 11

5.      That so long as this mortgage and the said note secured hereby are insured under the provisions of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the mortgaged property on the basis of race, color or creed.

6.      That so long as this mortgage and the note secured hereby are insured under the provision of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not rent dwelling accommodations in the mortgaged premises at rental rates in excess of the rates permitted by the Secretary of Housing and Urban Development, acting by, and through the Federal Housing Commissioner or for periods of less than one (1) month or in excess of three (3) years, nor rent the premises as an entirety.

~~7.      That the indebtedness secured by this mortgage represents funds to be used in the construction of certain improvements on the lands hereby described, in accordance with a building loan agreement between the Mortgagor and the Mortgagee dated _____ 19_, a copy of which is attached hereto and made a part hereof (provided, however, that if and to the extent that said building loan agreement is inconsistent herewith, this mortgage shall govern). Make construction of the improvements to be made pursuant to said building loan agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any reason other than strikes or lock outs, the Mortgagee, after due notice to the Mortgagor, is any subsequent owner is hereby vested with full and complete authority to enter upon the said premises to employ watchmen to protect such improvements from depredation or injury, and to preserve and protect the personal property therein, to continue any and all outstanding contracts for the erection and completion of said buildings or buildings, to make such other into any contracts and obligations whenever necessary, either in its own name or in the name of the Mortgagee, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and shall be secured by this mortgage and shall be due and payable on demand with interest thereon provided in the note secured hereby, but no such advances shall be insured unless same are specifically approved by the Federal Housing Commissioner prior to the making thereof. The principal sum and the other charges provided for herein shall, at the option of the Mortgagee, or holder of this mortgage and of the note secured hereby become due and payable on the failure of the Mortgagor, or other owner, to keep and perform any of the covenants, conditions and agreements of said building loan agreement. This covenant shall be terminated upon the completion of the improvements to the satisfaction of the Mortgagee and the making of the final advance as provided in said building loan agreement.~~

8.      That the Mortgagor will not voluntarily create or permit to be created against the property subject to this mortgage any lien or liens inferior or superior to the lien of this mortgage; and further, that it will keep and maintain said property free from the claim of all persons supplying labor or materials which will enter into the construction of any and all buildings now being erected or to be erected on said property.

9.      That the improvements ~~about to be made~~ upon the premises above described ~~and all plans and specifications~~ comply with all municipal ordinances and regulations made or promulgated by lawful authority, and that the same ~~will upon completion~~ comply with all such municipal ordinances and regulations and with the rules of the Board of Fire Underwriters having jurisdiction.

10.     That the Mortgagor will not permit or suffer the use of any of the property for any purpose other than that for which the same is now agreed upon to be used; nor will it permit or suffer any alteration of or addition to the buildings or improvements ~~hereafter constructed~~ in or upon said property without the consent of the Mortgagee.

5

Inst. # 2012040239 - Page 7 of 11

11.   That the Regulatory Agreement, if any, executed by the Mortgagor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Mortgage. Upon default under the Regulatory Agreement and upon the request of the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, the Mortgagee, at its option, may declare the whole of the indebtedness secured hereby to be due and payable.

It is agreed that if at any time, a Writ of Fieri Facias or other execution is properly issued upon a judgment obtained upon the note secured hereby, or if an Action of Mortgage Foreclosure is brought or a Writ of Scire Facias is issued or other foreclosure proceedings instituted upon this mortgage, an attorney's fee commission for collection, viz five per centum (5.0%) of said principal debt or sum shall be payable, and shall be recovered in addition to all principal and interest and all other recoverable sums then due, besides costs of suit. The Mortgagor does hereby expressly waive and relinquish all benefit that may accrue to him by virtue of any and every law, civil or military, made or to be made hereafter exempting the mortgaged premises from attachment, levy and sale under execution.

It is further agreed that the holder of this mortgage, in any action to foreclose, shall be entitled to the appointment of a Receiver of the rents and profits of the mortgaged premises as a matter of right and without notice, with power to collect the rents, issues, and profits of said mortgaged premises, due and becoming due during the pendency of such foreclosure suit, such rents and profits being hereby expressly assigned and pledged as additional security for the payment of the indebtedness secured by this mortgage, without regard to the value of the mortgaged premises or the solvency of any person or persons liable for the payment of the mortgage indebtedness. The Mortgagor for itself and any subsequent owner hereby waives any and all defenses to the application for a Receiver and hereby specifically consents to such appointment without notice, but nothing herein contained is to be construed to deprive the holder of the mortgage of any other right, remedy, or privilege it may now have under the law to have a Receiver appointed. The provision for the appointment of a Receiver of the rents and profits, and the assignment of such rents and profits, is made an express condition upon which the loan hereby secured is made. The rights and remedies herein provided for shall. be deemed to be cumulative and in addition to, and not in limitation of, those provided by law.

It is also agreed that, for the purpose of preserving possession of said mortgaged premises to the Mortgagee, its successors and assigns, in the event of any default as defined below, the Mortgagor, for the Mortgagor and for the successors and assigns of the Mortgagor, does hereby authorize and empower any attorney of any court as attorney for the Mortgagor, and for the successors or assigns of the Mortgagor, to sign an agreement for entering in any competent court an amicable action or judgment in ejectment, without any stay of execution, against the Mortgagor, or the successors or assigns of the Mortgagor and for against all persons claiming under the Mortgagor, or the successors or assigns of the Mortgagor and for the recovery by the Mortgagee, its successors or assigns, of possession of the mortgaged premises. In any such action, this mortgage or a copy thereof, verified by affidavit, shall be a sufficient warrant of attorney. Thereupon a Writ of Habere Facias Possessionem may issue forthwith without any prior writ or proceeding whatsoever. It is hereby expressly agreed that if for any reason after such action has been commenced the same shall be discontinued, marked satisfied of record or be determined, or possession of the mortgaged premises shall remain in or be restored to the Mortgagor, or the successors or assigns of the Mortgagor, the Mortgagee, its successors and assigns, shall have the right for the same default or in the event of any subsequent defaults, to bring on or more further amicable actions in the manner hereinbefore set forth to recover possession of the mortgaged premises. The Mortgagee, its successors and assigns, shall have the right to bring such amicable action in ejectment after an Action of Mortgage Foreclosure is brought or after the issuance of a Scire Facias sur Mortgage or other foreclosure

6

proceedings are instituted upon this mortgage and after judgment thereon or therein, and after a sale of the mortgaged premises by the sheriff.

It is also expressly agreed that if the Mortgagor should fail to pay any installment of principal and interest or payment due pursuant to covenant one above within thirty (30) days after the date of such installment or payment, or if the Mortgagor should fail to perform any of the terms, conditions or covenants of the mortgage, the note, the building-loan agreement, or the regulatory agreement, such failure shall constitute a default and in every such case, the whole principal debt shall, at the option of the Mortgagee, become due and payable immediately, and it shall and may be lawful for said Mortgagee forthwith to bring an Action of Mortgage Foreclosure, to sue out of a Writ of Scire Facias, or to institute other foreclosure proceedings upon this mortgage, and to proceed to judgment and execution for recovery of said principal debt, all interest thereon, all sums advanced for payment of any ground rent, taxes, water rents, charges, claims or insurance premiums as aforesaid, and all other recoverable sums, together with an attorney's commission for collection, without further stay of execution or other process, any law, usage or custom to the contrary notwithstanding. The Mortgagor hereby waives and relinquishes unto and in favor of the Mortgagee, all benefits under the laws now in effect or hereafter passed to relieve the Mortgagor in any manner, or to reduce the amount of the note to any greater extent than the amount actually paid for the premises hereby mortgaged at the sale thereof in any judicial proceedings upon the said note or upon this mortgage.

Notwithstanding any other provision contained herein or in the Note, it is agreed that the execution of the Note shall impose no personal liability upon the Mortgagor for payment of the indebtedness evidenced thereby and in the event of a default, the holder of the Note shall look solely to the "Collateral" (defined below) in satisfaction of the indebtedness evidenced by the Note and will not seek or obtain any deficiency or personal judgment against the Mortgagor except such judgment or decree as may be necessary to foreclose and/or bar its interest in the Collateral, provided, that nothing in this condition and no action so taken shall operate to impair any obligation of the Mortgagor under the Regulatory Agreement herein referred to and made a part hereof. As used herein, "Collateral" shall mean and include (i) the property subject to this Mortgage, including, but not limited to, the land, improvements, equipment, personal property, and appurtenances thereto and the rents, issues and profits thereof, as set forth in this Mortgage and (ii) the collateral described in the Security Agreement of even date herewith given to further secure the Note between the Mortgagor and Mortgagee.

This mortgage and every covenant and agreement herein contained shall be binding upon and inure to the benefit of the Mortgagor and the Mortgagee and their respective successors and assigns and to the extent permitted by law shall bind every subsequent owner of the mortgaged premises.

[Signatures appear on following page]

GPO 912-217

7

Inst. # 2012040239 - Page 9 of 11

IN WITNESS WHEREOF, the Mortgagor has caused this instrument to be duly executed in its behalf by the Manager of its Sole Trustee as of the date first set forth above.

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,
a trust formed under the laws of Pennsylvania

By: SAUCON MANAGEMENT LLC,
a Pennsylvania limited liability company,
Trustee

By:
Name: Abraham R. Atiyeh
Title: Manager

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF _Lehigh_

On this 12 day of December, 2012, before me, the undersigned officer, personally appeared Abraham R. Atiyeh who acknowledged himself to be the Manager of the Sole Trustee of Saucon Trust, u/t/a dated October 1, 2007, a trust formed under the laws of Pennsylvania, and that he, as Manager of the Sole Trustee, being authorized to do so, executed the foregoing instrument for the purpose therein contained by signing the names of the limited liability company and such trust.

Notary Public in and for said County and State

(To be executed when another witnesseth to execution of mortgage by corporation)

NOTARIAL SEAL
TARA S. WALTERS
Notary Public
ALLENTOWN CITY, LEHIGH COUNTY
My Commission Expires Jun 20, 2015

CERTIFICATE OF RESIDENCE

I, Christine R. Chandler, do hereby certify that the correct address of the within-named Mortgagee is 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201, witness my hand this _____ day of December, 2012 .

Christine R. Chandler, Vice President
(On behalf of the Mortgagee)

## EXHIBIT A

### LEGAL DESCRIPTION

UNIT 1 of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

Inst. # 2012040239 - Page 11 of 11

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 2006S Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1.  South 86°47'33" West 266.09 foot; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2.  North 03' 14'23" West 59.03 feet;

3.  North 86' 41'33" East 18.00 feet;

4.  North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5.  North 86° 48'59" East 247.48 feet to the westerly right of way-line of Main Street; thence along the same

6.  South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:   117,610.588 Sq. Ft.    2.7000 Acres

MAY 0 9 2022

I hereby CERTIFY that this document is recorded in the
Recorder's Office Of Northampton County, Pennsylvania



Andrea P. Suter

Andrea F. Suter
Recorder of Deeds

Dorothy J. Edelman

Dorothy J. Edelman
Lead Deputy Recorder of Deeds

Inst. # 2012040239 - Page 1 of 11

# COUNTY OF NORTHAMPTON



### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 559-3077

Andrea F. Suter - Recorder
Dorothy J. Edelman - Deputy

**Book -** 2012-1  **Starting Page -** 300709
**\*Total Pages -** 11

Instrument Number - 2012040239
Recorded On 12/13/2012 At 1:05:05 PM
\* Instrument Type - MORTGAGE
Invoice Number - 727362
\* Mortgagor - SAUCON TRUST
\* Mortgagee - M&T REALTY CAPITAL CORPORATION
User - BLM
\* Customer - SIMPLIFILE LC E-RECORDING

| NCGIS Registry UPI Certification |
| On December 13, 2012 By HG |

**\*FEES**

| | | **\*RECORDED BY:** |
|---|---|---|
| STATE WRIT TAX | $0.50 | OMEGA ABSTRACT |
| JCS/ACCESS TO JUSTICE | $23.50 | 512 W HAMILTON STREET |
| RECORDING FEES | $25.00 | ALLENTOWN, PA 18101 |
| AFFORDABLE HOUSING | $14.02 | |
| AFFORDABLE HOUSING - ADMIN FEE | $2.48 | |
| COUNTY RECORDS IMPROVEMENT FEE | $2.00 | I hereby CERTIFY that Recorder's Office Of Northampton |
| DEEDS RECORDS IMPROVEMENT FEE | $3.00 | |
| UPI CERTIFICATION FEE | $10.00 | |
| TOTAL PAID | $80.50 | |



Andrea F. Suter
Recorder of Deeds

## THIS IS A CERTIFICATION PAGE
# Do Not Detach
### THIS PAGE IS NOW THE FIRST PAGE
### OF THIS LEGAL DOCUMENT

**Book: 2012-1**       **Page: 300709**

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

# Exhibit E

## Loan Sale Letter

DocuSign Envelope ID: 79C88910-7D3C-4284-A720-2BDEEA5856D2



OFFICE OF HOUSING

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-8000

<u>VIA UPS</u>

Saucon Trust
c/o Abraham Atiyeh
1177 N. Sixth Street
Whitehall, PA 18052

      Re:    Saucon Valley Manor Senior Living
            FHA Project No. 034-22096

Dear Mortgagor:

    The U.S. Department of Housing and Urban Development plans to include the HUD-held mortgage loan on your property, which is identified above, in an upcoming loan sale.  HUD is selling your loan. HUD is not foreclosing on your loan or selling your property in this sale.

    Your loan will be offered along with other HUD-held loans in a competitive loan sale.  Neither you, nor any of your principals, affiliates, and assigns can purchase the loan or qualify to bid in the loan sale. The details of the sale will be published in the Sale Announcement after a loan sale date is determined.  You will be able to view the Sale Announcement on the HUD website at <u>Asset Loan Sales Information</u>. After the sale of the mortgage loan on your property is closed, the new mortgagee will notify you of where to send your mortgage payments.

    All the mortgage loans in this sale will be sold without FHA mortgage insurance.  Unless your loan is subordinate to another FHA-insured mortgage loan, the Regulatory Agreement between you and HUD will no longer apply after the loan sale is closed, and you will no longer be obligated to meet its requirements.

    We remind you that, even though the mortgage loan on your property will be offered for sale, you must be in full compliance with the requirement for electronic submission of your annual financial statements for fiscal years 2020 through 2022 for this project and any other HUD projects you own. For example, calendar year 2022 annual financial statements for the period ending December 31, 2022, must have been submitted by March 31, 2023.  You must also continue to send your monthly mortgage payments to HUD until you are notified that the mortgage loan has been sold and closed. You may be assessed a late charge by HUD if payments are not received on time.

    In preparation for the mortgage loan sale, HUD <u>may</u> require access to the property securing your loan for the purposes of performing:

        •   An appraisal;

DocuSign Envelope ID: 79C88910-7D3C-4284-A720-2BDEEA5856D2

- An environmental assessment;
- A physical needs assessment/site inspection; and /or
- A market rent study.

In the near future, Falcon Capital Advisors (Falcon), HUD's Transaction Specialist, will have its subcontractors or representatives contact you or the property's management agent to arrange a day and time to perform these assessments and studies, if applicable. The two subcontractors engaged to perform the above assessments on behalf of Falcon for HUD are *BBG Real Estate Services, Valbridge Property Advisors,* and *HealthTrust.* In view of the short timeframe for completing these tasks, HUD appreciates your cooperation in granting access to these Falcon representatives.

In order to expedite the document retrieval component of the due diligence process, we ask that you or the property's management agent make copies of the documents listed below and give them to the subcontractors at the time of their visit. We also ask that you submit the requested documents via email to Falcon at HUDSales@FalconAssetSales.com. Should any additional documents be identified, the subcontractors will request them during the site visit. The requested documents are as follows:

- The most recent rent roll for the property;
- Evidence of current property insurance with HUD listed as an additional insured party;
- Operating statements from the date of the most recently submitted audited financial statements to the present; and
- The following year-end audited financial statements: 2020, 2021, 2022.

If you have any questions or need additional information, you may contact Falcon at 844-709-0763 or HUDSales@falconassetsales.com. You can also visit HUD's Asset Sales website at https://www.hud.gov/program_offices/housing/comp/asset/hsgloan

We appreciate your assistance and cooperation in this matter.

Sincerely,

Roger M. Lukoff

6/20/2023

Roger Lukoff
Deputy Assistant Secretary
Healthcare Programs

Cc:     Saucon Valley Manor Senior Living
        bccconst@yahoo.com
        rxh01@aol.com

DocuSign Envelope ID: 79C88910-7D3C-4284-A720-2BDEEA5856D2



OFFICE OF HOUSING

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-8000

VIA UPS

Whitehall Trust
c/o Abraham Atiyeh
1177 N. Sixth Street
Whitehall, PA 18052

      Re:    Whitehall Manor Senior Living
              FHA Project No. 034-22084

Dear Mortgagor:

      The U.S. Department of Housing and Urban Development plans to include the HUD-held mortgage loan on your property, which is identified above, in an upcoming loan sale. HUD is selling your loan. HUD is not foreclosing on your loan or selling your property in this sale.

      Your loan will be offered along with other HUD-held loans in a competitive loan sale. Neither you, nor any of your principals, affiliates, and assigns can purchase the loan or qualify to bid in the loan sale. The details of the sale will be published in the Sale Announcement after a loan sale date is determined. You will be able to view the Sale Announcement on the HUD website at Asset Loan Sales Information. After the sale of the mortgage loan on your property is closed, the new mortgagee will notify you of where to send your mortgage payments.

      All the mortgage loans in this sale will be sold without FHA mortgage insurance. Unless your loan is subordinate to another FHA-insured mortgage loan, the Regulatory Agreement between you and HUD will no longer apply after the loan sale is closed, and you will no longer be obligated to meet its requirements.

      We remind you that, even though the mortgage loan on your property will be offered for sale, you must be in full compliance with the requirement for electronic submission of your annual financial statements for fiscal years 2020 through 2022 for this project and any other HUD projects you own. For example, calendar year 2022 annual financial statements for the period ending December 31, 2022, must have been submitted by March 31, 2023. You must also continue to send your monthly mortgage payments to HUD until you are notified that the mortgage loan has been sold and closed. You may be assessed a late charge by HUD if payments are not received on time.

      In preparation for the mortgage loan sale, HUD <u>may</u> require access to the property securing your loan for the purposes of performing:

      •   An appraisal;

DocuSign Envelope ID: 79C88910-7D3C-4284-A720-2BDEEA5856D2

- An environmental assessment;
- A physical needs assessment/site inspection; and /or
- A market rent study.

In the near future, Falcon Capital Advisors (Falcon), HUD's Transaction Specialist, will have its subcontractors or representatives contact you or the property's management agent to arrange a day and time to perform these assessments and studies, if applicable. The two subcontractors engaged to perform the above assessments on behalf of Falcon for HUD are *BBG Real Estate Services, Valbridge Property Advisors*, and *HealthTrust*. In view of the short timeframe for completing these tasks, HUD appreciates your cooperation in granting access to these Falcon representatives.

In order to expedite the document retrieval component of the due diligence process, we ask that you or the property's management agent make copies of the documents listed below and give them to the subcontractors at the time of their visit. We also ask that you submit the requested documents via email to Falcon at HUDSales@FalconAssetSales.com. Should any additional documents be identified, the subcontractors will request them during the site visit. The requested documents are as follows:

- The most recent rent roll for the property;
- Evidence of current property insurance with HUD listed as an additional insured party;
- Operating statements from the date of the most recently submitted audited financial statements to the present; and
- The following year-end audited financial statements: 2020, 2021, 2022.

If you have any questions or need additional information, you may contact Falcon at 844-709-0763 or HUDSales@falconassetsales.com. You can also visit HUD's Asset Sales website at https://www.hud.gov/program_offices/housing/comp/asset/hsgloan
We appreciate your assistance and cooperation in this matter.

Sincerely,

Roger M. Lukoff

6/20/2023

Roger Lukoff
Deputy Assistant Secretary
Healthcare Programs

Cc:     Whitehall Manor Senior Living
        abe7777@icloud.com
        rxh01@aol.com

# Exhibit F

# Notice of Sale

Federal Register/ Vol. 88, No. 144/ Friday, July 28, 2023/ Notices 48905

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Immigration and Customs Enforcement**

**[OMB Control Number 1653–0049]**

## Agency Information Collection Activities; Revision of a Currently Approved Collection: Suspicious/ Criminal Activity Tip Reporting

**AGENCY:** U.S. Immigration and Customs Enforcement, Department of Homeland Security.

**ACTION:** 30-Day notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act (PRA) of 1995 the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) will submit the following Information Collection Request (ICR) to the Office of Management and Budget (OMB) for review and clearance. This information collection was previously published in the **Federal Register** on November 1, 2021, allowing for a 60-day comment period. ICE received four comments. The purpose of this notice is to allow an additional 30 days for public comments.

**DATES:** Comments are encouraged and will be accepted until August 28, 2023.

**ADDRESSES:** Written comments and recommendations for the proposed information collection should be sent within 30 days of the publication of this notice to *www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** For specific question related to collection activities, please contact Jody C. Fasenmyer (802–662–8115), *jody.c.fasenmyer@ice.dhs.gov*, U.S. Immigration and Customs Enforcement.

**SUPPLEMENTARY INFORMATION:**

### Comments

Written comments and suggestions from the public and affected agencies concerning the proposed collection of information should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agencies estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

### Overview of This Information Collection

(1) Type of Information Collection: Revision of a Currently Approved Collection.

(2) Title of the Form/Collection: Suspicious/Criminal Activity Tip Reporting.

(3) Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection: 73–061, U.S. Immigration and Customs Enforcement.

(4) Affected public who will be asked or required to respond, as well as a brief abstract: Primary: Individual or Households. The Department of Homeland Security (DHS) tip reporting capability will facilitate the collection of information from the public and law enforcement partners regarding allegations of crimes enforced by DHS.

(5) An estimate of the total number of responses and the amount of time estimated for an average respondent to respond: ICE estimates a total of 194,381 responses at .11 minutes (.183 hours) per response.

(6) An estimate of the total public burden (in hours) associated with the collection: 35,637 annual burden hours.

Dated: July 24, 2023.

**Scott Elmore,**

*ICE PRA Clearance Officer.*

[FR Doc. 2023–15984 Filed 7–27–23; 8:45 am]

**BILLING CODE 9111–28–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–6357–N–02]**

## Notice of HUD-Held Multifamily and Healthcare Loan Sale (MHLS 2023–2)

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, U.S. Department of Housing and Urban Development (HUD).

**ACTION:** Notice of sale of one (1) multifamily and nine (9) healthcare mortgage loans.

**SUMMARY:** This notice announces HUD's intention to sell one unsubsidized multifamily and nine unsubsidized healthcare mortgage loans, without Federal Housing Administration (FHA) insurance, in a competitive, sealed bid sale on or about August 30, 2023 (MHLS 2023–2 or Loan Sale). This notice also describes generally the bidding process for the sale and certain persons who are ineligible to bid.

**DATES:** A Bidder's Information Package (BIP) will be made available on or about August 2, 2023. Bids for the loans must be submitted on the bid date, which is currently scheduled for August 30, 2023, between certain specified hours. HUD anticipates that an award or awards will be made on or before September 6, 2023. Closing is expected to take place on September 20, 2023.

**ADDRESSES:** To become a qualified bidder and receive the BIP, prospective bidders must complete, execute, and submit a Confidentiality Agreement and a Qualification Statement acceptable to HUD. Both documents will be available on the Mission Capital Advisors bidding system website: *market.missioncap.com*. This website contains information and links for sale registration and electronically completing and submitting the documents.

Questions about bidder qualification process may be sent to: Transaction Specialist at 1–844–709–0763 or email *HUDSales@FalconAssetSales.com*.

**FOR FURTHER INFORMATION CONTACT:** John Lucey, Director, Asset Sales, U.S. Department of Housing and Urban Development at *john.w.lucey@hud.gov* or telephone (202) 708–2625.

**SUPPLEMENTARY INFORMATION:** HUD announces its intention to sell, in MHLS 2023–2, ten (10) unsubsidized mortgage loans (Mortgage Loans), consisting of nine (9) first lien healthcare notes secured by skilled nursing and assisted living facilities located in various locations within Alabama, Iowa, Maine, Nebraska, New Jersey, Ohio, and Pennsylvania, and one (1) first lien multifamily note secured by a multifamily property located in Kentucky. The Healthcare Mortgage Loans are non-performing mortgage loans. The multifamily loan is a performing mortgage loan. The listing of the Mortgage Loans is included in the BIP. The Mortgage Loans will be sold without FHA insurance and with HUD servicing released. HUD will offer qualified bidders an opportunity to bid competitively on the Mortgage Loans.

The Mortgage Loans will be stratified for bidding purposes into mortgage loan pools as appropriate. Each pool will contain Mortgage Loans that generally have similar performance, property

type, geographic location, lien position and other characteristics. Loans may be offered in pools of more than one loan and, or in single loan pools. Qualified bidders may bid on one or more pools.

Bidder eligibility criteria is set forth in the Qualification Statement. As detailed in the Qualification Statement, certain entities/individuals may be precluded from bidding depending on their prior involvement with the loan(s).

**The Bidding Process**

The BIP describes in detail the procedure for bidding in MHLS 2023–2. The BIP also includes a standardized non-negotiable loan sale agreement (Loan Sale Agreement).

As part of its bid, each bidder must submit a minimum deposit of the greater of One Hundred Thousand Dollars ($100,000) or ten percent (10%) of the aggregate bid prices for all of such bidder's bids. In the event the bidder's aggregate bid is less than One Hundred Thousand Dollars ($100,000), the minimum deposit shall be not less than fifty percent (50%) of the bidder's aggregate bid. HUD will evaluate the bids submitted and determine the successful bid(s) in its sole and absolute discretion. If a bidder is successful, the bidder's deposit will be non-refundable and will be applied toward the purchase price, with any amount beyond the purchase price being returned to the bidder. Deposits will be returned to unsuccessful bidders after notification to successful bidders. Closings are expected to take place on September 20, 2023.

The Loan Sale Agreement, which is included in the BIP, contains additional terms and details. To ensure a competitive auction, the terms of the bidding process and the Loan Sale Agreement are not subject to negotiation.

**Due Diligence Review**

The BIP describes the due diligence process for reviewing loan files in MHLS 2023–2. Qualified bidders will be able to access loan information remotely via a high-speed internet connection. Further information on performing due diligence review of the Mortgage Loans is provided in the BIP.

**Mortgage Loan Sale Policy**

HUD reserves the right to add Mortgage Loans to or delete Mortgage Loans from MHLS 2023–2 at any time prior to the award date. HUD also reserves the right to reject any and all bids, in whole or in part, without prejudice to HUD's right to include the Mortgage Loans in a later sale. The Mortgage Loans will not be withdrawn

after the award date except as is specifically provided for in the Loan Sale Agreement.

This is a sale of unsubsidized mortgage loans, pursuant to Section 204(a) of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1997, (12 U.S.C. 1715z–11a[a]).

**Mortgage Loan Sale Procedure**

HUD selected a competitive auction as the method to sell the Mortgage Loans. This method of sale optimizes HUD's return on the sale of these Mortgage Loans, affords the greatest opportunity for all qualified bidders to bid on the Mortgage Loans, and provides the most efficient vehicle for HUD to dispose of the Mortgage Loans.

**Bidder Eligibility**

In order to bid in the sale, a prospective bidder must complete, execute, and submit both a Confidentiality Agreement and a Qualification Statement acceptable to HUD. The following individuals and entities are among those INELIGIBLE to bid on the Mortgage Loans being sold in MHLS 2023–2:

1. A mortgagor or healthcare operator, including its principals, affiliates, family members, and assigns, with respect to one or more of the Mortgage Loans being offered in the Loan Sale, or an Active Shareholder (as such term is defined in the Qualification Statement);

2. With respect to any other HUD multifamily and/or healthcare mortgage loan not offered in the Loan Sale, any mortgagor or healthcare operator, including any Related Party (as such term is defined in the Qualification Statement) of either, that has failed to file financial statements or is otherwise in default under such mortgage loan or is in violation or noncompliance of any regulatory or business agreements with HUD and that fails to cure such default or violation by no later than August 1, 2023;

3. Any individual or entity that is debarred, suspended, or excluded from doing business with HUD pursuant to Title 2 of the Code of Federal Regulations, Part 2424;

4. Any contractor, subcontractor and/or consultant or advisor (including any agent, employee, partner, director, principal or affiliate of any of the foregoing) who performed services for, or on behalf of, HUD in connection with MHLS 2023–2;

5. Any employee of HUD, a member of such employee's family, or an entity owned or controlled by any such

employee or member of such an employee's family;

6. Any individual or entity that uses the services, directly or indirectly, of any person or entity ineligible under provisions (3) through (5) above to assist in preparing its bid on any Mortgage Loan;

7. An FHA-approved mortgagee, including any principals, affiliates, or assigns thereof, that has received FHA insurance benefits for one or more of the Mortgage Loans being offered in the Loan Sale;

8. An FHA-approved mortgagee and/or loan servicer, including any principals, affiliates, or assigns thereof, that originated one or more of the Mortgage Loans being offered in the Loan Sale if the Mortgage Loans defaulted within two years of origination and resulted in the payment of an FHA insurance claim;

9. Any affiliate, principal or employee of any person or entity that, within the two-year period prior to August 1, 2023, serviced any Mortgage Loan or performed other services for or on behalf of HUD in regard to any Mortgage Loan;

10. Any contractor or subcontractor working for or on behalf of HUD that had access to information concerning any Mortgage Loan or provided services to any person or entity which, within the two-year period prior to August 1, 2023, had access to information with respect to any Mortgage Loan; and/or

11. Any employee, officer, director or any other person that provides or will provide services to the prospective bidder with respect to the Mortgage Loans during any warranty period established for the Loan Sale, that serviced the Mortgage Loans or performed other services for or on behalf of HUD or within the two-year period prior to August 1, 2023, provided services to any person or entity which serviced, performed services or otherwise had access to information with respect to any Mortgage Loan for or on behalf of HUD.

Other entities/individuals not described herein may also be restricted from bidding on the Mortgage Loans, as fully detailed in the Qualification Statement.

The Qualification Statement provides further details pertaining to eligibility requirements. Prospective bidders should carefully review the Qualification Statement to determine whether they are eligible to submit bids on the Mortgage Loans in MHLS 2023–2.

**Freedom of Information Act Requests**

HUD reserves the right, in its sole and absolute discretion, to disclose information regarding MHLS 2023–2, including, but not limited to, the identity of any successful bidder and its bid price or bid percentage for the Mortgage Loans, upon the closing of the sale of the Mortgage Loans. Even if HUD elects not to publicly disclose any information relating to MHLS 2023–2, HUD may be required to disclose information relating to MHLS 2023–2 pursuant to the Freedom of Information Act and all regulations promulgated thereunder.

**Scope of Notice**

This notice applies to MHLS 2023–2 and does not establish HUD's policy for the sale of other mortgage loans.

**Julia R. Gordon,**

*Assistant Secretary for Housing—Federal Housing Commissioner.*

[FR Doc. 2023–15960 Filed 7–27–23; 8:45 am]

**BILLING CODE 4210–67–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[Docket No. FWS–HQ–IA–2023–0147; FXIA16710900000–234–FF09A30000]**

### Foreign Endangered Species; Receipt of Permit Applications

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of receipt of permit applications; request for comments.

**SUMMARY:** We, the U.S. Fish and Wildlife Service, invite the public to comment on applications to conduct certain activities on foreign species that are listed as endangered under the Endangered Species Act (ESA). With some exceptions, the ESA prohibits activities with listed species unless Federal authorization is issued that allows such activities. The ESA also requires that we invite public comment before issuing permits for any activity otherwise prohibited by the ESA with respect to any endangered species.

**DATES:** We must receive comments by August 28, 2023.

**ADDRESSES:**

*Obtaining Documents:* The applications, application supporting materials, and any comments and other materials that we receive will be available for public inspection at *https://www.regulations.gov* in Docket No. FWS–HQ–IA–2023–0147.

*Submitting Comments:* When submitting comments, please specify the

name of the applicant and the permit number at the beginning of your comment. You may submit comments by one of the following methods:

• *Internet: https:// www.regulations.gov.* Search for and submit comments on Docket No. FWS– HQ–IA–2023–0147.

• *U.S. mail:* Public Comments Processing, Attn: Docket No. FWS–HQ– IA–2023–0147; U.S. Fish and Wildlife Service Headquarters, MS: PRB/3W; 5275 Leesburg Pike; Falls Church, VA 22041–3803.

For more information, see Public Comment Procedures under **SUPPLEMENTARY INFORMATION.**

**FOR FURTHER INFORMATION CONTACT:** Timothy MacDonald, by phone at 703– 358–2185 or via email at *DMAFR@ fws.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

**I. Public Comment Procedures**

*A. How do I comment on submitted applications?*

We invite the public and local, State, Tribal, and Federal agencies to comment on these applications. Before issuing any of the requested permits, we will take into consideration any information that we receive during the public comment period.

You may submit your comments and materials by one of the methods in **ADDRESSES.** We will not consider comments sent by email or to an address not in **ADDRESSES.** We will not consider or include in our administrative record comments we receive after the close of the comment period (see **DATES**).

When submitting comments, please specify the name of the applicant and the permit number at the beginning of your comment. Provide sufficient information to allow us to authenticate any scientific or commercial data you include. The comments and recommendations that will be most useful and likely to influence agency decisions are: (1) Those supported by quantitative information or studies; and (2) those that include citations to, and analyses of, the applicable laws and regulations.

*B. May I review comments submitted by others?*

You may view and comment on others' public comments at *https:// www.regulations.gov* unless our allowing so would violate the Privacy Act (5 U.S.C. 552a) or Freedom of Information Act (5 U.S.C. 552).

*C. Who will see my comments?*

If you submit a comment at *https:// www.regulations.gov,* your entire comment, including any personal identifying information, will be posted on the website. If you submit a hardcopy comment that includes personal identifying information, such as your address, phone number, or email address, you may request at the top of your document that we withhold this information from public review. However, we cannot guarantee that we will be able to do so. Moreover, all submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public disclosure in their entirety.

**II. Background**

To help us carry out our conservation responsibilities for affected species, and in consideration of section 10(c) of the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et seq.*), we invite public comments on permit applications before final action is taken. With some exceptions, the ESA prohibits certain activities with listed species unless Federal authorization is issued that allows such activities. Permits issued under section 10(a)(1)(A) of the ESA allow otherwise prohibited activities for scientific purposes or to enhance the propagation or survival of the affected species. Service regulations regarding prohibited activities with endangered species, captive-bred wildlife registrations, and permits for any activity otherwise prohibited by the ESA with respect to any endangered species are available in title 50 of the Code of Federal Regulations in part 17.

**III. Permit Applications**

We invite comments on the following applications.

Applicant: Fresno Chaffee Zoo Corporation, Fresno, CA; Permit No. PER3130634

The applicant requests a permit to import one live female captive-born Sumatran orangutan (*Pongo abelii*) from the Toronto Zoo, Toronto, Ontario, Canada for the purpose of enhancing the

# Exhibit G

## Letter from Windstream



BERGER
LAW GROUP P.C.

Phillip D. Berger *†
Matthew R. Kaufmann

*Also member of New Jersey Bar
† Also member of Washington, D.C. Bar

*Of Counsel*
Michael S. Dinney

919 Conestoga Road
Building 3, Suite 114
Rosemont, PA 19010
Tel 610-668-0800
Fax 610-668-2800
www.BergerLawPC.com

Berger@BergerLawPC.com
(610) 668-0774

October 5, 2023

*VIA CERTIFIED MAIL*
*AND REGULAR MAIL*

Whitehall Trust
1177 N. Sixth Street
Whitehall, PA 18052

> **RE:** *Windstream Capital LLC v. Whitehall Fiduciary, LLC, as Trustee of Whitehall Trust u/t/a dated August 1, 2007*

Dear Sir/Madam:

Please be advised that we represent Windstream Capital LLC, successor by assignment from the Secretary of Housing and Urban Development, successor by assignment from M & T Realty Capital Corporation (hereinafter "Windstream Capital LLC") with regard to the above-captioned matter. Whitehall Fiduciary, LLC, as Trustee of Whitehall Trust u/t/a August 1, 2007 ("Whitehall") is indebted to Windstream Capital LLC pursuant to the terms of that certain promissory note in the principal sum of $15,788,700.00 (the "Loan") dated January 26, 2012 (the "Note"). We have been notified that Whitehall is in default of the Note by failing to pay amounts due and owing thereon.

As a result of Whitehall's default, we have been notified that Whitehall is obligated to make payment to Windstream Capital of the total sum of $13,525,917.84 as of October 16, 2023 which is due and owing as follows:

| | |
|---|---|
| Principal | $11,479,039.44 |
| Accrued Interest 9/1/23-10/16/23 | 49,576.63 |
| Delinquent Principal and Interest | 1,955,658.60 |
| Late Fees | 39,113.17 |
| Payoff Processing Fee | 500.00 |
| Recording Fees | 150.00 |
| Attorneys Fees as of 10/4/23 | 1,880.00 |
| TOTAL DUE: | $13,525,917.84 |

October 5, 2023
Page 2

If the total balance due and owing to Windstream Capital LLC on the foregoing obligation is not paid in full by October 16, 2023, Windstream Capital LLC may take certain actions available at law to enforce its rights against Whitehall, which may include, but not be limited to, foreclosing of the real estate collateral securing the Loan.  Pursuant to the terms of the Note, if such actions are taken by Windstream Capital LLC, Whitehall will be responsible to Windstream Capital LLC for its legal expenses incurred to enforce its rights, including attorney's fees and costs of suit.  Your immediate attention to this matter is required.

Windstream Capital LLC reserves and preserves all rights and remedies available to it in connection with the Loan, the Loan Documents at law or in equity. Nothing contained herein is intended to constitute a release, waiver, limitation, or modification of the foregoing.  Any delay or forbearance by Windstream Capital LLC in the enforcement or pursuit of any of its rights and remedies under the Loan, or applicable law shall not constitute a waiver thereof, nor shall it be a bar to the exercise of Windstream Capital LLC's rights or remedies at a later date.

If you have any questions, or would like to discuss this matter, please have your attorney contact me.

Very truly yours,

PHILLIP D. BERGER

PDB/slt
cc:  Dawn O'Boyle
     Jeffrey Kurtzman, Esquire (kurtzman@kurtzmansteady.com)



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Whitehall Trust
1177 N. Sixth Street
Whitehall, PA 18052

9590 9402 8288 3094 1110 03

2. Article Number *(Transfer from service label)*

7022 1670 0002 3313 3767

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Certified Mail®
☐ Adult Signature Restricted Delivery
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ all
☐ all Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For Delivery Information visit our website at www.usps.com®.

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)     $
☐ Return Receipt (electronic)   $
☐ Certified Mail Restricted Delivery   $
☐ Adult Signature Required   $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage
$

Total Postage
$

Sent To   Whitehall Trust

Street an   1177 N. Sixth Street

City, Sta   Whitehall, PA 18052

7022 1670 0002 3313 3767

CERTIFIED MAIL

# Exhibit H

# Assignment of Mortgage

Inst. # 2024012857 - Page 1 of 6

This instrument
prepared by:
Lehigh Valley 1 LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

After recording, please return to:
Lehigh Valley 1, LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

Premises: 1177 6th Street
Township of Whitehall
Parcel: 549893788632-2

## ASSIGNMENT OF MORTGAGE

Project Name:  Whitehall Manor Senior Living City, State:  Whitehall, Pennsylvania

Borrower: Whitehall Fiduciary, LLC Original Amount: $15,788,700.00

WINDSTREAM CAPITAL LLC  ("Assignor"),  in consideration of Ten Dollars ($10.00) and other good and valuable consideration, hereby assigns, transfers, sets over and conveys to Lehigh Valley 1 LLC ("Assignee"), without recourse, the following:

1.    that certain Open-End Mortgage dated January 19, 2012, to be effective January 26, 2012 and recorded on January 26 , 2012 as Instrument No. 2012002759, in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania, as assigned, amended or modified from time to time (the "Mortgage", as further described on Exhibit B), which Mortgage secures that certain Mortgage Note dated January 26, 2012 (the "Note") and encumbers the property described herein and on Exhibit A attached hereto; and

2.    such other documents, agreements, installments, and other collateral (excluding the Regulatory Agreement reference in the Mortgage) which evidence, secure or otherwise relate to Windstream Capital LLC's right, title or interest in and to the Mortgage  and/or the Note, including without limitation all security agreements, intercreditor agreements, deposit account instructions and service agreements, deposit account control agreements, and the title insurance policies and hazard policies that may presently be in effect.

Inst. # 2024012857 - Page 2 of 6

**IN WITNESS WHEREOF,** Windstream Capital LLC has caused this Assignment to be executed and delivered under seal by its duly authorized agent as of the 15 day of _May_ 2024.

WITNESS:                           WINDSTREAM CAPITAL LLC

Name: Antoinette Hernandez

                                  By: James Featangelo

                                  Its: _Manager_

Name: KEVIN BANDEL


## ACKNOWLEDGEMENT

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this 15 day of _May_ , 2024

by, _James Featangelo_ , who is personally known to me or who has

produced_____ as identification and who did take an oath.


NOTARY PUBLIC, STATE OF FLORIDA



SHANNA ALVAREZ
MY COMMISSION # HH 332765
EXPIRES: November 16, 2026

Inst. # 2024012857 - Page 3 of 6

## CERTIFICATE OF RESIDENCE

The address of the within-named Assignee is:

Lehigh Valley 1 LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

On behalf of Assignee:

By:

Name:    James Pratangelo

Title:    Manager

Inst. # 2024012857 - Page 4 of 6

## Exhibit A

**UNIT 1 OF WHITEHALL MANOR CONDOMINIUM,** according to the **Declaration** of Condominium of **Whitehall Manor** Condominium dated **August 13, 2008 recorded in** the **Office** of the **Recorder** of **Deeds of Lehigh County,** Pennsylvania as its Document ID# 7494518.

**PARCEL ID NO. 5498 9378 8632-2**

Together with an undivided interest of 50% of, in and to the Common Elements of the said **WHITEHALL MANOR CONDOMINIUM.**

Inst. # 2024012857 - Page 5 of 6

## EXHIBIT B

### Mortgage Description – Assignments of Mortgage

1   Open-End Mortgage executed by Whitehall Fiduciary, LLC, as Trustee of Whitehall Trust U/T/A dated August 1, 2007, in favor of M&T Realty Capital Corporation, dated January 19, 2012, to be effective January 26, 2012, and recorded on January 26, 2012, as Instrument No. 2012002759, in the Office of the Recorder of Deeds of Lehigh County, Pennsylvania ("Recorder");

    a.   Assignment of Mortgage executed by M&T Realty Capital Corporation to the United States Secretary of Housing and Urban Development dated November 8, 2022, effective as of November 16, 2022, and recorded on November 16, 2022, as Instrument No. 2022038363, with the Recorder;

    b.   Assignment of Mortgage executed by the Secretary of Housing and Urban Development to Windstream Capital LLC dated September 20, 2023, and recorded on October 30, 2023, as Instrument No. 2023025934

159430045.1

Inst. # 2024012857 - Page 6 of 6

## *MICHELLE GRAUPNER*
### *LEHIGH COUNTY CLERK OF JUDICIAL RECORDS*



**Recorder of Deeds Division**
**Lisa Stella-Ali, Chief Deputy**
**Lehigh County Courthouse**
**455 W. Hamilton Street - Room 122**
**Allentown, PA 18101-1614**
**(610) 782-3162**

\*RETURN DOCUMENT TO:
CAPITOL LIEN RECORDS & RESEARCH
1010 N DALE ST
ST. PAUL, MN 55117

**Instrument Number - 2024012857**
Recorded On 6/10/2024 At 3:00:10 PM
\* Instrument Type - ASSIGNMENT OF MORTGAGE
Invoice Number - 546999        User ID: KW            \*Total Pages - 6
\* Grantor - WINDSTREAM CAPITAIL LLC  WHITEHALL FIDUCIARY LLC
\* Grantee - LEHIGH VALLEY 1 LLC
\* Customer - CAPITOL LIEN RECORDS & RESEARCH

\* FEES
```
STATE WRIT TAX             $0.50
STATE JCS                 $40.25
RECORDING FEES            $18.00
COUNTY ARCHIVES FEE        $2.00
ROD ARCHIVES FEE           $3.00
UPI CERTIFICATION FEES    $10.00
TOTAL PAID                $73.75
```

I hereby CERTIFY that this document is
Recorded in the Recorder of Deeds Office
of Lehigh County, Pennsylvania



Michelle Graupner
Clerk of Judicial Records
Recorder of Deeds Division

**LCGIS Registry UPI Certification**
**On June 10, 2024 By TLL**

## THIS IS A CERTIFICATION PAGE

# Do Not Detach

## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

INSTRUMENT NUMBER - **2024012857**



Inst. # 2024011568 - Page 1 of 6

# COUNTY OF NORTHAMPTON

### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 829-6210

Andrea F. Suter - Recorder
Dorothy J. Edelman - Lead Deputy
Barbara L. Manieri - Deputy



**Book - 2024-1   Starting Page - 99908**
\*Total Pages - 6

Instrument Number - 2024011568
Recorded On 6/11/2024 At 9:04:41 AM

| NCGIS Registry UPI Certification |
| On June 10, 2024 By KW |

\* Instrument Type - ASSIGNMENT OF MORTGAGE
  Invoice Number - 1084517
\* Grantor - WINDSTREAM CAPITAL LLC
\* Grantee - LEHIGH VALLEY 1 LLC
  User - MKTE
\* Customer - CAPITOL LIEN RECORDS & RESEARCH

\*FEES

| | | \*RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | CAPITOL LIEN RECORDS & RESEARCH |
| JCS/ACCESS TO JUSTICE | $40.25 | 1010 N DALE ST |
| RECORDING FEES | $17.00 | ST. PAUL, MN 55117 |
| COUNTY RECORDS | $2.00 | |
| IMPROVEMENT FEE | | |
| DEEDS RECORDS | $3.00 | |
| IMPROVEMENT FEE | | |
| UPI CERTIFICATION FEE | $10.00 | |
| TOTAL PAID | $72.75 | |

I hereby CERTIFY that this document is recorded in the
Recorder's Office Of Northampton County, Pennsylvania

*Andrea F. Suter*

Andrea F. Suter
Recorder of Deeds

## THIS IS A CERTIFICATION PAGE

# Do Not Detach

THIS PAGE IS NOW THE FIRST PAGE
OF THIS LEGAL DOCUMENT

# Book: 2024-1        Page: 99908

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

This instrument
prepared by:
Lehigh Valley 1 LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

After recording, please return to:
Lehigh Valley 1, LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

Premises: 1050 Main Street
Borough of Hellertown
Parcel: Q7SW2A-1-3 0715

## ASSIGNMENT OF MORTGAGE

Project Name: Saucon Valley Manor City, State: Hellertown, Pennsylvania

Borrower: Saucon Trust        Original Amount: $19,462,800.00

WINDSTREAM CAPITAL LLC ("Assignor"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration, hereby assigns, transfers, sets over and conveys to Lehigh Valley 1 LLC ("Assignee"), without recourse, the following:

1.     that certain Open-End Mortgage dated December 1, 2012, and recorded on December 13, 2012 in Book 2012-1, at Page 300709, in the Office of the Recorder of Deeds of Northampton County, Pennsylvania, as assigned, amended or modified from time to time (the "Mortgage", as further described on Exhibit B), which Mortgage secures that certain Mortgage Note dated December 1, 2012 (the "Note") and encumbers the property described herein and on Exhibit A attached hereto; and

2.     such other documents, agreements, installments, and other collateral (excluding the Regulatory Agreement reference in the Mortgage) which evidence, secure or otherwise relate to Windstream Capital LLC's right, title or interest in and to the Mortgage and/or the Note, including without limitation all security agreements, intercreditor agreements, deposit account instructions and service agreements, deposit account control agreements, and the title insurance policies and hazard policies that may presently be in effect.

**IN WITNESS WHEREOF,** Windstream Capital LLC has caused this Assignment to be executed and delivered under seal by its duly authorized agent as of the 15 day of May 2024.

WITNESS:

Name: Antoinette Hernandez

Name: KEVIN BANDEL

WINDSTREAM CAPITAL LLC

By: James Fratangelo

Its: Manager

## ACKNOWLEDGEMENT

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this 15 day of May _____, 2024

by, James Fratangelo _____, who is personally known to me or who has

produced_____ as identification and who did take an oath, as manager of Windstream Capital LLC.



NOTARY PUBLIC, STATE OF FLORIDA

SHANNA ALVAREZ
MY COMMISSION # HH 332785
EXPIRES: November 18, 2026

## CERTIFICATE OF RESIDENCE

The address of the within-named Assignee is:

Lehigh Valley 1 LLC
2100 Ponce de Leon Blvd., Suite 720
Coral Gables, FL 33134

On behalf of Assignee

By:

Name: James Fratangelo
Title: Manager

EXHIBIT A

LEGAL DESCRIPTION

UNIT I of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-5-0715

Being more fully bounded as set forth on attached page

DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 2006S Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1. South 86°47'33" West 266.09 feet; thence in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;
2. North 03° 14'23" West 59.03 feet;
3. North 86° 41'33" East 18.00 feet;
4. North 03° 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same
5. North 86° 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same
6. South 03° 18'24" East 470.30 feet to the place of beginning.

CONTAINS:   117,610.588 Sq. Ft.   2.7000 Acres

**EXHIBIT B**

**Mortgage Description – Assignments of Mortgage**

1.  Mortgage executed by Saucon Trust, U/T/A dated December 1, 2012, in favor of M&T Realty Capital Corporation and recorded on December 13, 2012, in Book 2012-1, at Page 300709, Instrument No. 2012040239 in the Office of the Recorder of Deeds of Northampton County, Pennsylvania ("Recorder");

    a.  Assignment of Mortgage executed by M&T Realty Capital Corporation to the United States Secretary of Housing and Urban Development dated November 8, 2022, effective as of November 16, 2022, and recorded on November 21, 2022, in Book 2022-1, at Page 306345, Instrument No. 2022036070, with the Recorder;

    b.  Assignment of Mortgage executed by the Secretary of Housing and Urban Development to Windstream Capital LLC dated September 20, 2023, and recorded on October 30, 2023, in Book 2023-1, at Page 207700, Instrument No. 2023023619, with the Recorder.

159432397.1

Exhibit I

Saucon Regulatory Agreement

Inst. # 2012040240 - Page 1 of 15

# COUNTY OF NORTHAMPTON



### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 559-3077

Andrea F. Suter - Recorder
Dorothy J. Edelman - Deputy

**Book - 2012-1   Starting Page - 300720**
**\*Total Pages -   15**

Instrument Number - 2012040240

Recorded On 12/13/2012 At 1:05:06 PM

| NCGIS Registry UPI Certification |
| On December 13, 2012 By HG |

\* Instrument Type - AGREEMENT

Invoice Number - 727362

\* Grantor - SAUCON TRUST

\* Grantee - SECRETARY OF HOUSING AND URBAN DEVELOPMENT

User - BLM

\* Customer - SIMPLIFILE LC E-RECORDING

| \*<u>FEES</u> | | \*<u>RECORDED BY:</u> |
|---|---|---|
| STATE WRIT TAX | $0.50 | OMEGA ABSTRACT |
| RECORDING FEES | $33.00 | 512 W HAMILTON STREET |
| COUNTY RECORDS IMPROVEMENT FEE | $2.00 | ALLENTOWN, PA 18101 |
| DEEDS RECORDS IMPROVEMENT FEE | $3.00 | |
| UPI CERTIFICATION FEE | $10.00 | I hereby CERTIFY that this document is recorded in the |
| TOTAL PAID | $48.50 | Recorder's Office Of Northampton County, Pennsylvania |



Andrea P. Suter

Andrea F. Suter
Recorder of Deeds

## THIS IS A CERTIFICATION PAGE
# Do Not Detach
### THIS PAGE IS NOW THE FIRST PAGE
### OF THIS LEGAL DOCUMENT

**Book: 2012-1      Page:  300720**

00AE9A

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

Inst. # 2012040240 - Page 2 of 15

After Recording, Return to:

**OMEGA ABSTRACT COMPANY**
Suite 400 Commonwealth Building
Allentown, PA 18104
610-821-8600
Fax 610-821-8635

Tax Parcel   Q7SW2A – 1 – 3 - 0715

Address:   1050 Main Street
            Hellertown, PA

REGULATORY AGREEMENT

BETWEEN

SAUCON TRUST

AND

SECRETARY OF HOUSING AND URBAN DEVELOPMENT

| **Regulatory Agreement for Multifamily Housing Projects** | U.S. Department of Housing And Urban Development Office of Housing Federal Housing Commissioner | | |
|---|---|---|---|
| Under Sections 207, 220, 221 (d) (4), 231 and 232, Except Nonprofits | | | |
| Project Number B34-22096 | Mortgagee M&T Realty Capital Corporation | | |
| Amount of Mortgage Note $19,462,800.00 | Date December 1, 2012 | | |
| Mortgage Recorded    State Pennsylvania | County Northampton | Date Contemporaneously herewith | Originally endorsed for Insurance under Section 232, pursuant to Section 223(f) |
| Book | Page | | |

This Agreement, together with the LEAN Rider to Regulatory Agreement for Multifamily Housing Projects attached hereto and made a part hereof (the "Rider"), entered into this as of the 1st day of December, 2012 between Saucon Trust, a/b/a dated October 1, 2007 whose address is 1050 Main Street, Hellertown, Pennsylvania 18055, their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors (hereinafter referred to as Secretary):

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $10,264.00 per month, unless a different date or amount is approved in writing by the Secretary.  See Rider Paragraph A.

Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee.

Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default. In addition, in the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary. .

3. Real property covered by the mortgage and this agreement is described in Schedule Exhibit A attached hereto.

(This paragraph 4 is not applicable to cases insured under Section 232.)

Replaces FHA-2496 which may be used until supply exhausted        Page 1 of 5        Form HUD-92466 (11/2002) ref Handbook 4571.1

Inst. # 2012040240 - Page 4 of 15

4. (a) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary, for any project subject to regulation of rent by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

(b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owners or others to such tenant upon his request, in addition to the facilities and services included in the approved rental schedule. Approval of charges for facilities and services is not required for any project not subject to regulation of rent by the Secretary.

(c) For any project subject to regulation of rent by the Secretary, the Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which Owners have no effective control or;

(ii) Deny the increase stating the reasons therefor.

5. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Sections 231 or 232 and is not designed primarily for occupancy by elderly persons, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any remaining unrented units may be rented to non-preferred applicants;

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over nonpreferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Through such further provisions agreed to in writing by the parties.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

6. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) ~~Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property~~
See Rider Paragraph B.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not

entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project; and

(5) No distribution shall be made when either (i) Owners are not current on their mortgage payment obligations under the note identified herein or under the mortgage as defined herein, or (ii) the mortgagor/owner of the project named Whitehall Manor Senior Living, located in Whitehall, Pennsylvania and designated as FHA Project No. 034-22084, is not current on its mortgage payment obligations under the HUD-insured note and mortgage with respect to such project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

See Rider Paragraph B.

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power

of sale, and fail to have such adverse actions set aside within forty-five (45) days.

9. (a) ~~Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project~~
See Rider Paragraph C.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents. See Rider Paragraph E.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary. See Rider Paragraph D.

(f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a financial institution, whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by

Inst. # 2012040240 - Page 6 of 15

paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(b) ~~If the mortgage is insured under Section 232:~~

~~(1) The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.~~

~~(2) The Owners shall suitably equip the project for nursing home operations.~~

~~(3) The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.~~

~~(i) If the mortgage is insured under Section 231: Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.~~

See Rider Paragraphs F, G and H.

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts 100, 107 and 110, and Subparts I and M of Part 200).

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the

Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage.

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

See Rider Paragraph I.

12. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to

collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

(d) "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing assisted living facility services and other activities as are incidental thereto;

(f) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project; and

(ii) All tenant security deposits held.

(g) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(h) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to its satisfaction within the time allowed by this

Agreement or such further time as may be allowed by the Secretary after written notice;

(i) "Section" refers to a Section of the National Housing Act, as amended.

(j) "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

(k) "Elderly person" means any person, married or single, who is sixty-two years of age or over.

See Rider Paragraph J.

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provisions of this Agreement shall not affect the validity or of the remaining portions thereof.

17. The following Owners:  Saucon Trust, u/t/a dated October 1, 2007, its trustees, present and future

do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

(To be executed with formalities for recording a deed to real estate.)

Inst. # 2012040240 - Page 8 of 15

[COUNTERPART SIGNATURE PAGE TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first set forth above.

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,
a trust formed under the laws of Pennsylvania

By:  SAUCON MANAGEMENT LLC,
a Pennsylvania limited liability company,
Trustee

By: _____
Name: Abraham R. Atiyeh
Title: Manager

STATE OF PENNSYLVANIA            )
                                 ) ss:
COUNTY OF _Lehigh_               )

On this ___ day of December, 2012, before me _Randi Lamb_, a Notary Public in and for said County and State, duly commissioned and sworn, personally appeared Abraham R. Atiyeh, known to me to be the person whose name is subscribed to the within Instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity on behalf of which the person acted, executed the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Certificate first above written.

_____
Notary Public in and for said County and State

My commission expires _11·15·2016_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Randi Lamb, Notary Public
City of Allentown, Lehigh County
My Commission Expires Nov. 15, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

[COUNTERPART SIGNATURE PAGE TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first set forth above.

Secretary of Housing and Urban Development, acting by and
through the Federal Housing Commissioner

By: _____

Catherine A. Worley
Authorized Agent
Office of Residential Care Facilities

ACKNOWLEDGEMENT

STATE OF WASHINGTON )
                     ) ss:
COUNTY OF KING       )

I certify that I know or have satisfactory evidence that Catherine A. Worley is the person who appeared before me, on this ___ day of December, 2012 and said person acknowledged that she signed this instrument, on oath stated that she was authorized to execute the instrument and acknowledged it as the Authorized Agent of the Secretary of U.S. Department of Housing and Urban Development, acting by and through the Federal Housing Commissioner, and the Director of the Production Division in the Office of Residential Care Facilities, U.S. Department of Housing and Urban Development, and that she, being authorized to do so by virtue of such office, executed the foregoing instrument on behalf of the Federal Housing Commissioner, acting for the Secretary of the U.S. Department of Housing and Urban Development, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal.

[SEAL]

_____
Notary Public

(Print Name) _____

Residing at _____

Title (and rank) _____

My commission expires: _____

LEAN Rider
to Regulatory Agreement for
Multifamily Housing Projects

This Rider is attached to, and made a part of that certain Regulatory Agreement for Multifamily Housing Projects dated December 1, 2012 (the "Agreement") by and between Saucon Trust, u/t/a dated October 1, 2007 ("Owners") and the Secretary of Housing and Urban Development (the "Secretary") with respect to Saucon Valley Manor, FHA Project No. 034-22096. In the event of any conflict between any provision of this Rider and any other provision of the Agreement, the provision of this Rider shall be controlling. The Agreement is hereby amended and supplemented as follows:

A.    Reserve Fund for Replacements. The following is hereby added to the end of the first subparagraph of paragraph 2(a) of the Agreement:

The amount of the monthly deposits to the reserve fund for replacements shall be subject to change in accordance with the requirements of the Secretary, but such change can be accomplished by a letter from HUD to the Owner and will not necessitate an amendment to the Agreement. In connection therewith, every ten (10) years, the mortgagor shall obtain a physical and capital needs assessment report from the Secretary to evaluate. The cost of such report may be paid from the reserve fund for replacements.

In addition to the required monthly deposits to the said reserve fund, Owners shall make an initial deposit in an amount not less than $345,000.00.

B.    Certain Matters Requiring Approval of the Secretary.

(1)    Paragraph 6(c) of the Agreement is hereby amended to read as follows:

(c) Convey, assign, or transfer any right to manage or receive the rents and profits from the mortgaged property.

(2)    The following is hereby added to the end of paragraph 6 of the Agreement:

(i)    Permit any conveyance, assignment, or transfer of any direct or indirect legal or beneficial interest in the Owners that requires approval of the Secretary under (i) the Secretary's transfer of physical assets requirements and procedures or (ii) the Secretary's previous participation approval requirements and procedures.

(j)    Enter into, or agree to the assignment of, any operating or commercial lease for all or part of the mortgaged property. As a condition of the Secretary's approval of any operating lease or any assignment thereof, the lessee or assignee, as applicable, shall execute a regulatory agreement in form and substance satisfactory to the Secretary.

(k)    Enter into any amendment of any operating or commercial lease of all or any part of the mortgaged property that (i) reduces the rent or other payments due thereunder, (ii) increases the obligations of the Owners or the rights of the lessee, (iii) decreases the rights of the Owners or the obligations of the lessee, or (iv) alters any provision of such lease required by the Secretary to be included therein.

(l)    Use the mortgaged property for any purpose other than the Approved Use.

C.    Management Contracts. Paragraph 9(a) of the Agreement is hereby deleted in its entirety and the following is substituted in lieu thereof:

(a)    Any management contract involving the project entered into by any of the Owners or any lessee shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate such management contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project. In addition to the foregoing, in the event that a management agent is

R-1

(or will be) the holder of the project's license or is (or will be) the payee under one or more third-party payor agreements with respect to the project, the provisions of paragraphs 6(j) and 6(k) of this Agreement shall be applicable to such management agreement as and to the same extent as if such management agreement were an operating lease.

D.  <u>Financial Statements</u>.  Paragraph 9(e) of the Agreement is hereby amended to replace "sixty (60) days" with "ninety (90) days."

E.  <u>Confidentiality of Resident/Patient Medical Records and Information</u>.  Paragraph 9(e) of the Agreement is hereby amended to add the following at its end:

(e)  . . . The obligations of Owners under this paragraph shall be limited to the extent necessary in order for Owners to comply with applicable laws regarding the confidentiality of resident/patient medical records and information.

F.  <u>Permits and Approvals</u>.  Paragraph 9(h) of the Agreement is hereby deleted in its entirety and the following is substituted in lieu therefor:

(h)(1)  The Owners shall at all times maintain in full force and effect, or cause the lessee or management agent (as applicable) to maintain in full force and effect, all certificates of need, bed authority, provider agreements, licenses, permits and approvals required to operate the project for the Approved Use (collectively, the "Permits and Approvals"). Without the prior written consent of the Secretary, none of the Permits or Approvals shall be conveyed, assigned, encumbered, transferred or alienated from the project. The Owners shall ensure that the project is at all times operated in accordance with the requirements of the Permits and Approvals.

(2)  The security agreement and UCC financing statements referred to in paragraph 9(i) below shall constitute, to the extent permitted by law, a first lien upon all of the Owners' rights, titles and interest, if any, in the Permits and Approvals. However, in the event of either a monetary or other default under this agreement, the note, or the mortgage, the Owners shall cooperate in any legal and lawful manner necessary or required to permit the continued operation of the project for the Approved Use. For the intents and purposes herein, Owners hereby irrevocably nominate and appoint the Secretary, his/her successors and assigns, as their attorney-in-fact coupled with an interest to do all things necessary to continue to operate the project for the Approved Use including but not limited to the power and authority to provide any and all information and data, pay such fees as may be required, and execute and sign in the name of the Owners, their successors or assigns, any and all documents, to the extent that such information, data, fees and documents may be required by any governmental entity exercising jurisdiction over the project.

(3)  The Owners shall not alter, or suffer or permit the alteration of, any Permit or Approval, without the prior written approval of the Secretary. In the event that any such alteration is proposed, upon learning of such proposed alteration, the Owners will advise the Secretary and mortgagee promptly. The Owners will insert the foregoing requirements into any operating lease for the project.

(4)  The Owners shall deliver to the Secretary and the mortgagee, within ten (10) days after receipt thereof, copies of any and all notices, reports, surveys and other correspondence (regardless of form) received by the Owners from any governmental authority that includes any statement, finding or assertion that (i) the Owners, any lessee, any management agent or the project is or may be in violation of (or default under) any of the Permits or Approvals or any governmental requirements applicable thereto, (ii) any of the Permits or Approvals are to be terminated or not renewed or (iii) the Owners are, or may be subject to, any governmental investigation or inquiry involving fraud. The Owners shall deliver to the Secretary and the mortgagee, simultaneously with delivery thereof to any governmental authority, any and all responses given by or on behalf of the Owners to such governmental authority and shall provide to the Secretary and the mortgagee, promptly upon request, such information regarding any of the foregoing as the Secretary or the mortgagee may request. The receipt by the

Secretary or the mortgagee of notices, reports, surveys, correspondence and other information shall not in any way impose any obligation or liability on the Secretary, the mortgagee or their respective agents, representatives or designees to take (or refrain from taking) any action, and the Secretary, the mortgagee and their respective agents, representatives and designees shall have no liability for any action or failure to act thereon or as a result thereof.

G.    Personal Property; Security Interests.  The following is hereby added to the Agreement as paragraph 9(i):

(i)    The Owners shall suitably equip, or cause to be equipped, the project for its use and operation for the Approved Use.  Except as otherwise approved in writing by the Secretary, the Owners shall grant to the mortgagee and the Secretary a first lien security interest in all personal property of the Owners as additional security for the obligations of the Owners under the note, mortgage and this agreement.  Such security interest shall be evidenced by such security agreements as the mortgagee and/or the Secretary may require and, in connection therewith, the Owners shall execute and deliver such deposit account control agreements as may be required by the mortgagee and/or the Secretary.  Owners hereby authorize each of the mortgagee and the Secretary to file such UCC financing statements and continuation statements as either of them may deem to be necessary or appropriate in connection with the foregoing security interest. The Owners shall not be permitted to grant any other liens on any of such personal property without the prior written approval of the mortgagee and the Secretary.  If the project includes a skilled nursing home and is not subject to an operating lease, the Owners shall be permitted to pledge their accounts receivable to an accounts receivable lender in a manner approved by the mortgagee and the Secretary.  In the event that the mortgagee and the Secretary grant such approval, (i) the holder(s) of such lien shall enter into an intercreditor agreement and a rider thereto with the mortgagee or the Secretary, or both, on such terms and conditions as may be required by the mortgagee and the Secretary and (ii) the Owners shall comply with any requirements imposed on them by the mortgagee or the Secretary (or either of them) in connection therewith.

H.    Professional Liability Insurance.  The following is hereby added to the Agreement as paragraph 9(j):

(j)    The Owners shall maintain, or cause the lessee or management agent (as applicable) to maintain, professional liability insurance that complies with the applicable requirements of the Secretary. Annually, the Owners shall provide, or cause the lessee or management agent (as applicable) to provide, to the Secretary and mortgagee, a certification of compliance with the Secretary's professional liability insurance requirements as evidenced by an Accord or certified copy of the insurance policy.

I.    Notices.  Notices sent pursuant to Paragraph 11 of the Agreement may be sent by registered or certified mail, hand delivery or by a nationally recognized overnight delivery service.

J.    Defined Terms.  The following definitions are hereby added to paragraph 13 of the Agreement:

(l)    "rent," "profits" and "income" shall include: all healthcare insurance receivables, rents, lease payments, revenues, charges, fees and assistance payments arising from the operation of the project, including but not limited to workers' compensation, social security and other third-party reimbursement payments, Accounts Receivable (as defined in the Collateral Description for the Security Agreement and UCC-1 Financing Statement for the Mortgagor) and all payments and income arising from the operation of the project and/or the provision of services to residents or tenants thereof.

(m)    "Approved Use" means the use of the project as a 250-bed assisted living facility and such other uses as may be approved in writing from time to time by the Secretary based upon a request made by the Owners, lessee or management agent, but excluding any uses that are discontinued with the written approval of the Secretary.

[To be executed and notarized by the Owners in the same manner as the Regulatory Agreement]

R-3

Inst. # 2012040240 - Page 13 of 15

[SIGNATURE PAGE TO LEAN RIDER TO REGULATORY AGREEMENT FOR
MULTIFAMILY HOUSING PROJECTS]

IN WITNESS WHEREOF, the undersigned has executed this Rider as of the date first set forth above.

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,
a trust formed under the laws of Pennsylvania

By: SAUCON MANAGEMENT LLC,
a Pennsylvania limited liability company,
Trustee

By:
Name: Abraham R. Atiyeh
Title: Manager

STATE OF PENNSYLVANIA )
                       ) ss:
COUNTY OF _Lehigh_     )

On this _6th_ day of December, 2012, before me, _Randi Lamb_, a Notary Public in
and for said County and State, duly commissioned and sworn, personally appeared Abraham R. Atiyeh, known to me
to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the
same in his authorized capacity, and that by his signature on the instrument the person or the entity on behalf of
which the person acted, executed the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this
Certificate first above written.

Notary Public in and for said County and State

My commission expires _11·16·2016_.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Randi Lamb, Notary Public
City of Allentown, Lehigh County
My Commission Expires Nov. 16, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

## EXHIBIT A

### LEGAL DESCRIPTION

UNIT 1 of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715
Being more fully bounded as set forth on attached page

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1. South 86'47'33" West 266.09 feet; thence in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;

2. North 03' 14'23" West 59.03 feet;

3. North 86' 41'33" East 18.00 feet;

4. North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same

5. North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same

6. South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:  117,610.588 Sq. Ft.     2.7000 Acres

12/06/2012 M917443 V.4

Exhibit J

Saucon Mortgage Loan

Inst. # 2012040239 - Page 1 of 11

# COUNTY OF NORTHAMPTON

### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 559-3877

Andrea F. Suter - Recorder
Dorothy J. Edelman - Deputy



**Book - 2012-1   Starting Page - 300709**
*Total Pages -  11

Instrument Number - 2012040239
Recorded On 12/13/2012 At 1:05:05 PM
* Instrument Type - MORTGAGE
Invoice Number - 727362
* Mortgagor - SAUCON TRUST
* Mortgagee - M&T REALTY CAPITAL CORPORATION
User - BLM
* Customer - SIMPLIFILE LC E-RECORDING

| NCGIS Registry UPI Certification |
| On December 13, 2012 By HG |

| * FEES | | *RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | OMEGA ABSTRACT |
| JCS/ACCESS TO JUSTICE | $23.50 | 512 W HAMILTON STREET |
| RECORDING FEES | $25.00 | ALLENTOWN, PA 18101 |
| AFFORDABLE HOUSING | $14.02 | |
| AFFORDABLE HOUSING - ADMIN FEE | $2.48 | |
| COUNTY RECORDS IMPROVEMENT FEE | $2.00 | I hereby CERTIFY that this document is recorded in the Recorder's Office Of Northampton County, Pennsylvania |
| DEEDS RECORDS IMPROVEMENT FEE | $3.00 | |
| UPI CERTIFICATION FEE | $10.00 | |
| TOTAL PAID | $80.50 | |

Andrea P. Suter
Andrea F. Suter
Recorder of Deeds

## THIS IS A CERTIFICATION PAGE

# Do Not Detach

### THIS PAGE IS NOW THE FIRST PAGE
### OF THIS LEGAL DOCUMENT

**Book: 2012-1**     **Page: 300709**

* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

00AEB9

Inst. # 2012040239 - Page 2 of 11

Return to:
Donald B. Lewis
Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street
Suite 3500, Great American Tower
Cincinnati, Ohio 45202

Url: Q7SW2A-1-3-0715

FHA Form No. 4151-b
(CORPORATE)
Rev. March 1971

# MORTGAGE

THIS MORTGAGE reads, as of the 1st day of December, 2012, between SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007, a trust formed under the laws of Pennsylvania, the Mortgagor and M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the state of Maryland and having its principal place of business at 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201, the Mortgagee.

In order to secure the payment of an indebtedness in the principal sum of Nineteen Million Four Hundred Sixty-Two Thousand Eight Hundred and No/100 Dollars ($19,462,800.00), lawful money of the United States, which sum or so much thereof as may be advanced with interest thereon at Two and one half percent (2.50%) per annum, is payable in accordance with the terms of a certain note bearing even date herewith as follows:

Interest only payable on the first day of January, 2013. Commencing on the first day of February, 2013, monthly installments of interest and principal shall be paid in the sum of Sixty-Nine Thousand Five Hundred Seventy-Eight and 58/100 Dollars ($69,578.58) each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full. In any event, shall be due and payable on January 1, 2043. The installments of interest and principal shall be applied first to interest at the rate of two and one half percent (2.50%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.

which note provides: (1) that privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due on the first day of any month upon thirty (30) days prior written notice to the holder; (3) that if the debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment thereof hereby agree to be jointly and severally bound to pay to the holder hereof any adjusted premium charge required by the applicable Regulations; (3) that notwithstanding any provision for a prepayment charge or premium, prepayments of principal made as aforesaid, which do not exceed an aggregate of fifteen per centum (15%) of the original principal sum of the note in any one calendar year, may be made without any prepayment charge or premium; and (4) that no default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal made pursuant to the privilege of prepayment equals or exceeds the amount of such required installment of principal; and (2) that in the event any installment or part of any installment due under the Note becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder of the Note, in addition to other sums due, a late charge in an amount equal to two percent (2%) of the amount of principal and/or interest so delinquent, as further provided in the Note.

And also to secure payment by the Mortgagor to the Mortgagee of all sums expended or advanced by the Mortgagee pursuant to any term or provision of this mortgage;

And also to secure performance of each covenant, term, condition and agreement of the Mortgagor herein contained and in a certain Building-Loan-Agreement-and-Regulatory Agreement hereinafter referred to;

The Mortgagor for valuable consideration, the receipt of which is hereby acknowledged, hath granted, bargained, sold, aliened, enfeoffed, released and confirmed, and by these presents doth grant, bargain, sell, alien, enfeoff, release and confirm unto the said Mortgagee, all the following-described real estate situate in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania; to wit:

See Exhibit A, attached hereto and incorporated herein by reference.

TOGETHER with all and singular the buildings and improvements on said premises, as well as all alterations, additions, or improvements now or hereafter made to said premises, and any and all appliances, machinery, furniture, and equipment (whether fixtures or not) of any nature whatsoever now or hereafter installed in or upon said premises, screens, alleys, passages, ways, waters, water courses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereunto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues and profits thereof; and

TOGETHER with all building materials and equipment now or hereafter delivered to said premises and intended to be installed therein; and

TOGETHER with all fixtures and articles of personal property now or hereafter attached to or in and about the building or buildings now erected or hereafter to be erected on the lands herein described which are necessary to the complete and comfortable use and occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods, chattels, and personal property as are ever used or furnished in operating a building, or the activities conducted therein, similar to the one herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner.

And the said Mortgagor, for itself, its successors and assigns does hereby covenant, promise, and agree with said Mortgagee, its successors and assigns, that all furnaces, heaters, ranges, mantels, cabinets, gas and electric light fixtures, elevators, laundry equipment, refrigerator, air-conditioning equipment, including all operating equipment, Murphy beds and all apparatus, appliances, and fixtures for the creation and distribution of light, heat, power, and water, including all pipes, wires, faucets, bathroom and kitchen fixtures of whatsoever kind and nature at present contained or hereafter placed in the building or hereafter standing upon the mortgaged premises and all structures, gas and oil tanks, screens, shades, awnings and Venetian blinds, storm doors and windows and equipment erected or placed in or upon the mortgaged premises are to be considered as annexed to and forming part of the freehold.

TO HAVE AND TO HOLD the said lot or piece of ground described, with the buildings and improvements thereon erected, the hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances unto the said Mortgagee, its successors or assigns, to and for the only proper use and behoof of the said Mortgagee, its successors or assigns forever;

Provided however that if said Mortgagor does and shall well and truly pay or cause to be paid unto the said Mortgagee, the aforesaid debt or principal sum secured by this mortgage, on the day and

2

Inst. # 2012040239 - Page 4 of 11

time and in the manner hereinbefore mentioned and appointed for payment of the same, together with interest and all sums advanced for payment of any ground rents, taxes, water rents, charges, claims or insurance premiums and any other advance hereunder as aforesaid, without any fraud or further delay and without any deduction, defalcation or abatement to be made of anything, for or in respect of any ground rents, taxes or water rents or charges or claims or advances whatsoever, then this mortgage and the estate hereby granted, shall cease and become void.

The Mortgagor covenants with the Mortgagee as follows:

1.     That the Mortgagor will deposit with the Mortgagee concurrently with payments of interest or of interest and principal, on the first day of each month after the date hereof until the said note is fully paid, the following sums:

(a)     An amount sufficient to provide the holder hereof with funds to pay the next mortgage insurance premium if this mortgage and the note secured hereby are insured, or a monthly service charge, if they are held by the Secretary of Housing and Urban Development, as follows:

(i)     If and so long as said note of even date and this mortgage are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the holder one month prior to its due date the annual mortgage insurance premium, in order to provide such holder with funds to pay such premium to the Secretary of Housing and Urban Development pursuant to the National Housing Act, as amended, and applicable Regulations thereunder, or

(ii)     Beginning with the first day of the month following an assignment of this mortgage and the note secured hereby to the Secretary of Housing and Urban Development, a monthly service charge which shall be an amount equal to one-twelfth of one-half per centum of the average outstanding principal balance due on the note computed for each successive year, beginning with the first of the month following such assignment, without taking into account delinquencies or prepayments.

(b)     A sum equal to the ground rents, if any, next due, plus the premium that will next become due and payable on policies of fire and other hazard insurance covering the mortgaged property, plus water rents, taxes and assessments next due on the mortgaged property (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rents, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, water rents, taxes, and special assessments.

(c)     All monthly installments of interest or of principal and interest and all payments mentioned in paragraphs (a) and (b) above shall be added together, and the aggregate amount thereof shall be paid by the Mortgagor each month in a single payment to be applied by the Mortgagee to the following items in the order set forth:

(i)     Premium charges under the contract of insurance with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner or service charge;

(ii)     Ground rents, taxes, water rents, assessments, fire and other hazard insurance premiums;

(iii)     Interest on the debt secured hereby; and

(iv)     Amortization of the principal of the debt secured hereby.

3

Provided that any excess funds accumulated under paragraph (b) above remaining after payment of the items therein mentioned shall be credited to subsequent monthly payments of the same nature required thereunder, but if any such item shall exceed the estimate therefor, the Mortgagor shall without demand forthwith make good the deficiency. Failure to do so before the due date of such item shall be a default hereunder. In case of termination of the contract of mortgage insurance by prepayment of the mortgage in full, or otherwise (except as hereinafter provided), accumulations under paragraph (a) above not required to meet payments due under the contract of mortgage insurance, shall be credited to the Mortgagor. If the property is sold under foreclosure or is otherwise acquired by the Mortgagee after default, any remaining balance of the accumulations under paragraph (b) above shall be credited to the principal of the debt as of the date of commencement of foreclosure proceedings or as of the date the property is otherwise acquired; and accumulations under paragraph (a) above shall be similarly applied unless required to pay sums due to the Secretary of Housing and Urban Development, acting by and through the Commissioner under the contract of mortgage insurance.

2.     That the Mortgagor will keep the improvements now existing or hereafter erected on the mortgaged property insured against loss by fire and such other hazards, casualties, and contingencies, as may be stipulated by the Secretary of Housing and Urban Development, acting by and through the Commissioner upon the insurance of the mortgage and other hazards and liabilities as may be required from time to time by the Mortgagee, and all such insurance shall be carried in such companies and be for such periods as may be required by the Mortgagee, and be in an amount which will comply with the coinsurance clause applicable to the location and character of the property but not less than eighty per centum (80%) of the actual cash value of the insurable improvements and equipment of the property and will pay when due any insurance premiums not provided for by monthly payments hereunder and in default thereof the Mortgagee may effect such insurance. Such policies shall be in standard form and endorsed with standard mortgagee clause with loss payable to the Mortgagee and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner as interest may appear, and shall be deposited with the Mortgagee; the insurance carrier shall be selected by the Mortgagor, subject to approval by the Mortgagee, which shall not be unreasonably withheld. If the premises covered hereby, or any part thereof, shall be destroyed or damaged by fire or other hazard against which insurance is held as hereinabove provided, the amounts paid by any insurance company or companies by reason of such damage, in pursuance of the contract or contracts of such lien or other hazard insurance, to the extent of the indebtedness secured hereby remaining unpaid, shall be paid to the Mortgagee, and, at its option, may be applied to the debt or released for the repairing or rebuilding of the premises.

3.     That the Mortgagor will keep said premises in as good order and condition as they now are, and will not commit or permit any waste of said premises, reasonable wear and tear excepted. If the Mortgagor shall refuse or neglect to make or cause to be made all necessary repairs on this mortgaged property, then at the option of the Mortgagee, such repairs may be made at the expense of the Mortgagor, and the cost thereof, with interest at the rate provided in the note secured hereby shall be added to and made a part of the principal debt secured hereby and shall be payable on demand.

4.     The Mortgagor shall have the right to advance and pay any ground rents, taxes, assessments, water rents, and all other charges and claims which are provided to be made by the Mortgagor in paragraphs 1(a) and (b) above, and to advance and pay any sums of money that in its or their judgment may be necessary to perfect or preserve the title of the premises covered hereby. Any amount or amounts so paid by the Mortgagee shall be added to the principal debt secured hereby, shall bear interest at the rate provided in the note secured hereby from the date of payment, and shall be payable on demand. The Mortgagee, at its option, shall be entitled to be subrogated in any lien, claim or demand paid by it, or discharged with money advanced by it and secured by this mortgage.

4

Inst. # 2012040239 - Page 6 of 11

5.    That so long as this mortgage and the said note secured hereby are insured under the provision of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the mortgaged property on the basis of race, color or creed.

6.    That so long as this mortgage and the note secured hereby are insured under the provision of the National Housing Act, or held by the Secretary of Housing and Urban Development, the Mortgagor will not rent dwelling accommodations in the mortgaged premises at rental rates in excess of the rates permitted by the Secretary of Housing and Urban Development, acting by, and through the Federal Housing Commissioner or for periods of less than one (1) month or in excess of three (3) years, nor rent the premises as an entirety.

7.    That the indebtedness secured by this mortgage represents funds to be used in the construction of certain improvements on the lands herein described, in accordance with a building loan agreement between the Mortgagor and the Mortgagee dated _____ 19__, a copy of which is attached hereto and made a part hereof (provided, however, that if and to the extent that said building loan agreement is inconsistent herewith this mortgage shall govern). If the continuation of the improvements to be made pursuant to said building loan agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any cause other than strikes or lock-outs, the Mortgagee after due notice to the Mortgagor, is any subsequent owner, is hereby vested with full and complete authority to enter upon the said premises to employ watchmen to protect such improvements from depredation or injury and to preserve and protect the personal property thereon, to continue any and all outstanding contracts for the erection and completion of said buildings or buildings, to make such note into any contracts and obligations wherever necessary either in its own name or in the name of the Mortgagor, or other owner, and to pay and discharge all debts, obligations and liabilities incurred thereby. All such sums so advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and shall be secured by this mortgage and shall be due and payable on demand with interest at the rate provided for in the note secured hereby, but no such advances shall be insured unless same are specifically approved by the Federal Housing Commissioner prior to the making thereof. The principal sum and other charges provided for herein shall, at the option of the Mortgagee or holder of this mortgage and the note secured hereby become due and payable on the failure of the Mortgagor, or other owner, to keep and perform any of the covenants, conditions and agreements of said building loan agreement. This covenant shall be terminated upon the completion of the improvement to the satisfaction of the Mortgagee and the making of the final advance as provided in said building loan agreement.

8.    That the Mortgagor will not voluntarily create or permit to be created against the property subject to this mortgage any lien or liens inferior or superior to the lien of this mortgage and further, that it will keep and maintain said property free from the claim of all persons supplying labor or materials which will enter into the construction of any and all buildings now being erected or to be erected on said property.

9.    That the improvements about to be made upon the premises above described and all plans and specifications comply with all municipal ordinances and regulations made or promulgated by lawful authority, and that the same will upon completion comply with all such municipal ordinances and regulations and with the rules of the Board of Fire Underwriters having jurisdiction.

10.    That the Mortgagor will not permit or suffer the use of any of the property for any purpose other than that for which the same is now agreed upon to be used; nor will it permit or suffer any alteration of or addition to the buildings or improvements hereafter constructed in or upon said property without the consent of the Mortgagee.

5

Inst. # 2012040239 - Page 7 of 11

11.    That the Regulatory Agreement, if any, executed by the Mortgagor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Mortgage. Upon default under the Regulatory Agreement and upon the request of the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, the Mortgagee, at its option, may declare the whole of the indebtedness secured hereby to be due and payable.

It is agreed that if at any time, a Writ of Fieri Facias or other execution is properly issued upon a judgment obtained upon the note secured hereby, or if an Action of Mortgage Foreclosure is brought or a Writ of Scire Facias is issued or other foreclosure proceedings instituted upon this mortgage, an attorney's fee commission for collection, viz five per centum (5.0%) of said principal debt or sum shall be payable, and shall be recovered in addition to all principal and interest and all other recoverable sums then due, besides costs of suit. The Mortgagor does hereby expressly waive and relinquish all benefit that may accrue to him by virtue of any and every law, civil or military, made or to be made hereafter exempting the mortgaged premises from attachment, levy and sale under execution.

It is further agreed that the holder of this mortgage, in any action to foreclose, shall be entitled to the appointment of a Receiver of the rents and profits of the mortgaged premises as a matter of right and without notice, with power to collect the rents, issues, and profits of said mortgaged premises, due and becoming due during the pendency of such Foreclosure suit, such rents and profits being hereby expressly assigned and pledged as additional security for the payment of the indebtedness secured by this mortgage, without regard to the value of the mortgaged premises or the solvency of any person or persons liable for the payment of the mortgage indebtedness. The Mortgagor for itself and any subsequent owner hereby waives any and all defenses to the application for a Receiver and hereby specifically consents to such appointment without notice, but nothing herein contained is to be construed to deprive the holder of the mortgage of any other right, remedy, or privilege it may now have under the law to have a Receiver appointed. The provision for the appointment of a Receiver of the rents and profits, and the assignment of such rents and profits, is made an express condition upon which the loan hereby secured is made. The rights and remedies herein provided for shall be deemed to be cumulative and in addition to, and not in limitation of, those provided by law.

It is also agreed that, for the purpose of procuring possession of said mortgaged premises to the Mortgagee, its successors and assigns, in the event of any default as defined below, the Mortgagor, for the Mortgagor and for the successors and assigns of the Mortgagor, does hereby authorize and empower any attorney of any court as attorney for the Mortgagor, and for the successors or assigns of the Mortgagor, to sign an agreement for entering in any competent court an amicable action or judgment in ejectment, without any stay of execution, against the Mortgagor, or the successors or assigns of the Mortgagor and against all persons claiming under the Mortgagor, or the successors or assigns of the Mortgagor and for the recovery by the Mortgagee, its successors or assigns, of possession of the mortgaged premises. In any such action, this mortgage or a copy thereof, verified by affidavit, shall be a sufficient warrant of attorney. Thereupon a Writ of Habere Facias Possessionem may issue forthwith without any prior writ or proceeding whatsoever. It is hereby expressly agreed that if for any reason after such action has been commenced the same shall be discontinued, marked satisfied of record or be determined, or possession of the mortgaged premises shall remain in or be restored to the Mortgagor, or the successors or assigns of the Mortgagor, the Mortgagee, its successors and assigns, shall have the right for the same default or in the event of any subsequent defaults, to bring on or more further amicable actions in the manner hereinbefore set forth to recover possession of the mortgaged premises. The Mortgagee, its successors and assigns, shall have the right to bring such amicable action in ejectment after an Action of Mortgage Foreclosure is brought or after the issuance of a Scire Facias or Mortgage or other foreclosure

6

proceedings are instituted upon this mortgage and after judgment thereon or therein, and after a sale of the mortgaged premises by the sheriff.

It is also expressly agreed that if the Mortgagor should fail to pay any installment of principal and interest or payment due pursuant to covenant one above within thirty (30) days after the due date of such installment or payment, or if the Mortgagor should fail to perform any of the terms, conditions or covenants of the mortgage, the note, the building-loan-agreement, or the regulatory agreement, such failure shall constitute a default and in every such case, the whole principal debt shall, at the option of the Mortgagee, become due and payable immediately, and it shall and may be lawful for said Mortgagee forthwith to bring an Action of Mortgage Foreclosure, to sue out of a Writ of Sales Facias, or to institute other foreclosure proceedings upon this mortgage, and to proceed to judgment and execution for recovery of said principal debt, all interest thereon, all sums advanced for payment of any ground rent, taxes, water rents, charges, claims or insurance premiums as aforesaid, and all other recoverable sums, together with an attorney's commission for collection, without further stay of execution or other process, any law, usage or custom to the contrary notwithstanding. The Mortgagor hereby waives and relinquishes unto and in favor of the Mortgagee, all benefit under the laws now in effect or hereafter passed to relieve the Mortgagor in any manner, or to reduce the amount of the note to any greater extent than the amount actually paid for the premises hereby mortgaged at the sale thereof in any judicial proceedings upon the said note or upon this mortgage.

Notwithstanding any other provision contained herein or in the Note, it is agreed that the execution of the Note shall impose no personal liability upon the Mortgagor for payment of the indebtedness evidenced thereby and in the event of a default, the holder of the Note shall look solely to the "Collateral" (defined below) in satisfaction of the indebtedness evidenced by the Note and will not seek or obtain any deficiency or personal judgment against the Mortgagor except such judgment or decree as may be necessary to foreclose and/or bar its interest in the Collateral, provided, that nothing in this condition and no action so taken shall operate to impair any obligation of the Mortgagor under the Regulatory Agreement herein referred to and made a part hereof. As used herein, "Collateral" shall mean and include (i) the property subject to this Mortgage, including, but not limited to, the land, improvements, equipment, personal property, and appurtenances thereto and the rents, issues and profits thereof, as set forth in this Mortgage and (ii) the collateral described in the Security Agreement of even date herewith given to further secure the Note between the Mortgagor and Mortgagee.

This mortgage and every covenant and agreement herein contained shall be binding upon and inure to the benefit of the Mortgagor and the Mortgagee and their respective successors and assigns and to the extent permitted by law shall bind every subsequent owner of the mortgaged premises.

[Signatures appear on following page]

GPO 913-217

7

Inst. # 2012040239 - Page 9 of 11

IN WITNESS WHEREOF, the Mortgagor has caused this instrument to be duly executed in its behalf by the Manager of its Sole Trustee as of the date first set forth above.

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007, a trust formed under the laws of Pennsylvania

By: SAUCON MANAGEMENT LLC, a Pennsylvania limited liability company, Trustee

By: _____
Name: Abraham R. Atiyeh
Title: Manager

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF ___Lehigh___

On this 12 day of December, 2012, before me, the undersigned officer, personally appeared Abraham R. Atiyeh who acknowledged himself to be the Manager of the Sole Trustee of Saucon Trust, u/t/a dated October 1, 2007, a trust formed under the laws of Pennsylvania, and that he, as Manager of the Sole Trustee, being authorized to do so, executed the foregoing instrument for the purpose therein contained by signing the names of the limited liability company and such trust.

_____
Notary Public in and for said County and State

CERTIFICATE OF RESIDENCE

```
NOTARIAL SEAL
TARA S PARETSKI
Notary Public
ALLENTOWN CITY, LEHIGH COUNTY
My Commission Expires Jun 30, 2016
```

I, Christine R. Chandler, do hereby certify that the correct address of the within-named Mortgagee is 25 South Charles Street, 17th Floor, Baltimore, Maryland 21201, witness my hand this _____ day of December, 2012 40.

_____
Christine R. Chandler, Vice President
(On behalf of the Mortgagee)

COMMONWEALTH OF PENNSYLVANIA

Loan No. 034-22096

Mortgage

SAUCON TRUST, U/T/A OCTOBER 1, 2007
TO
MAYTRAITY CAPITAL CORPORATION

COMMONWEALTH OF PENNSYLVANIA,
COUNTY OF

Recommence on this _____ day of _____ A.D._____
in the Recorder's Office of said County, in Mortgage Book,_____ Vol.____, Page____

Given under my hand and seal of the said office, the day and year aforesaid.

_____
Recorder.

Inst. # 2012040239 - Page 10 of 11

## EXHIBIT A

### LEGAL DESCRIPTION

UNIT 1 of 'Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

Inst. # 2012040239 - Page 11 of 11

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue;

1.     South 86°47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;
2.     North 03° 14'23" West 59.03 feet;
3.     North 86° 41'33" East 18.00 feet;
4.     North 03° 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same
5.     North 86° 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same
6.     South 03° 18'24" East 470.30 feet to the place of beginning.

CONTAINS:     117,610.588 Sq. Ft.     2.7000 Acres

MAY 0 9 2022

I hereby CERTIFY that this document is recorded in the
Recorder's Office Of Northampton County, Pennsylvania



*Andrea P. Suter*

Andrea F. Suter
Recorder of Deeds

*Dorothy J. Edelman*

Dorothy J. Edelman
Lead Deputy Recorder of Deeds

Exhibit K

Saucon Note

# MORTGAGE NOTE

**$19,462,800.00**

Hellertown, Pennsylvania
as of December 1, 2012

FOR VALUE RECEIVED, the undersigned, SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007, a trust formed under the laws of Pennsylvania hereinafter called the Maker, promises to pay to M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the state of Maryland or order, hereinafter designated as the Payee, the principal sum of Nineteen Million Four Hundred Sixty-Two Thousand Eight Hundred and No/100 Dollars ($19,462,800.00) with interest from date at the rate of two and one half per centum (2.50%) per annum on the unpaid balance until paid. The said principal and interest shall be payable in monthly installments as follows:

**Interest only payable on the first day of January, 2013. Commencing on the first day of February, 2013, monthly installments of interest and principal shall be paid in the sum of Sixty-Nine Thousand Five Hundred Seventy-Eight and 58/100 Dollars ($69,578.58) each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full. In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest, shall be due and payable on January 1, 2048. The installments of interest and principal shall be applied first to interest at the rate of two and one half percent (2.50%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid and the balance thereof shall be applied on account of principal.**

**See Rider to Mortgage Note attached hereto and incorporated by reference herein.**

Both principal and interest under this Note, as well as the additional payments set forth in the mortgage, shall be payable at the office of M&T Realty Capital Corporation, P.O. Box 64269, in Baltimore, Maryland 21264-4269, or such other place as the holder may designate in writing.

~~Privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days' prior written notice to the holder.~~ If this debt is paid in full while insured under the provisions of the National Housing Act, as amended, all parties liable for payment thereof agree to be jointly and severally bound to pay to the holder hereof such adjusted mortgage insurance premium as may be required by the applicable Regulations.

~~Notwithstanding any provision herein for a prepayment charge, such charge shall be applicable only to the amount of prepayment in any one calendar year which is in excess of fifteen per centum (15%) of the original principal sum of this Note.~~

Simultaneously with the execution of this Note the Maker has executed and delivered to the Payee a Mortgage secured upon certain premises situated in the county of **Northampton**, Commonwealth of Pennsylvania, more particularly described in the Mortgage. All of the terms, covenants, provisions, conditions, stipulations and agreements contained in said Mortgage to be kept and performed by the Maker are hereby made a part of this Note to the same extent and with the same force and effect as if they were fully set forth herein, and the Maker covenants and agrees to perform the same, or cause the same to be kept and performed, strictly in accordance with the terms and provisions thereof.

If default be made in the payment of any installment under this Note, and if such default is not made good prior to the due date of the next such installment, the entire principal sum and accrued interest shall at once become due and payable without notice, at the option of the holder of this Note. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

~~No default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal already made pursuant to the privilege of prepayment set forth in this Note equals or exceeds the amount of such required installment of principal.~~

All parties to this Note, whether principal, surety, guarantor or endorser, hereby waive presentment for payment, demand, protest, notice of protest and notice of dishonor.

The Maker does hereby empower any attorney of any court of record within the United States or elsewhere to appear for it, with or without a declaration filed, and confess judgment or judgments against it in favor of the Payee or any subsequent holder hereof, as of any term, for the entire unpaid principal of this Note, and all arrearages of interest thereon, together with costs of suit, attorney's fee ~~commission~~ of **five percent (5)%** for collection, and a release of all errors, on which judgment execution or executions may issue forthwith. The Maker hereby waives the right of inquisition on all property levied upon to collect the indebtedness evidenced hereby and does voluntarily condemn the same and authorizes the Prothonotary to enter such condemnation, and waives and releases all laws, now in force or hereafter enacted, relating to exemption, appraisement or stay of execution.

**[Signatures Appear on Following Page]**

R-2

IN WITNESS WHEREOF, the Maker has caused these presents to be executed ~~under seal the day and year first above written~~ on December ⟨⟨ , 2012, to be effective as of the date first set forth above.

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007, a trust formed under the laws of Pennsylvania

By: SAUCON MANAGEMENT LLC, a Pennsylvania limited liability company, Trustee

By: _____
Name: Abraham R. Atiyeh
Title: Manager

[SEAL]

Attest: _____

---

STATE OF PENNSYLVANIA

Loan No. 034-22096

Mortgage Note

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007

TO

M&T REALTY CAPITAL CORPORATION

No. 034-22096

Insured under Section 232 pursuant to Section 223(f) of the National Housing Act and Regulations published thereunder

In effect on September 27, 2012

~~To the extent of advances approved by the Secretary of Housing and Urban Development acting by and through the Federal Housing Commissioner~~

By _____
(Authorized Agent)

Date _____

A total sum of $19,462,800.00 has been approved for insurance hereunder by the Secretary of Housing and Urban Development acting by and through the Federal Housing Commissioner.

By _____
(Authorized Agent)

Date December 19, 2012

Reference is made to the Act and to the Regulations hereunder covering assignments of the insurance protection on this bond

HUD-Wash, D.C.

04737-R Rev. 3/71

Attest: _____
Carol A. O'Quinn
Assistant Vice President

M&T Realty Capital Corporation
Pay to the order of _____
_____ without recourse

By: Paula M. Quigley
Paula M. Quigley, Managing Director

## RIDER TO MORTGAGE NOTE

This Rider to Mortgage Note (this "Rider") is attached to and made a part of the Mortgage Note (the "Note") from SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007, a trust formed under the laws of Pennsylvania, (the "Maker"), to M&T REALTY CAPITAL CORPORATION, a Maryland corporation, dated as of December 1, 2012.

    1.    Prepayment. (a) Except as hereinafter set forth, Maker shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time. Maker shall have the right, on or after January 31, 2013 (the "Lockout Termination Date") to prepay the indebtedness evidenced hereby in whole or in part on the last business day of any calendar month on or after such date during the term hereof upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid. Such total amount shall include interest accrued through and including the last day of the month in which the prepayment is made. In the event of any prepayment of principal at any time on or after the Lockout Termination Date, the Maker shall concurrently pay to the holder of this Note (i) interest on the amount prepaid through and including the last day of the month in which the prepayment is made and (ii) a prepayment premium equal to the following designated percentages of the amount of the principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from January 31, 2013 through January 30, 2014 | 10.0% |
| from January 31, 2014 through January 30, 2015 | 9.0% |
| from January 31, 2015 through January 30, 2016 | 8.0% |
| from January 31, 2016 through January 30, 2017 | 7.0% |
| from January 31, 2017 through January 30, 2018 | 6.0% |
| from January 31, 2018 through January 30, 2019 | 5.0% |
| from January 31, 2019 through January 30, 2020 | 4.0% |
| from January 31, 2020 through January 30, 2021 | 3.0% |
| from January 31, 2021 through January 30, 2022 | 2.0% |
| from January 31, 2022 through January 30, 2023 | 1.0% |
| from January 31, 2023 and thereafter | 0.0% |

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, without the prior written consent of the holder of this Note (which consent such holder shall have no obligation to give) the Maker shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

(b)  Notwithstanding any prepayment prohibition imposed and/or premium required by this Note with respect to prepayments made prior to January 31, 2022, the indebtedness evidenced by this Note may be prepaid in whole or in part on the last business day of any calendar month without the consent of the holder of this Note and without prepayment premium if the Federal Housing Commissioner (the "Commissioner") determines that prepayment will avoid a mortgage insurance claim and is therefore in the best interests of the Federal Government. The holder of this Note understands that the Commissioner would consider exercising its right to override the prepayment prohibition and/or prepayment premium contained herein only upon satisfaction of all of the following terms and conditions:

(i)  Maker has defaulted under this Note and the Commissioner has received notice of such default, as required by 24 C.F.R. §207.256;

(ii)  The Commissioner determines that the project financed with the proceeds of this Note has been experiencing a net income deficiency, which has not been caused solely by management inadequacy or lack of interest by Maker, and which is of such magnitude that Maker is currently unable to make required debt service payments, pay all project operating expenses and fund all required HUD reserves;

(iii)  The Commissioner finds there is reasonable likelihood that Maker can arrange to refinance the loan evidenced by this Note at a lower interest rate or otherwise reduce the debt service payments through partial prepayment; and

(iv)  The Commissioner determines that refinancing the loan evidenced by this Note at a lower rate or partial prepayment is necessary to restore the said project to a financially viable condition and to avoid an insurance claim.

(c)  Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be collected by the holder of this Note, with respect to any prepayment which is made by or on behalf of the Maker from insurance proceeds as a result of damage to the mortgaged premises or condemnation awards which, at the option of the holder of this Note, may be applied to reduce the indebtedness of Maker evidenced hereby pursuant to the terms and provisions of the security instrument securing this note (the "Mortgage") of even date given by Maker to the holder of this Note to secure said indebtedness. Any prepayment made pursuant to this Paragraph 1(c) shall be deemed to have been made on the last day of the month in which such payment is received by holder and shall include interest on the amount prepaid through and including the last day of the month in which the prepayment is made.

(d)  Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be

collected by the holder of this Note, in the event that the maximum principal amount of this Note is reduced (or a partial prepayment is made) solely as the result of a mortgage reduction (or a partial prepayment) required by the Commissioner based upon any cost certification or other report required to be provided by the Maker to the Commissioner subsequent to the date hereof. Any prepayment made pursuant to this Paragraph 1(d) shall be deemed to have been made on the last day of the month in which such payment is received by holder and shall include interest on the amount prepaid through and including the last day of the month in which the prepayment is made.

2.     Late Charges. In the event any installment or part of any installment due under this Note becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder of this Note, in addition to other sums due hereunder, a late charge in an amount equal to two percent (2%) of the amount of principal and/or interest so delinquent. Whenever, under the law of the jurisdiction where the property is located, the amount of any such late charge is considered to be additional interest, this provision shall not be effective if the rate of interest specified in this Note, together with the amount of the late charge, would aggregate an amount in excess of the maximum rate of interest permitted and would constitute usury.

3.     Method of Payment. All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, and all late charges and other amounts required to be paid hereunder, other than regularly scheduled installments of interest, shall be made to the holder of this Note in immediately available Federal Funds. Payments received after 12:00 noon Eastern time will be deemed to have been received on the next following business day.

4.     LEAN Non-Recourse. Notwithstanding any other provision contained in this Note, it is agreed that the execution of this Note shall impose no personal liability on the Maker for payment of the indebtedness evidenced hereby, and, in the event of a default, the holder hereof shall look solely to the "Collateral" (defined below) in satisfaction of the indebtedness evidenced hereby and will not seek or obtain any deficiency or personal judgment against the Maker hereof except such judgment or decree as may be necessary to foreclose or bar its interest in the Collateral, except as set out in the Mortgage of even date given to secure this Note. As used herein, "Collateral" shall mean and include (i) the property subject to the Mortgage, including, but not limited to, the land, improvements, equipment, personal property, and appurtenances thereto and the rents, issues and profits thereof, as set forth in said Mortgage and (ii) the collateral described in the Security Agreement of even date herewith given to further secure this Note between Maker and the holder hereof.

**[Signature appears on following page]**

R-3

IN WITNESS WHEREOF, the undersigned Maker has executed this Rider as of the date first above written.

MAKER:

SAUCON TRUST, U/T/A DATED OCTOBER 1, 2007,
a trust formed under the laws of Pennsylvania

By: SAUCON MANAGEMENT LLC,
    a Pennsylvania limited liability company,
    Trustee

By: _____
Name: Abraham R. Atiyeh
Title: Manager

Exhibit L

Assignment to HUD

Inst. # 2022036070 - Page 1 of 7

# COUNTY OF NORTHAMPTON

## RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 829-6210

Andrea F. Suter - Recorder
Dorothy J. Edelman - Lead Deputy
Barbara L. Manteri - Deputy



**Book - 2022-1   Starting Page - 306345**
**\* Total Pages - 7**

Instrument Number - 2022036070
Recorded On 11/21/2022 At 11:33:26 AM

NCGIS Registry UPI Certification
On November 18, 2022 By SRM

\* Instrument Type - ASSIGNMENT OF MORTGAGE
Invoice Number 1047996
\* Grantor - M&T REALTY CAPITAL CORPORATION
\* Grantee - UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT
User - KABE
\* Customer - FIDELITY NATIONAL TITLE - WESTERVILLE (10043)

| \* FEES | | \* RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | FIDELITY NATIONAL TITLE - WESTERVILLE |
| JCS/ACCESS TO JUSTICE | $40.25 | (10043) |
| RECORDING FEES | $19.00 | 4111 EXECUTIVE PKWY, SUITE 30 |
| COUNTY RECORDS | $2.00 | WESTERVILLE, OH 43081 |
| IMPROVEMENT FEE | | |
| DEEDS RECORDS | $3.00 | |
| IMPROVEMENT FEE | | I hereby CERTIFY that this document is recorded in the |
| UPI CERTIFICATION FEE | $10.00 | Recorder's Office Of Northampton County, Pennsylvania |
| TOTAL PAID | $74.75 | |



Andrea F. Suter
Recorder of Deeds

**THIS IS A CERTIFICATION PAGE**

# Do Not Detach

**THIS PAGE IS NOW THE FIRST PAGE**
**OF THIS LEGAL DOCUMENT**



00IPI9

**Book: 2022-1        Page: 306345**

\* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

Inst. # 2022036070 - Page 2 of 7

1050 Main St. Unit #1 Hellertown 18055
Borrough Hellertown PA
Project No.: 034-22096
Project Name: Saucon Valley Manor
Location: Northampton County, Pennsylvania
Q 7 SW 24 - 1 - 3 - 0715

**ASSIGNMENT OF MORTGAGE**

Dated November 8, 2022, Effective as of November 16, 2022

KNOW ALL MEN BY THESE PRESENTS:

THAT, M&T REALTY CAPITAL CORPORATION, a corporation organized and existing under the laws of the State of Maryland, hereinafter referred to as the "Assignor", having offices at One Light Street, 12th Floor, Baltimore, Maryland 21202, for value received, does by these presents, without recourse, representation or warranty, except as hereinafter set forth, grant, bargain, sell, assign, transfer and set over unto the UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, his/her successors and assigns, hereinafter referred to as "Assignee", having offices at 451 7th Street, SW, Washington D.C., 20410, all right, title and interest in and to that certain:

Mortgage Note dated December 1, 2012, and Mortgage dated December 1, 2012, each executed by Saucon Trust, U/T/A Dated October 1, 2007, each being in the original principal amount of Nineteen Million Four Hundred Sixty-Two Thousand Eight Hundred and No/100 Dollars ($19,462,800.00), which Mortgage Note was made payable to M&T Realty Capital Corporation and which Mortgage Note is secured by a Mortgage recorded December 13, 2012, in Book 2012-1, at Page 300709 in the Office of the Recorder of Deeds of Northampton County, Pennsylvania.

SEE ATTACHED EXHIBIT "A" FOR A DESCRIPTION OF THE REAL PROPERTY.

TO HAVE AND TO HOLD the same unto said UNITED STATES SECRETARY OF HOUSING AND URBAN DEVELOPMENT, HIS/HER SUCCESSORS AND ASSIGNS.

THIS Assignment is without recourse or warranty, except that the undersigned hereby warrants that no act or omission of the undersigned has impaired the validity or priority of said Mortgage. The undersigned also warrants that said Mortgage is prior to all mechanics' and materialmen's liens filed of record subsequent to the recording of such Mortgage regardless of whether such liens attached prior to such recording date, and prior to all liens and encumbrances which may have attached or defects which may have arisen subsequent to the recording of such

Mortgage (except such liens or other matters as have been approved by the Assignee hereunder).
The undersigned also warrants that, as of the execution of this Assignment, the sum of Sixteen
Million Two Hundred Thirty-Eight Thousand Eight Hundred Sixty-Two and 47/100 Dollars
($16,238,862.47), together with the interest accruing at the rate of 2.50% per annum, as provided
in the said Mortgage Note and Mortgage, is actually due and owing under said Mortgage Note
and Mortgage, that there are no offsets or counterclaims thereto, and that the undersigned has a
good right to assign the said Mortgage Note and Mortgage.

[THIS SPACE INTENTIONALLY LEFT BLANK]

Inst. # 202036070 - Page 4 of 7

IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed on its behalf as of the date first above written.

**M&T REALTY CAPITAL CORPORATION**, a
Maryland corporation

By: _____
Name: Michael Angles
Title:  Senior Vice President

STATE OF MARYLAND          }
                           } ss.
CITY OF BALTIMORE          }

Before me, Melissa L. First _____, a Notary Public, in and for said City and State, on this day personally appeared **Michael Angles**, known to me to be the person whose name is subscribed to the foregoing instrument, and known to me to be the <u>Senior Vice President</u> of M&T Realty Capital Corporation, a Maryland corporation, and acknowledged to me that he executed said instrument for the purposes and consideration therein expressed and as the authorized act of said corporation.

Given under my hand and seal of office, this the 8th day of November, 2022.

_____
Notary Public
My Commission Expires:

MELISSA L. FIRST
Notary Public - State of Maryland
Baltimore County
My Commission Expires Apr 6, 2026

This instrument prepared by:      Ariel A. Mullin
                                  Vorys, Sater, Seymour and Pease LLP
                                  301 E. Fourth Street, Suite 3500
                                  Cincinnati, Ohio 45202

Inst. # 2022036070 - Page 5 of 7

## EXHIBIT A

### Legal Description

UNIT 1 of Condos at Saucon Valley Manor, also known as Saucon Valley Condominium, according to the Declaration of Condominium of Saucon Valley Condominium, also known as Condos at Saucon Valley Manor, as recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Record Book 2006-1 at page 507467

Together with an undivided interest of 40% of, in and to the Common Elements of the said CONDOS AT SAUCON VALLEY MANOR.

Together with an easement upon Unit 2 for encroachment of improvements and entry facilities, and dedicated parking, as provided in the Declaration of Condominium of CONDOS AT SAUCON VALLEY MANOR (see Exhibit B, page 3 of the Declaration)

BEING Northampton County, Pennsylvania Tax Parcel Q7SW2A-1-3-0715

Being more fully bounded as set forth on attached page

Borrough Helkertown
1050 Main St. unit #1
Helkertown, PA 18055

Inst. # 2022036070 - Page 6 of 7

## DESCRIPTION OF 1050 MAIN STREET

ALL THAT CERTAIN lot or tract of land situated on the west side of Main Street (S.R. 412) in the Borough of Hellertown, County of Northampton, and Commonwealth of Pennsylvania, being known as 1050 Main Street, also being Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, said plan recorded in the Northampton County Recorder of Deeds Office in Map Book Volume 20065 Page 759, bounded and described as follows to wit:

BEGINNING at the intersection formed by the westerly right of way line of Main Street with the northerly curb line of Sycamore Avenue; thence along the said northerly curb line of Sycamore Avenue

1. South 86'47'33" West 266.09 feet; thence-in and through land now or formerly of Abraham R. Atiyeh D.B.V. 2000-1 Page 14351 the following three courses and distances;
2. North 03' 14'23" West 59.03 feet;
3. North 86' 41'33" East 18.00 feet;
4. North 03' 13'52" West 411.34 feet to the southerly right of way line of Thomas Avenue; thence along the same
5. North 86' 48'59" East 247.48 feet to the westerly right of way line of Main Street; thence along the same
6. South 03' 18'24" East 470.30 feet to the place of beginning.

CONTAINS:    117,610.588 Sq. Ft.    2.7000 Acres

Inst. # 2022036070 - Page 7 of 7

**Certificate of Residence**

I do hereby certify that the correct address of the within-named Assignee is:

offices at 451 7th St. SW.
washington, PA 20410

SAUCON VALLEY MANOR
FHA PROJECT NO. 034-22096

## DOCUMENT CERTIFICATION

The document attached hereto is certified to be a true and correct copy of the original of the following document:

## ASSIGNMENT OF MORTGAGE

Naming the United States Secretary of Housing and Urban Development, his/her successors and assigns as Assignee
Dated November 8, Effective November 16, 2022

Was submitted to the Office of the Recorder of Northampton County, Pennsylvania (the "Recorder's Office") on November 16, 2022, but due to delays in processing for recording in the Recorder's Office, such was ultimately recorded on November 21, 2022, in Book 2022-1 at Page 306345.

Commonwealth Land Title Insurance Company

By: _____
Name: _____
Title: Authorized Agent